# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# MIDLAND-ODESSA DIVISION

SHELBY HAMMER,
ADRIANNE CLIFTON,
TODD FREESE, AND
CHRYSTAL MYERS,
            *PLAINTIFFS*,

v.

LAURA NODOLF;
MIDLAND COUNTY, TEXAS,
CITY OF MIDLAND, TEXAS, AND
JENNIE ALONZO
            *DEFENDANTS*.

CIVIL ACTION NO. 7:23-CV-158

**JURY TRIAL DEMANDED**

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE COUNTS:

Comes now Shelby Hammer, Adrianne Clifton, Todd Freese, and Chrystal Myers, Plaintiffs, by and through counsel, and file this civil rights action against Laura Nodolf individually; the City of Midland, Texas; Midland County, Texas; and Jennie Alonzo individually for Defendants' violations of the United States Constitution and the laws of the United States, and for cause of action would show the Court as follows:

## 1. BACKGROUND

1.     Plaintiffs Adrianne Clifton, Todd Freese, Shelby Hammer, and Chrystal Myers (the "Trinity Four") all have lengthy and distinguished careers as devoted educators. In

February 2022, the Trinity Four were working at Trinity School of Midland in Midland, Texas. Each of the Trinity Four is a beloved and respected member of their community.

2.      On February 25, 2022, in the middle of a school day and in the presence of students, employees, and parents, Defendant Jennie Alonzo had the Trinity Four arrested at Trinity School of Midland. They were handcuffed—hands behind their backs—and all but Plaintiff Hammer led through the front doors of the school to the waiting patrol cars.

3.      Adrianne Clifton and Todd Freese were escorted by uniformed, armed officers in front of the kindergarteners and first graders eating lunch. They were walked by parents bringing their children lunch.

4.      Chrystal Myers had to dodge upperclassman (including her own son) headed back to class from chapel services.

5.      After leading uniformed, armed police all over the campus in full view of students, employees, and parents, Shelby Hammer was also eventually arrested. Shelby was handcuffed in sight of at least one middle school class and teacher, the technology director, and the President of the Board of Trustees. She was walked in handcuffs with her hands behind her back to the patrol car.

6.      Prior to Plaintiffs' arrests, Defendant Alonzo approached Defendant Nodolf for marching orders on how to proceed with the case. Defendant Nodolf instructed Defendant Alonzo to arrest the Plaintiffs on the felony of failure to report child abuse with the intent to conceal, without conducting any further investigation.

7.     Accordingly, Defendant Alonzo obtained arrest warrants for each of the Trinity Four. Those warrants were based on an affidavit Alonzo executed. As detailed below, that affidavit contained multiple lies and serious material omissions. Those lies and omissions formed the basis for the eventual charges faced by all four: failure to report the sexual assault of a child with the intent to conceal—a horrific, potentially career-ending allegation. Had Alonzo's affidavit been truthful, there would not have been probable cause for an arrest in the first place.

8.     Immediately following the arrests of the Trinity Four, attorney Brian Carney showed up demanding to speak to the Plaintiffs. The police in charge called Defendant Nodolf, who told them not to allow Mr. Carney any visits. During this time, Plaintiff Myers asked for Mr. Carney to be present and was told that was not allowed, even though he was right outside. Myers then waived her Fifth Amendment rights and spoke to detectives. Plaintiff Clifton also asked to speak with Mr. Carney. She was urged to reconsider her request before being denied access to Mr. Carney. At Plaintiffs' criminal trial, Alonzo admitted as much, and that Defendant Nodolf gave her approval.

> A. I did not deny you [Mr. Carney] access. My supervisors who were there on scene, to include Lieutenant McCright, which Ms. Nodolf I believe was contacted in reference to you being there and wanting access to your clients, and they instructed whatever they had instructed to do. And I was instructed to continue on and interview whomever I was going to interview.[1]

---

[1] Testimony of J. Alonzo, *Texas v. Myers, et. al*, Cause No. CR58382 – 85, at 175 (142 Dist. Ct.; Midland County, TX, Apr. 25, 2023).

9.     Alonzo testified before the grand jury. Consistent with Defendant Nodolf's new policy not to record grand jury presentations in any way,[2] this presentation was not recorded or transcribed.

10.     This was the second case Ms. Nodolf's office presented against private school administrators for failure to report child abuse with intent to conceal. When the first case against five administrators from Midland Christian School (the "Midland Christian Five") was presented, no officers testified before the grand jury. The case was no-billed, and the Midland Police Department went into an uproar.[3] Following that no-bill, the Midland Municipal Police Officers Association released the following statement:

> "MMPOA (Midland Municipal Police Officers Association has historically been an advocacy organization. Most of our activities are focused on supporting our members as they serve their community. In fact, we cannot recall a single news release or official statement made by this association in at least the past eight years. The nature of these recent events compels the leadership of MMPOA to release this statement.
>
> There have been many who have commented on the facts or merits of this case without being privy to them. MMPOA will not be one of them. MMPOA does advocate for a relentless pursuit of truth, for sound investigations, and for fair and trustworthy processes. To that end, MMPOA has serious concerns about

---

[2] At one time, Defendant Nodolf had grand jury proceedings both videotaped and transcribed. The transcript and recording from one of her grand jury presentations revealed Nodolf herself had seriously misled the grand jury in that case when it issued an indictment for manslaughter. Nodolf's statements to the grand jury were brought up repeatedly in the trial itself. That case, which was State versus David Wilson (a case discussed more below), ended in an acquittal. After those memorialized grand jury proceedings from Wilson were so dramatically used against Nodolf, she instituted a policy that unless required by law the State's grand jury proceedings were to never be recorded or transcribed.

[3] Micah Allen, *Midland Municipal Police Officers Assoc. releases statement on Midland Christian*, CBS7 News (May 13, 2022), https://www.cbs7.com/2022/05/13/midland-municipal-police-officers-assoc-releases-statement-midland-christian/ (last visited Oct. 10, 2023).

the Grand Jury process as it was handled by the Midland County District Attorney's Office in this case.

It is difficult to "let the process work itself out" as Mayor Payton asked of the city when the Midland County District Attorney's Office does not have the lead detective from the Midland Police Department testify before the Grand Jury. Such testimonies are commonplace especially in sensitive, complex, or high-profile cases.

Not having the lead detective appear before the Grand Jury to present the case and answer questions from the Grand Jury does a disservice to all parties by potentially limiting the Grand Jury's ability to make a full and fair determination of probable cause.

Regardless, we, the members of MMPOA, will continue our efforts to selflessly, tirelessly, relentlessly and sacrificially serve our city. We are grateful to serve under a city leadership and with fellow citizens who support our efforts to keep our city safe.

-MMPOA"

11.     Not wanting a repeat of the controversy from the no-bill of the Midland Christian Five, when Plaintiffs' case went to the grand jury just months later, Alonzo took the stand. And this time, Plaintiffs got indicted.

12.     At Plaintiffs' grand jury presentation, Defendant Nodolf, Defendant Alonzo, and other co-conspirators were aware of Defendant Alonzo's knowing, reckless false averments. Upon information and belief, Defendant Alonzo, Defendant Nodolf, and co-conspirator assistant district attorneys conspired to, and did, present false information and recklessly misrepresented facts. Defendant Alonzo testified to the grand jury and upon information and belief testified consistently with her sworn affidavit. A more complete list is offered in the following section, but some of the biggest errors in that affidavit included:

a) Swearing that B.B. said her vagina had been touched or penetrated. This statement is categorically false. B.B. has never, ever, made this allegation in any context.

b) Swearing that B.B. said she had told Plaintiffs her vagina had been touched or penetrated. This statement is categorically false.

c) Omitting the fact that there was zero evidence indicating intentional concealment, an element which elevated the charge from a misdemeanor to a felony;

d) Failing to include Plaintiff Myers' protestations to law enforcement that B.B. never told any of them this.

e) Failing to include that Plaintiff Myers' in fact did file a report regarding the information they were told.

13.     The information and belief above are bolstered by the fact that co-conspirator district attorney Lively elicited this same false information from Defendant Alonzo at Plaintiffs' criminal trial:

Q. Did she disclose touching of her -- of a part of her genitals during the CAC interview?

A. Yes.

Q. Okay. And what would that be?

A. If I remember correctly, she said that he touched her -- and the word that she used was "vagina," over the clothes.

Q. Okay. And that's what she said?

A. Yes, ma'am.[4]

14.     All four Plaintiffs were indicted. All four immediately moved for speedy trials.

---

[4] Testimony of J. Alonzo, *Texas v. Myers, et. al*, Cause No. CR58382 – 85, at 20 (142 Dist. Ct.; Midland County, TX, Apr. 25, 2023).

15.     The Trinity Four waited well over a year before they went to trial. During that time,

B.B.'s parents emailed co-conspirator assistant district attorneys and Defendant Nodolf

directly at least seven confirmed times. B.B.'s mother was a personal friend of Defendant

Nodolf.

16.     Finally, at Plaintiffs' joint trial the State presented evidence for over a week in the

142nd Judicial District Court of Midland County, Texas. After eight days of trial, but before

the Trinity Four were even able to get to their case-in-chief, the District Attorney's Office

dismissed the case.

17.     The fallout from Defendants' illegal and unconstitutional actions has forever

changed the lives of the Trinity Four. Just hours after their arrests, local headlines read

*Affidavit States Trinity School Administrators Failed to Report Sexual Assault On Campus*[5] and

*Affidavits Describe Trinity School Admins' Failure to Report After a Student Reportedly Sexually Assaulted Another Student*[6]

18.     The mugshots of the Trinity Four were plastered all over the news starting in

February 2022 until the day the charges were dismissed in April 2023. The headlines

accompanying every story and mugshot painted the Trinity Four as deceitful educators,

---

[5] CBS7 Staff, UPDATE: Affidavit states Trinity School administrators failed to report sexual assault on campus, CBS7 News, Feb. 25, 2022, at 1, https://www.cbs7.com/2022/02/25/midland-police-department-arrests-four-administrators-trinity-school-midland-failure-report-with-intent-conceal-neglect-or-abuse/.

[6] NewsWest 9 Staff, Affidavits describe Trinity School admins' failure to report after a student reportedly sexually assaulted another student, NewsWest 9, Feb. 25, 2022, at 1, https://www.newswest9.com/article/news/crime/trinity-school-leaders-arrested-failure-report-intent-to-conceal-neglect-or-abuse/513-35ce3cdd-1ef5-4f4d-899c-a6b8a9bab9c7.

child abusers, predators, criminals, and overall horrible people. There was community outcry for all four to be thrown into prison, with some saying they should be "locked up and fed to the inmates." Those stories remain to this day. And they were all based on the false affidavit of Defendant Alonzo.

19.    Shelby Hammer, Adrianne Clifton, Todd Freese, and Chrystal Myers are now filing this lawsuit against Laura Nodolf, Midland County, Jennie Alonzo, and the City of Midland for depriving Plaintiffs of rights secured under the Constitution and Laws of the United States. They bring this case not only to vindicate their rights but also to hold accountable the government officials who violated them.

## 2. Jurisdiction and Venue

20.    This action is brought pursuant to 42 U.S.C. § 1983. The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

21.    Venue is proper in this Court under 28 U.S.C. § 1391(b), as the Western District of Texas, Midland-Odessa Division is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## 3. Parties

22.    Plaintiff Shelby Hammer is a resident of Midland County, Texas. She has a B.A. in History from Duke University, an M.Ed. in Private School Leadership from Columbia University, and a M.A. in History from the University of Alabama. She has over twenty years of experience as an educator. She was hired as the Head of School at Trinity in 2018.

Her son has graduated from Trinity, and her daughter was a Trinity student at the time of Shelby's arrest.

23.     Plaintiff Adrianne Clifton was reared in Midland, Texas, where she resides to this day. She has a Masters in Education from the University of Texas and at the time of the arrest was the Assistant Head of School for Administration / Director of Admissions at Trinity. Adrianne joined Trinity in 2008, but before that she was the principal at Santa Rita Elementary School in Midland for many years. Her reputation as an educator in Midland runs deep. Now, as the Associate Head of School, Adrianne helps with enrollment and financial aid; she helps international students submit their immigration forms; she helps craft school policies; and she helps ensure the school complies with federal grants. Because Adrianne has always worked in the front office as an administrator, she does not have any daily, structured contact with students.

24.     Plaintiff Todd Freese is a resident of Midland County, Texas. He has been an educator for over fifteen years. Before that, he was a pastor. At Trinity, Todd is the Middle School and Upper School Dean of Students. In that role, Todd provides support for the students, oversees student life and on-campus activities, and addresses student behavior. He joined Trinity in 2015 and is a fixture of the Trinity community, beloved by parents and students alike.

25.     Plaintiff Chrystal Myers is a resident of Midland County, Texas. She has a B.S. in Education, an M.S. in Curriculum and Instruction, and another M.S. in Educational Leadership, all from the University of the Southwest. She is a lifelong educator and is now

in her seventh year as Trinity's Head of the Middle School. As Head of Middle School, Chrystal is responsible for over 150 students. Additionally, Chrystal's daughter graduated from Trinity, and her son will graduate from Trinity in 2024.

26.     Defendant Laura Nodolf is the elected District Attorney for the Midland County, Texas. Nodolf is employed by the County of Midland as its elected district attorney who, at all times relevant to this action, was acting under the color of law and within the scope of her employment. Nodolf is the policy maker for the Midland County District Attorney's Office. Defendant Nodolf is sued in her individual capacity.

27.     Defendant Midland County, Texas, is a governmental unit existing under the laws of the State of Texas.

28.     Defendant City of Midland is a municipal corporation organized under the Constitution and laws of the State of Texas and located within the Western District of Texas, Midland-Odessa Division. The Midland Police Department (MPD) is a department operated by the City of Midland. Through its Chief of Police, MPD sets policy for its police officers. At all times relevant, Seth Herman acted as Chief of MPD.

29.     Defendant Jennie Alonzo is employed by the City of Midland as an MPD sergeant who, at all times relevant to this action, was acting under the color of law and within the scope of her employment. Defendant Alonzo is sued in her individual capacity.

## 4. Factual Background

### 4.1. The Relationship Between B.B. and T.F.

30.     In February of 2022, the Midland County District Attorney, Laura Nodolf, began arresting administrators at local private schools alleging felonious violations of Texas Family Code Section 261.109.

31.     Emboldened by the first round of arrests made at Midland Christian School, Darby Brown—a disgruntled former Trinity school parent—called and reported to police that her daughter (B.B.) had been "sexually assaulted" at Trinity by another student (T.F.). She claimed the school knew about the "sexual assault" and had not properly handled the situation.

32.     A forensic interviewer interviewed B.B. The by-then fifteen-year old B.B. said she had been "sexually assaulted," but indicated that, to her, a "sexual assault" was simply being touched in places she did not want to be touched or being touched without consenting.

33.     The forensic interviewer asked where, specifically, T.F. had touched B.B. B.B. told the interviewer that T.F. would grab her hips, waist, and chest; would grab or pinch her butt; and would hug her from behind—all on top of her clothes. B.B. reported that T.F. put B.B.'s hand on his penis (again on top of his clothes).

34.     B.B. told the interviewer that T.F. had asked if he could touch her butt, and T.F. said "sure" and that when he touched her chest she "started laughing." T.F. would text/Instagram direct message B.B. and verify whether he could continue touching her and

having her touch him in such fashions. She always told him he could. She told the interviewer, "I never really said no." "Mentally I was saying no, but I didn't actually."

35.     B.B. detailed for the interviewer the worst incident with T.F. B.B. said that in Spanish class one day, T.F. unzipped her pants and worked his way down her belly until he reached her panty line, at which point he moved his hand back up. She zipped up her pants and went on about her work.

36.     In response to the interviewer's questions, B.B. clarified—not once, but twice— that T.F. never even touched—much less penetrated—her vagina.

37.     At Plaintiffs' criminal trial, B.B. again confirmed that T.F. has never touched her genitals.

38.     T.F. would send nude pictures of himself to B.B. on B.B.'s social media. B.B would send pictures of herself in a bikini to T.F.

39.     At one point in December 2019, B.B. was called into Plaintiff Freese's office. At the time of that meeting, B.B. said she had not told anyone about her and T.F.[7]

40.     The interviewer never directly asked what information the student conveyed to Plaintiffs Clifton, Myers, or Hammer. At the Plaintiffs' criminal trial, it was made clear that B.B. spoke with Plaintiff Myers one time. B.B. never spoke with Plaintiffs Clifton or Hammer.

---

[7] Also in December 2019, B.B.'s father emailed Plaintiff Freese. B.B. had told her parents about T.F., which B.B.'s father memorialized in the email to Plaintiff Freese. In that email, B.B.'s father said T.F. had slapped and pinched B.B.'s buttock four times and had asked for B.B. to send pictures of her buttocks to T.F. Touching a buttock is not a reportable act.

41.     For their part, Plaintiffs all steadfastly maintain they were never told any of this information until after their arrests nearly two years later.

### 4.2. B.B. Was Never Sexually Assaulted

42.     Under Section 22.011 of the Texas Penal Code, a person commits sexual assault of a child if

> (2)     regardless of whether the person knows the age of the child at the time of the offense, the person intentionally or knowingly:
>
>> (A)     causes the penetration of the anus or sexual organ of a child by any means;
>>
>> (B)     causes the penetration of the mouth of a child by the sexual organ of the actor;
>>
>> (C)     causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor;
>>
>> (D)     causes the anus of a child to contact the mouth, anus, or sexual organ of another person, including the actor; or
>>
>> (E)     causes the mouth of a child to contact the anus or sexual organ of another person, including the actor.

43.     Based on both her descriptions to the forensic interviewer and her trial testimony, B.B. was never sexually assaulted.

### 4.3. Plaintiffs Did Report the One Reportable Incident They Discovered

44.     Under Section 261.101 of the Texas Family Code, if a professional has cause to believe a child has been a victim of the offense of indecency with a child, the professional

must, within forty-eight hours, report those suspicions to the Department of Family and

Public Services.[8]

45.     Indecency with a child occurs when a person:

> (1)     engages in sexual contact with the child or causes the child to engage in sexual contact; or

> (2)     with intent to arouse or gratify the sexual desire of any person:

>> (A)     exposes the person's anus or any part of the person's genitals, knowing the child is present; or

>> (B)     causes the child to expose the child's anus or any part of the child's genitals.

46.     "Sexual contact," in turn, is defined as "any touching of the anus, breast, or any

part of the genitals of another person with intent to arouse or gratify the sexual desire of

any person." Tex. Pen. Code Ann. § 21.01(2).

47.     B.B. did report *for the first time* in the forensic interview that T.F. had touched her

breast. This is sexual contact. *See* Tex. Pen. Code Ann. § 21.01(2). But the 2022 forensic

interview was the first time B.B. ever said anything about T.F. touching her breast to

anyone. Even B.B. herself agreed at Plaintiffs' criminal trial that she never mentioned to

any of the Plaintiffs her breast was supposedly touched.

48.     B.B. did not convey to any Plaintiff at any time that she had experienced anything

that is reportable under the Texas Family Code.

---

[8] The term "reasonable" was added to § 261.101 in 2021. Persons Required to Report in Acts 2021, 87th Leg., R.S., ch. 902 § 1, eff. Sept. 1, 2021. Following the amendment, a reporter must now have "reasonable cause" to believe that a child has been neglected or abused prior to the filing of any report. Tex. Fam. Code Ann. § 261.101.

49.   After she arrested Plaintiffs, Defendant Alonzo contacted CPS herself and reported Plaintiffs for knowing about indecency with a child committed on one of their students and failing to report that indecency to law enforcement or CPS with the intent to conceal it. CPS investigated Defendant Alonzo's allegations for over two months.

50.   Ultimately, CPS concluded there was not even a preponderance of evidence that any of the Plaintiffs had done anything wrong. CPS noted that B.B. had not made any outcry to Plaintiffs. It closed the investigation, ruling out any wrongdoing by Plaintiffs.

### 4.4.   PER DEPARTMENT POLICY, DEFENDANT ALONZO IMMEDIATELY INVOLVED DEFENDANT NODOLF

51.   As with all high-profile cases, Defendant Alonzo took this case to Defendant Laura Nodolf and sought investigative direction. This, according to Chief Herman, is Midland Police Department's "policy" on all high-profile cases.

52.   Similarly, through its own policy-maker Defendant Nodolf, the Midland County District Attorney's Office had its own policy of involving itself in the police-side of investigations before they were concluded. During the two years preceding this lawsuit, Defendant Nodolf involved herself and advised local law enforcement co-conspirators on numerous occasions. All of this prior to probable cause being formed.

53.   Defendant Nodolf implemented and practiced these policies through her own actions. When pressed about this by local lawyers, Ms. Nodolf denies involving herself in investigations because "it would jeopardize [her] immunity."

54. According to Alonzo's sworn testimony, she knew that she immediately was dealing with a high-profile situation and well-respected members of the community. Just one week before arresting the Trinity Four, Defendant Alonzo had similarly arrested the Midland Five.[9] The Midland Five were arrested on Friday, February 18, 2022. According to Alonzo, on Tuesday, February 22, she became aware of a former Trinity student (B.B.) alleging she was sexually assaulted on Trinity campus.

55. That Tuesday, February 22, 2022, B.B. had gone through a forensic interview at the Child Advocacy Center (CAC - detailed below). Alonzo observed that interview. She also spoke with B.B.'s parents together for a little over an hour. She did not conduct any additional investigation into B.B.'s allegations.

56. On Wednesday or Thursday Alonzo went to Defendant Midland County District Attorney Laura Nodolf and asked what Ms. Nodolf wanted her to do.

57. Defendant Nodolf instructed Alonzo to do with the Trinity Four exactly what Alonzo had done with the Midland Five—to make arrests and then conduct any additional investigation afterwards. From Plaintiffs' criminal trial transcript:

> Q. So you, Ms. Nodolf, Ms. Lively, Sergeant Sharp had a meeting of the minds, and all four of you together decided, you know, not only is this a failure to report but it's a felony version of it, right?
>
> A. Yes, sir.
>
> Q. And then as you told us, the D.A.'s office told you to get the warrants?
>
> A. They said, "Handle this case the way you handled the last one."

---

[9] Those actions are now also subject to a 42 U.S.C. § 1983 case, pending in the Court. *Lee et al. v. Midland et al.*, No. 7:22-CV-185 (W.D. Tex.).

Q. Before doing any investigation?

A. Yes, sir.

Q. Before talking to any other witnesses?

A. Yes, sir.

Q. Just take this girl and her mother's word for it, and let's roll?

A. Yes, sir.

Q. Is that how you would want to be treated if you were accused of something? Would you want them to go get the other side, see if there's maybe exculpatory or, you know, evidence that might be helpful to you?

A. So the way we were treated in the first case –

Q. I'm sorry, that's not my question.

A. Well –

Q. How would you want to be treated?

A. Yes, sir, I would want them to get both sides of the story. But I did what I was advised to do.

Q. And you did what you were told to do by her?

A. Not just her.

Q. And Ms. Nodolf?

A. Yes, sir.[10]

58.     Defendant Alonzo presented B.B.'s CAC interview and her interview of B.B.'s parents to Defendant Nodolf and other members of the District Attorney's Office and asked, "What do you want us to do with the case?"[11]

59.     In Defendant Alonzo's view, there were several options, any of which she would have taken: she could have written it up and left it internally with the police department,

---

[10] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 119-120.

[11] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 184.

"never touch it again." She could have "grand juried" the case, or directly filed the case without arresting the Trinity Four, and if so she could have filed it as a misdemeanor or a felony.[12]

> Q. And you could have done that or got a grand jury subpoena before you arrested them, right? Yes?
>
> A. Not in this case, I did not.
>
> Q. You could have?
>
> A. I could have. That's not what I was advised to do.
>
> Q. By who?
>
> A. The district attorney's office.
>
> Q. So the D.A.'s office told you, "Charge these people, and we'll figure it out later"?
>
> A. The D.A.'s office told me to get the warrants.
>
> Q. Who specifically told you?
>
> A. It was stated to handle the case the same way I handled the last one.
>
> Q. Who?
>
> A. Laura.
>
> Q. Your elected district attorney?
>
> A. Yes, sir.
>
> Q. And "Laura" means Laura Nodolf, right?
>
> A. Yes, sir.[13]

---

[12] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 183-84.

[13] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 106-107.

60.     When presented with these options, Defendant Nodolf gave Defendant Alonzo her "marching orders,"[14] and those were to cease investigation and file the case as a felony.[15]

> Q.     Your actions in this case were to arrest four people without having all the information, correct?
>
> A.     Yes, sir.
>
> Q.     And that was done at the direction of the district attorney?
>
> A.     Yes, sir.[16]

61.     Accordingly, Alonzo did not conduct any further investigation. Instead, she executed one-sided, untruthful affidavits alleging each one of the Trinity Four had committed felonies and omitting any information indicating otherwise; obtained the warrants; and had all four very publicly arrested. This occurred on February 25, 2022, which was the Friday of the same week of B.B.'s allegation.

62.     At Plaintiffs' criminal trial, an emotional Defendant Alonzo admitted if she had it to do over again, she would not follow such instructions from Defendant Nodolf:

> Q. I mean, not that you don't. But, I mean, you feel like you're a lone ranger out here, correct?
>
> A. Yes, sir.
>
> Q. Upsetting?
>
> A. Yes, sir.
>
> THE COURT: Do you have a Kleenex?
>
> Q. (BY [Defense counsel]) Feel like you're not getting any support?

---

[14] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 168.

[15] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 161.

[16] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 178.

A. Yes, sir.

Q. Sorry, Jennie. You understand, though, despite that, the frustration my clients feel?

A. Yes, sir.

Q. And the repercussions that they've suffered?

A. Yes, sir.

Q. If you had to do this all over again, would you do it?

A. No, sir.[17]

### 4.5. Defendants refused to indict another educator, even though the grand jury requested it

63.    Upon information and belief, the State sold the grand jury a lie. That lie (which was first laid out in Defendant Alonzo's affidavit) is that B.B. told Plaintiff Freese that she had been sexually assaulted in a meeting that occurred in December 2019. There was a meeting in Plaintiff Freese's office where B.B. discussed her and T.F.'s relationship. Plaintiff Freese, however, was not alone during that meeting. Another educator, who was B.B.'s designated "safe person," was also present for the entire meeting.[18]

64.    If the State thought B.B. recounted a reportable offense and that Plaintiff Freese was criminally liable for not reporting what B.B. said in that meeting, then the "safe person" should have also faced that same criminal liability, as she was exposed to exactly the same thing as Plaintiff Freese. The grand jury asked to consider indicting her as well.

---

[17] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 185.

[18] This eyewitness educator testified at Plaintiffs' criminal trial on Plaintiffs' behalf and recounted that during this meeting, B.B. did not report any conduct by T.F. that was a "reportable offense." Defendants did not even interview this educator until after Plaintiffs' arrests and indictments.

65.     The prosecutor in charge of the case contacted Defendant Nodolf, informing her of the grand jury's wishes. Rather than giving the grand jury what it wanted, Defendant Nodolf instructed the prosecutor to inform the grand jury that the decision to bring them a case was solely at the discretion of the District Attorney's Office, and they would not be offering the "safe person" for the grand jury's consideration.

66.     It also came out at trial that B.B.'s mother "despised" Plaintiff Clifton. So Clifton, who literally sat in a corner for one parent meeting regarding school policy, got indicted while the "safe person" who sat through the exact same meeting as Plaintiff Freese did not.

### 5. Defendant Alonzo's Arrest Warrant Affidavit

#### 5.1. The Affidavit's Multiple Factual Inaccuracies and Material Omissions

67.     Defendant Alonzo intentionally, knowingly, or with reckless disregard for the truth misled the magistrate in the following material ways.

68.     Defendant Alonzo's arrest warrant affidavit was identical for all four Plaintiffs.

69.     To create probable cause, Defendant Alonzo lied in her affidavit claiming B.B. "stated suspect's hand did touch her vagina."

70.     In truth, B.B. told the forensic interviewer—not once but twice—that the other student had never touched her vagina.

71.     To create probable cause, Alonzo lied in her affidavit claiming that on January 15, 2020, Plaintiff Chrystal Myers was made aware of an indecency with a child and failed to report it.

72.     In truth, Myers did make a report to CPS when she was notified that the student (T.F.) had sent a picture of his genitals to B.B. This report was made on January 23, 2020, confirmation #605757al. Nothing about this report was included in Defendant Alonzo's affidavit.

73.     Defendant Alonzo omitted from her affidavit that shortly after the arrests, she interviewed Plaintiff Myers. Myers informed Defendant Alonzo the only thing B.B. ever told her was that T.F. "swatted" her on her backside, which is not a reportable offense. Myers continued that no other child confirmed this nor did any camera footage. Nevertheless, the school separated B.B. and T.F. But Myers made clear no other touching had occurred. This flat-footed denial is completely absent from Alonzo's affidavit.

74.     Additionally, at trial, the forensic interviewer confirmed that B.B. never said the other student had touched her vagina.

75.     Below are additional material falsehoods and omissions in the remainder of the affidavit:

| AFFIDAVIT | TRUTH |
| --- | --- |
| [B.B.] had to tell Freese in detail what had occurred. Todd Freese **was notified** on this day of the offense of Indecency with a child Texas Penal Code PC 21.11. This offense is an offense listed in the Texas Family Code section 261.101 as an offense that has a duty to report by professionals. Mr. Freese did not report the offense to a state agency which is in a violation of Texas Family Code section 261.109 which is a state jail felony. | The forensic interviewer never asked B.B. what she actually told Plaintiff Freese. To the extent B.B. explained her use of the term "everything," she did not describe telling Plaintiff Freese about an indecency with a child—just butt grabbing. B.B. never explicitly said she told any Plaintiff about her vagina being touched or breast being grabbed. |

| | B.B. admits in the same answer that her "parents still didn't even know because [she] hadn't told anyone"[19] |
|---|---|
| However, she [B.B.'s mother] and the father of [B.B.] decided to contact Freese via email that has been provided to me. **Freese claims that he did not receive the email.** | As Defendant Alonzo later confirmed, the email did in fact go to Plaintiff Freese's junk folder. He did not "claim" anything; this is true. |
| But Freese also stated it was a "he said. she said situation", **downplaying the incident.** | Freese searched diligently for camera footage to support B.B.'s claims of butt grabbing in the gym—the only thing he was told about. At that point it truly was a "he said, she said." Plaintiff Freese did not downplay the incident. |
| On this date [Jan. 15, 2020] is when Myers **was made aware** of the Indecency with a child Texas Penal Code PC 21.11. This offense is an offense listed In the Texas Family Code section 261.101 as an offense that has a duty to report by professionals. Myers did not report the offense to a state agency which is in a violation of Texas Family Code section 261.109, which is a state jail felony. | B.B. did not tell her parents anything so B.B.'s parents did not know about an indecency allegation. Consequently, they did not make Plaintiff Myers "aware" of that. In truth, neither B.B. nor her parents ever told any Plaintiff about conduct amounting to indecency with a child. |
| On January 22, 2020, [B.B]'s mother had an interview with Hammer about sexual misconduct. The Assistant Head for Admin/Director of Admission - Adrianne Clifton was present and took notes by hand on a legal pad. At this point Hammer and Clifton **are aware** of the Indecency with a child Texas Penal Code PC 21.11. This offense is an offense listed in the Texas Family Codes section 261.101 as an offense | B.B. did not tell her parents anything so B.B.'s parents did not know about an indecency allegation. Consequently, they did not make Plaintiffs Clifton or Hammer "aware" of that. In truth, neither B.B. nor her parents ever told any Plaintiff about conduct amounting to indecency with a child. |

---

[19] B.B. CAC Interview at 21:09.

| | |
|---|---|
| that has a duty to report by professionals. Myers did not report the offense to a state agency which is in a violation of Texas Family Code section 261.109, which is a state jail felony. | |
| [B.B.]'s parents stated Trinity School wanted them to sign this document agreeing they would not come after the school, for the "incident". [B.B.]'s parents hired an attorney to assist them with this process. Ultimately, [B.B.]'s parents gave up and did not to want to take the right away from her to talk about what happened to her. | The waiver and settlement agreement sent to the B.B.'s family did not contain any language prohibiting B.B. or her family from contacting police, media, or anyone else about the "incident." It did include a confidentiality clause requiring the terms of the waiver and release to remain confidential as consideration for the refund otherwise nonrefundable tuition. It also prohibited them from disparaging Trinity School. Contrary to the implication in the affidavit, the terms of the agreement allow B.B. and her family to "talk about what happened to her." |

### 5.2. Even if Everything in the Affidavit was True, No Reasonable Officer Would Believe Probable Cause Existed to Justify the Arrests

76.     Even if Defendant Alonzo's arrest warrant affidavits were not riddled with lies and omissions, no reasonable officer would believe that the information could establish probable cause to arrest the Plaintiffs.

77.     Although required by the law, Defendant Alonzo only included the phrase "cause to believe," one time in the introductory paragraph of her warrant affidavit where she explained the elements of the offense. Her affidavit never attributes to any Plaintiff anything more than being "notified" or "made aware," standards far less than the required

"cause to believe." In this way, Defendant Alonzo also conspired with Defendant Nodolf to, and did, mislead the magistrate—a non-lawyer Justice of the Peace.[20]

78.     The affidavit also fails to account for the longstanding legal principle that the act and the intent must occur simultaneously.[21] Thus, any failure to report in December of 2019 or January of 2020 could not have been done with the intent to conceal because the only reference to concealment is the proposed waiver and release of all claims, which was not received by B.B.'s family until September of 2020.

79.     Defendant Alonzo also failed to describe with particularity as to each Plaintiff how their conduct met the "intent to conceal" element. Put simply, there has never been any evidence that any of the Plaintiffs tried to conceal anything. The only possible reference in the affidavit is to Plaintiff Hammer who upon the school attorney's recommendation "sent" a proposed confidentiality agreement, which did not cover the (non-existent) "sexual assault" between B.B. and T.F.[22]

---

[20] Honorable David M. Cobos, Personal Information, *available at* https://www.txdirectory.com/online/person/?id=14751&office=14751 (last visited Oct. 11, 2023).

[21] *See, e.g.*, *Morissette v. United States*, 342 U.S. 246, 274, 72 S. Ct. 240, 255, 96 L. Ed. 288 (1952) (quoting *People v. Flack*, 26 N.E. 267, 270) ("'It is alike the general rule of law, and the dictate of natural justice, that to constitute guilt there must be not only a wrongful act, but a criminal intention. Under our system, (unless in exceptional cases,) both must be found by the jury to justify a conviction for crime. . . .'").

[22] The trial court in Plaintiffs' criminal trial ruled the agreement inadmissible under Tex. R. Evid. 408. Both the Trinity School of Midland and the B.B.'s family were represented by counsel in relation to this release and waiver agreement.

80.     Defendant Alonzo had to allege failure to report *with intent to conceal* for two important reasons. First, even if B.B. had said anything, the only time B.B., her mother, or her father spoke with any of the Plaintiffs was in December 2019 and January 2020. B.B.'s mother reached out to police in February 2022. Simple failure to report has a two-year statute of limitations.[23] In order to get around the statute of limitations, Defendant Alonzo had to plead the "failure to report" in a way that would increase the statute of limitations time period. The only way to do that was to add the "with intent to conceal" element.[24]

81.     Second, Defendant Nodolf had instructed Defendant Alonzo to bring back felony charges.[25] Simple failure to report is a misdemeanor. Failure to report with intent to conceal, however, is a felony.[26]

82.     At no point has there ever been any indication whatsoever that Plaintiffs tried to conceal anything. Plaintiffs Clifton and Hammer never even met with B.B. directly. A complete search of Trinity's school server revealed Plaintiff Clifton never sent or received even a single email on T.F. and B.B.

---

[23] *See* Tex. Code Crim. Proc. Ann. art. 12.02 ("charging instruments may be presented within two years from the date of the commission of the offense, and not afterward").

[24] Tex. Code Crim. Proc. Ann. art. 12.01 (limiting felony prosecutions to "three years from the date of the commission of the offense [for] all other felonies.").

[25] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 161.

[26] Tex. Fam. Code Ann. § 261.109(c) ("An offense under Subsection (a-1) [failure to report] is a Class A misdemeanor, except that the offense is a state jail felony if it is shown on the trial of the offense that the actor intended to conceal the abuse or neglect.").

83.     Nevertheless, on February 25, 2022, the four Trinity Administrators were handcuffed and perp walked out of the school at around 11 am in front of their colleagues and students—some of whom were their own children.

84.     Following the arrests and subsequent investigation, upon information and belief, District Attorney Laura Nodolf and Alonzo made the same misrepresentations to a grand jury, recklessly and callously disregarding the rights of Plaintiffs, allowing a malicious prosecution to commence against them.

85.     Even after the trial court excluded the prosecution's only evidence of concealment (the waiver and release), upon information and belief, District Attorney Nodolf conspired with assistant district attorneys to continue the already-malicious prosecution knowing they did not have any evidence to prove the concealment element of the case.

86.     As a result of the Defendants' continued misrepresentations, Plaintiffs were subjected to the arrest, indictment, and humiliation of a highly publicized criminal trial, which has permanently affected their standing in the Midland community and in the educator community at large. But for Defendants' conduct, Plaintiffs would not have suffered these harms.

### 6. Defendant Nodolf's Pattern and Practice of Acting Far Outside the Bounds of District Attorney

87.     Prosecutors are usually absolutely immune from civil liability. Under *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), however, prosecutors are not immune when performing "administrative duties and . . . investigatory

functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings."

88.    Prosecutors are absolutely immune only "for their conduct in 'initiating a prosecution and in presenting the State's case' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" *Burns v. Reed*, 500 U.S. 478, 486, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (citations omitted) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430-31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

89.    "In sum, prosecutors are not entitled to absolute immunity when "'functioning as the equivalent of a detective rather than as an advocate preparing for trial.'" *Wooten v. Roach*, 964 F.3d 395, 407 (5th Cir. 2020) (quoting *Cousin v. Small*, 325 F.3d 627, 632–33 (5th Cir. 2003) (per curiam).

90.    Relevant here, giving legal advice to police during the investigation phase of a case forfeits the protection of absolute prosecutorial immunity. *See Burns*, 500 U.S. at 482, 111 S.Ct. 1934.

91.    Similarly, an elected district attorney who advises law enforcement during the investigation, orders arrests, and at least conspires to have citizens arrested on affidavits lacking probable cause based on recklessly incomplete and/or false information is not entitled to qualified immunity. *Wearry v. Foster*, 33 F.4th 260 (5th Cir. 2022).

92.    Finally, a district attorney who misleads or conspires to mislead a grand jury in the same way as a constitutionally defective warrant affidavit also waives her immunity. *Wilson v. Stroman*, 33 F.4th 202 (5th Cir. 2022).

93.     As set out below, Defendant Nodolf has a long history of involving herself in the investigative phase of offenses, advising the police pre-probable cause, and conspiring to and violating citizens' constitutional rights, just as she has to Plaintiffs here.[27]

## 6.1.   State v. Megan McMurry

94.     The following is a factual summary of Megan McMurry's case:

In October 2018, Megan and Adam McMurry lived in a gated apartment complex in Midland, Texas with their daughter and son, J.M. and C.M. Ms. McMurry was a teacher at Abell Junior High School, part of the Midland Independent School District. Mr. McMurry served in the National Guard and was then deployed to Kuwait and Syria. J.M. was fourteen years old and homeschooled online and C.M. was twelve years old and attended AJHS at the time of the events of this case.

While Mr. McMurry was deployed, Ms. McMurry was away exploring teaching opportunities in Kuwait from October 25 to October 30, 2018; she arranged for her neighbors, Gabriel and Vanessa Vallejos, to look after J.M. and C.M., as they had done before when she was away. Mrs. McMurry also arranged for coworkers to take C.M. to school.

The day after Mrs. McMurry left, the school counselor scheduled to drive C.M. to school fell sick and asked an MISD police officer, Alexandra Weaver, if she could drive C.M. while Ms. McMurry was out of town. Weaver did not take C.M. to school, but the counselor got another AJHS faculty member to drive C.M. Meanwhile, Weaver opened an investigation into the children's welfare, and told her supervisor, Officer Kevin Brunner, of her conversation with the counselor. Brunner met in turn with other faculty members who, while confirming that Ms. McMurry was traveling, also told Brunner that neighbors were checking on the children.

Weaver meanwhile filed a complaint against Ms. McMurry with the Texas Department of Family and Protective Services (CPS). Brunner and Weaver then traveled to the McMurry apartment to conduct a welfare check on J.M. Brunner

---

[27] In fact, following Plaintiffs' arrests, co-conspirator law enforcement officers grew so skeptical of advice and orders given by Nodolf, numerous co-conspirator officers began surreptitiously recording phone calls and in-person verbal interactions with her. To be clear, police officers were recording the elected DA, Defendant Nodolf, because they did not trust the advice and counsel she was giving.

asked J.M. when Ms. Vallejos last checked on her and J.M. said Ms. Vallejos had been over that morning.1 The officers told J.M. that they would be taking her to another location. J.M. texted her father that the police were at the McMurry apartment.

The officers took J.M. to the apartment complex's conference room for further questioning and ordered J.M. not to respond to her father who repeatedly called and texted her. J.M. told an apartment complex staff member that she wanted to reach her father, but when the staff member told the officers this, Brunner refused to let J.M. call her father. Brunner called Ms. Vallejos and asked her to meet them at AJHS. Brunner and Weaver then took J.M. to the junior high school in the backseat of their police car. Ms. Vallejos called J.M., but Brunner told J.M. that she could not take the call.

At the school, Brunner placed J.M. in an office. The Vallejoses came and spoke to Brunner, stating that they had last seen the children the night before. The Vallejoses were then allowed to see J.M. and they Facetimed Mr. McMurry. That afternoon, CPS investigated the status of the children but found no neglect or unreasonable risk of harm and sent the children home with the Vallejoses.

Brunner nonetheless continued his investigation and filed probable cause affidavits on December 2 and 4, 2018, to obtain an arrest warrant for Ms. McMurry. In January 2020, a jury acquitted Ms. McMurry of the charges of abandoning or endangering her children.

After the acquittal, the McMurrys sued Brunner under 42 U.S.C. § 1983. J.M. asserted that Brunner violated her Fourth Amendment right to be free from unreasonable seizures.[28]

95.    The district court held that Officer Brunner was not entitled to qualified immunity.[29]

The Fifth Circuit affirmed. The United States Supreme Court recently denied a writ of certiorari.[30]

---

[28] *McMurry v. Brunner*, No. 21-50888, 2022 WL 17493708, at *1–2 (5th Cir. Dec. 7, 2022), cert. denied, 143 S. Ct. 2567 (2023).

[29] *Id.*

[30] *Id.*

96.     The district court also held that Officer Brunner could not invoke the independent intermediary doctrine to rely on the grand jury's indictment to establish he had acted reasonably. The Fifth Circuit affirmed. The United States Supreme Court denied a writ of certiorari.[31]

97.     The Fifth Circuit explained the reason Officer Brunner could not rely on the independent intermediary doctrine:

> Brunner's invocation of the independent intermediary doctrine is unavailing as his probable cause affidavit—presented to the grand jury—contained information that Brunner did not know when he removed J.M. The grand jury was presented with information obtained in an investigation that continued after Brunner removed J.M., namely how long it had actually been since Ms. Vallejos last checked on J.M. And it is significant that the affidavit omitted the fact that Mr. McMurry was available and trying to communicate and Brunner knew this. Given the asymmetry of information presented to the grand jury and information known to Brunner at the time of the alleged misconduct, the indictment of Ms. McMurry did not ratify Brunner's actions as reasonable, a conclusion refuted with an acquittal by a fully informed jury. The independent intermediary doctrine does not apply.[32]

98.     According to both she and her trial counsel, Defendant Nodolf violated Mrs. McMurry's constitutional rights in the following ways:

a) Ordered her arrest on less than probable cause and based on false or recklessly misleading information in violation of the Fourth Amendment;

b) Deliberately withheld material information concerning Officer Brunner's violent history as a police officer, including either resigning or being terminated from his previous law enforcement position in New York due to unlawful use of force;

---

[31] *Id.*

[32] *Id.* at *4.

c) Either personally or under her direct instruction presented the same false and recklessly misleading information from McMurray's arrest warrant affidavit to the grand jury on one or more occasions;

d) Intentionally delayed her constitutionally guaranteed Sixth Amendment right to a speedy trial by;

e) Knowingly securing two defective indictments in order to prolong the prosecution;

f) When she finally secured an indictment that would survive a motion to quash, Defendant Nodolf realized she could not prove a case based on the evidence;

g) Defendant Nodolf then dumped the case onto one of her assistant district attorneys. That assistant district attorney repeatedly told McMurry and her counsel that she did not want to prosecute the case, but Nodolf was making her;

h) On the eve of the actual trial setting, upon information and belief, Nodolf and her assistant conspired to delay yet again by claiming the assistant district attorney was ill and could not be in court, even though the assistant was still working and emailing McMurry's lead detective the very day she was "out sick"—something only discovered later during Mrs. McMurry's pending civil litigation against the City of Midland.

## 6.2. State v. David Wilson

99.    David Wilson had a home security system that malfunctioned in the early morning hours of March 5, 2019. The malfunction indicated someone had tripped an alarm at Mr. Wilson's home even though no one had done so. The home was actually secure. There was no beeping, alarm, or any kind of notice given to Mr. Wilson that the alarm was malfunctioning, and the alarm company did not call Mr. Wilson to check on him. Instead, and unknown to Mr. Wilson, the alarm company dispatched police to a "POOL OH Door burglary" at Mr. Wilson's home.

100.   Neither the alarm monitoring company nor the police ever contacted—or even attempted to contact—Mr. Wilson by phone.

101.   When officers arrived at the home, they opened the front door, briefly looked around, and closed it. When they opened the front door a second time, Mr. Wilson— protecting his three young daughters, wife, and himself—fired one shot in the direction of the front door, striking and killing MPD Officer Nathan Heidelberg.

102.   At no point before the shot was fired did anyone attempt to let Mr. Wilson know that police had been dispatched to his house.

103.   Mr. Wilson did not know that the person at his front door was an officer until he was taken into custody several minutes after the shooting.

104.   Immediately afterwards, MPD sent almost every available officer to respond to the scene at Mr. Wilson's home.

105.   After ordering everyone outside, in full tactical gear, police then "cleared" the home by conducting a protective sweep.

106.   Mr. Wilson was arrested and transported to the Midland Police Department— where, over the next several hours, he gave a complete statement to investigating officers.

107.   At some point that evening, law enforcement contacted Defendant Nodolf.

108.   After being contacted by law enforcement, Defendant Nodolf and co-conspirators known and unknown, physically went to Mr. Wilson's home with multiple people who appear (on video) to be investigators employed by Nodolf's office.

109. Even though the home had already been cleared and secured by MPD's SWAT Team and even though Mr. Wilson was already in custody, Nodolf walked inside Mr. Wilson's home and perused around it. This was after the house had been swept and secured but before she or law enforcement sought a warrant to search the home.

110. Mr. Wilson's home surveillance system captured the illegal search:



**Defendant Nodolf walking through the area between**
**Mr. Wilson's dining room and living room:**



**Defendant Nodolf is looking at something on the table in Mr. Wilson's dining room**



**Defendant Nodolf still perusing Mr. Wilson's dining room**



**Defendant Nodolf, standing in Mr. Wilson's dining room, appears to be having a discussion with a Texas Ranger (to her right, wearing the hat) and Midland Police Officers**

111.     The same Texas Ranger testified at Mr. Wilson's criminal trial that it was not uncommon for Defendant Nodolf to arrive at the scene of a potential offense. He additionally testified that he and Defendant Nodolf went into Mr. Wilson's house without a warrant.

112.     Mr. Wilson's home surveillance system also captured Nodolf alongside six police officers searching the inside of Wilson's home several hours before seeking and obtaining a search warrant.

113.     After she was done at Mr. Wilson's home (and still before seeking or obtaining any arrest or search warrant), Defendant Nodolf went to the police station where Mr. Wilson was waiting. At the station, Defendant Nodolf again actively participated in the investigation.

114. Texas Ranger Allen testified at Mr. Wilson's criminal trial that he would step out of the interrogation room with Mr. Wilson to go ask Defendant Nodolf which questions she wanted him to ask. At that point, no warrant had issued. Defendant Nodolf was getting heavily involved in the investigation before a case had been filed.

115. Upon information, belief, and footage from Mr. Wilson's surveillance system, at Defendant Nodolf's direction, co-conspirator employees of the District Attorney's Office drove Defendant Nodolf to and from Mr. Wilson's home and to the interrogation location.

116. After several months of investigation, Ranger Allen and Defendant Nodolf could not find cause for the alarm malfunction nor could they find any contract between Mr. Wilson and the alarm company regarding whether he was to be contacted when an alarm went off. In fact, there was no contract at all between Mr. Wilson and the alarm installation and monitoring company.

117. Nevertheless, in May 2019, when presenting Mr. Wilson's case to the Grand Jury, Nodolf claimed Mr. Wilson was entirely to blame for creating the deadly situation leading to Officer Heidelberg's death. Most of Defendant Nodolf's grand jury presentation was recorded by video camera. On video, one can see Ms. Nodolf showing off her custom made bullet proof vest to the grand jurors.

118. Defendant Nodolf contended Mr. Wilson had, in a written contract, instructed the alarm company to not call him before dispatching police and that he therefore had no right to claim he was surprised by police showing up to his house unannounced. As established by a recording of the grand jury presentation later handed over to Mr. Wilson's defense

attorneys, to be sure she got her point across, Nodolf held up some document and suggested to the grand jury it was the non-existent "contract" Mr. Wilson supposedly signed.

119.   During the same grand jury presentation, Defendant Nodolf told the grand jury that the acoustic panels on the ceiling in the living room of the home were made to amplify sounds. This was an important matter because Officer Heidelberg had entered through a door leading into Mr. Wilson's living room. Those acoustic panels are not designed to amplify sound, as Defendant Nodolf told the grand jury. To the contrary, the man who had the house built testified at Mr. Wilson's criminal trial that those panels are designed to absorb sound.

120.   On May 2, 2019, the grand jury indicted Mr. Wilson for manslaughter.

121.   After being called out for some of these false statements to the grand jury during pretrial hearings, Defendant Nodolf ceased recording grand jury presentations as a matter of policy.

122.   Mr. Wilson's case was set for trial to begin November 1, 2021.

123.   On October 28, 2021, Ms. Nodolf and two co-conspirator assistant district attorneys presented a new case, to a different grand jury, and obtained an indictment for murder. Upon information and belief, Defendant Nodolf and her co-conspirators misled this grand jury exactly like Mr. Wilson's first grand jury: making materially false statements regarding the alarm, the home, and the facts of what happened. This presentation was not recorded or transcribed.

124.     Upon information and belief, Defendant Nodolf was not ready for Mr. Wilson's trial and had been dilatory in her pretrial preparation, so she used a murder indictment hoping to bait Mr. Wilson's defense team into a continuance. Indeed, Defendant Nodolf even mentioned wanting a continuance during an emergency final pretrial and murder arraignment hearing. She, again, was intentionally interfering with a defendants' right to a speedy, public jury trial in violation of the Sixth Amendment.

125.     Wilson's team did not take the bait and demanded a speedy trial. In December 2021, Mr. Wilson went to trial on charges of Officer Heidelberg's murder. He was quickly acquitted.[33]

### 6.3.  State v. Jared Lee et al.

126.     The "Midland Christian Five," is a case with several nearly identical facts as the instant one. The civil rights lawsuit stemming from these criminal charges is pending in this Court, with The Honorable Barbara Lynn presiding.[34] This case is not only similar, it, in a way, is what started everything with the instant case.

127.     The Midland Christian Five consist of five career educators from Midland Christian school–a private Christian School in Midland: Jared Lee, Dana Ellis, Matthew Counts, Gregory McClendon, and Barry Russell. There was a false rumor going around the school

---

[33] For personal reasons, Mr. Wilson chose to not seek 42 U.S.C. Section 1983 relief against Defendant Nodolf.

[34] *See Lee et al. v. City of Midland et al.*, Cause No. 7:22-CV-00185-BL, Plaintiffs' First Amended Complaint (W.D. Tex. Dec. 6, 2022).

that a sexual assault had occurred in the locker room. The Five investigated the allegations and determined they were, in fact, totally and completely false. Nevertheless, Defendant Alonzo conducted a very biased "investigation" into the incident.

128.    At the conclusion of the "investigation," Alonzo filed sworn warrant affidavits and criminal complaints for failure to report child abuse with the intent to conceal. Those documents, which Alonzo swore to under oath, omitted overwhelming evidence supporting the conclusion that the Five had come to–that there was no reportable abuse. Those sworn statements also contained flat-out falsehoods. Alonzo, alongside two other officers with Midland Police Department, charged the Five not just with failure to report (a misdemeanor) but with intentionally concealing the abuse (a felony).

129.    Nevertheless, with the ill-gotten affidavits in hand, Alonzo and her colleagues handcuffed, arrested, and perp walked the Five on the school campus on a Friday morning. The media had been alerted, so the arrests and charges were extremely public. In fact, they made international headlines. This very public arrest is what alerted B.B.'s mother to the idea that maybe she could get the police to publicly arrest educators who she held personal grudges against at the other big Christian private school in town (Trinity).

130.    Approximately three months later, the grand jury no-billed each one of the Midland Christian Five.

131.    The Five brought a 42 U.S.C. § 1983 suit against the City of Midland, Alonzo, and other officers, and that case is still pending.

132. Just days after the Five filed their 1983 Complaint, they were arrested again for failure to report child abuse with intent to conceal regarding a different child. As part of the Midland Christian Five II criminal case, the trial court conducted a *Brady* hearing. At the hearing, the following was revealed by Lt. Rosemary Sharp, Defendant Alonzo's supervisor:

a) Alonzo has been promoted to Sergeant following these incidents;

b) Defendants Nodolf and Alonzo had "many" meetings regarding both Midland Christian cases, as well as Plaintiffs' criminal case, prior to seeking arrest warrants. Co-conspirators Sharp and Lively were present;[35]

c) Sharp sought advice from the District Attorney's Office prior to probable cause regarding the waiver and settlement agreement because she "didn't know what a gag order was";[36]

d) Sharp confirmed the "policy" of taking high-profile cases to Defendant Nodolf for her to direct law enforcement on how to proceed;[37]

e) Sharp confirmed Defendant Nodolf instructed Defendant Alonzo to "get warrants for the [Plaintiffs] rather than fully investigating the case."[38]

133. Finally realizing these cases lacked merit, Defendant Nodolf recused her office from the second Midland Christian case. Within weeks, the newly appointed prosecutor

---

[35] *State v. Lee, et. al*, Cause No. CR58386, Transcript of Rosemary Sharp, *Brady* Hearing at 52, 57, 64 (441st Dist. Ct. of Midland Cty., Tex. July 21, 2023).

[36] *Id.* at 71.

[37] *Id.* at 42.

[38] *Id.* at 66.

dismissed these remaining cases, saying the facts "DOES [sic] NOT MEET THE ELEMENTS OF OFFENSE," in the dismissals.[39]

### 6.4. STATE V. CLINTON YOUNG

134.    Clinton Young was convicted of kidnapping and double murder and sentenced to death in 2003 in Midland County. After years of post-conviction litigation, in October 2017, the Midland County District Attorney's Office sought, and obtained, a death warrant. Mr. Young moved to withdraw the warrant, alleging among other things that his conviction was based on the perjured testimony of David Page, a co-conspirator. Mr. Page had been bragging in prison that he was actually the one who had committed the slayings and he had successfully framed Mr. Young. The presiding judge set the matter for a hearing, bench warranting David Page back to Midland County.

135.    As detailed in his 2020 Application for Writ of Habeas Corpus, once Mr. Page was back in Midland County Jail, Defendant Nodolf, ever the want-to-be detective, took it upon herself to privately interview Mr. Page, without notifying anyone on Mr. Young's team that she was doing so. In a recording of that interview, Mr. Page is memorialized admitting to Defendant Nodolf that he had in fact perjured himself on several key topics at Mr. Young's trial.

136.    Defendant Nodolf did not turn this information over.

---

[39] *Id.*, Motion and Order to Dismiss (Sept. 18, 2023).

137.	Instead, Defendant Nodolf continued to *actively oppose* Mr. Young's request to withdraw the death warrant. The Court of Criminal Appeals later stayed Mr. Young's execution on different grounds. At that point, Defendant Nodolf dumped the case on a different prosecutor, who turned over the significant *Brady* evidence of Mr. Page's recorded statements. Mr. Young came within eight days of being executed. His conviction was later overturned.

### 6.1. OTHER CONDUCT EVIDENCING NODOLF'S PATTERN AND PRACTICE OF DOING FAR MORE THAN A DISTRICT ATTORNEY SHOULD

138.	Moonlighting, Defendant Nodolf has also participated in "sting" operations, occuring at hotels in the Western District of Texas. Defendant Nodolf provided food and beverages to law enforcement co-conspirators and her assistant district attorney co-conspirators, while she either chatted online or texted with suspects and future defendants to lure them to the hotel to be arrested for cyber and sex crimes. Upon information and belief, she would also provide legal counsel to law enforcement co-conspirators.

139.	In one instance (and upon information and belief, likely more), Defendant Nodolf even acted as the decoy prostitute (a/k/a the "Jane") in a prostitution sting where her office would later prosecute the defendant.

## 7. Causes of Action

### Count 1:
### False Arrest in Violation of the Fourth and Fourteenth Amendments pursuant to Malley v. Briggs

140.    All preceding paragraphs are incorporated herein by reference.

141.    Plaintiffs have a clearly established constitutional right under the Fourth Amendment to be secure in their persons, homes, and property against unreasonable seizure and *to not have a warrant issued for their arrests without probable cause*. U.S. Const. amend. IV (emphasis added). As the Supreme Court of the United States has plainly stated, "[w]here the standard is probable cause, a . . . seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

142.    The Fourteenth Amendment also protects against the deprivation of liberty without due process of law.

143.    Pursuant to 42 U.S.C. § 1983, every person who, under color of any statute, ordinance, regulation, custom or usage of any State, subjects, or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the parties injured in an action for redress.

144.    Each Defendant is a "person" within the meaning of 42 U.S.C. § 1983.

145.    As a direct result of Defendants' conduct, Plaintiffs were falsely arrested, charged, indicted, and faced trial for failure to report with intent to conceal, despite the absence of

probable cause to establish that each had committed a crime. Defendants' conduct, as described above, deprived Plaintiffs of their rights to be secure in their persons against unreasonable seizure, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. Section 1983.

146.    Normally, a police officer who has been civilly sued is entitled to a "good faith" defense if that officer had sought an arrest warrant from a magistrate. *Malley v. Briggs*, 475 U.S. 335, 339 (1986). That is, if the officer reasonably believes the information he or she provided to the magistrate was sufficient to establish probable cause, the officer cannot be held liable for damages if, later on, it turns out the information was incorrect. *Id.* As long as the officer's belief in the validity of the warrant was objectively reasonable, they are protected from civil liability. *Id.* On the other hand, if no officer of "reasonable competence" would have sought the warrant, then the officer's error in executing that warrant constitutes gross incompetence and neglect of duty. *Id.* at 345. When an officer's neglect of duty rises to the level of deliberate violation of rights or a clear departure from acceptable professional standards, they are not entitled to the shield of qualified immunity. *Id.*

147.    Each Defendant, jointly, severally, or both, deprived Plaintiffs of their rights under the Fourth Amendment as incorporated and applied to the states through the Fourteenth Amendment. Each Defendant also jointly, severally, or both, deprived Plaintiffs of due process in violation of the Fourteenth Amendment. Defendant Nodolf conspired with co-conspirators known and unknown to violate Plaintiffs' constitutional rights.

148.    As described above, Defendants Alonzo and Nodolf, while acting under the color of law and within the scope of their employment, knowingly and intentionally, or with reckless disregard for the truth, caused facially deficient arrest warrant affidavits to be presented to the Magistrate Judge for the purpose of obtaining an arrest warrants.

149.    Defendants Nodolf and Alonzo are not entitled to qualified immunity because they either submitted or directed the submission of a warrant application so lacking in indicia of probable cause as to render their belief in its existence unreasonable. *See Malley*, 475 U.S at 345. No reasonable police officer or law enforcement actor could reasonably have believed the law was otherwise, or that the affidavits in question established probable cause against Plaintiffs.

150.    Because the affidavits regarding Plaintiffs lack assertions of fact that, even if true, would establish probable cause, Defendants have each, individually and as a group, violated Plaintiffs' Fourth Amendment rights.

151.    As a direct result of Defendants' conduct, Plaintiffs were falsely arrested and charged with failure to report child abuse with intent to conceal, despite the absence of probable cause to establish that each had committed a crime. Defendants' conduct, as described above, deprived Plaintiffs of their right to be secure in their persons against unreasonable seizure, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. § 1983.

## COUNT 2:
## FALSE ARREST IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS PURSUANT TO *FRANKS V. DELAWARE*

152.     All preceding paragraphs are incorporated herein by reference.

153.     In the alternative, Plaintiffs plead civil liability against Defendants based on a "Franks" violation. *See Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); *see also Hale v. Fish*, 899 F.2d 390, 400 n. 3 (5th Cir. 1990).

154.     There are two possible ways for an officer to be held liable in a Section 1983 claim under *Franks*. First, if he or she "deliberately or recklessly provides false, material information for use in an affidavit in support of [a warrant]." *Wilson v. Stroman*, 33 F.4th 202, 206 (5th Cir. 2022), *cert. denied sub nom. Reyna v. Wilson*, 143 S. Ct. 425, 214 L. Ed. 2d 234 (2022) *cert. denied*, 143 S. Ct. 426, 214 L. Ed. 2d 234 (2022) (quoting *Melton v. Phillips*, 875 F.3d 526, 264 (5th Cir. 2017) (en banc)).

155.     Second, if he or she "makes knowing and intentional omissions that result in a warrant being issued without probable cause." *Id.*

156.     Since at least *Franks v. Delaware*, and as reiterated by the Fifth Circuit in *Hale v. Fish*, police officers and law enforcement officials have known that willful, intentional, and/or reckless misrepresentations made for the purpose of establishing probable cause violate an individual's Fourth Amendment rights. Put otherwise, no reasonable officer could possibly conclude that they were authorized to include known false statements and/or fail to include exculpatory information in an affidavit.

157.    Normally, under the independent intermediary doctrine, a grand jury's indictment will break the chain of causation for any false arrest claim pertaining to the affidavit and the arrest warrant issued by the magistrate judge. *See Wilson*, 33 F.4d at 206. This doctrine does not apply, however, if "the grand jury was misled *in the very same way* as the magistrate who issued the warrants." *Id.* (emphasis in original).

158.    First, Defendants Nodolf and Alonzo deliberately or recklessly provided false, material information for use in the affidavits in support of Plaintiffs' arrest warrants. *See Wilson*, 33 F.4th at 206.

159.    Second, Defendants Nodolf and Alonzo deliberately or recklessly made knowing and intentional omissions that resulted in warrants for Plaintiffs' arrests being issued without probable cause. *See Wilson*, 33 F.4th at 206.

160.    Defendant Alonzo swore under oath that she had personal knowledge of the information set forth in the probable cause affidavits. She did not.

161.    As a direct and proximate result of Defendants' conduct and actions, Plaintiffs were wrongfully arrested even though probable cause for their arrest did not exist.

162.    By lying in her affidavit that B.B. had reported that T.F. "did touch her vagina," and that Chrystal Myers "failed to report" when she in fact did make a CPS report and B.B. never claimed T.F. touched her vagina, Alonzo padded her affidavit with deliberate falsehoods in order to make the unconstitutional arrests—a top-down directive that came straight from Defendant Nodolf.

163.    Upon information and belief, like the affidavits in this case, the grand jury presentation suffered from a complete lack of additional investigation. Defendants Nodolf and Alonzo conspired to, and did, mislead the grand jury in the same way the affidavit misled the magistrate who issued the arrest warrants.

164.    Additionally, although she directed Defendant Alonzo to cease investigation and make arrests, Nodolf claimed not to be involved in the investigation or prosecution of these cases.

165.    Instead, as is commonly her practice, Defendant Nodolf acts as though she has delegated authority to her co-conspirator assistant district attorneys. But Defendant Nodolf does not delegate. According to Defendant Alonzo, her supervisor Rosemary Sharp, and MPD Chief of Police Seth Herman, every decision in every high-profile case, including during the investigation phase, must go through her. Indeed, according to Chief Herman, that is the policy of MPD and the Midland District Attorney's Office.

166.    Although she has claimed she did not participate in the grand jury presentation of these cases, upon information and belief, Defendant Nodolf instructed her co-conspirator assistant district attorney Jennifer Lively to get Plaintiffs indicted by repeating the lies contained in Alonzo's affidavit and concealing additional exculpatory facts from the grand jury. Co-conspirator Lively dutifully complied.

167.    Even though she claims not to know and be distant from the ongoing prosecutions, Defendant Nodolf is truly pulling the strings and making all decisions. Throughout the pendency of Plaintiffs' cases, the assistant district attorney assigned by Nodolf, Jennifer

Lively, repeatedly told Plaintiffs' defense counsels decisions about searches of the school's server seized by Alonzo had to go through Defendant Nodolf, who apparently volunteered to personally drive the server to Kerrville, Texas to be searched. Lively repeatedly told Plaintiffs' trial attorneys that decisions about discovery matters had to be run by Nodolf.

168.    When the jig was up, Defendant Nodolf even attached her own affidavit to the motion to dismiss Plaintiffs cases. In the affidavit, Defendant Nodolf turned on Defendant Alonzo, averring Alonzo's testimony was "false, misleading, and incorrect."

169.    Upon information and belief, by repeating the lies contained in Alonzo's arrest warrant affidavits, and concealing exculpatory information included in the CPS report and forensic interview, District Attorney Laura Nodolf herself, or through her instruction to co-conspirator Lively, knowingly provided false information to a grand jury to secure an unjust and malicious prosecution against Plaintiffs.

170.    Because the grand jury in Plaintiffs' cases was misled by Defendant Alonzo's misstatements and omissions in the very same way as the magistrate who issued the arrest warrants, the independent intermediary doctrine does not serve to break the chain of causation for Plaintiffs' false arrest. *See Wilson*, 33 F.4d at 206.

## Count 3:
## U.S.C. § 1983 – Fourteenth Amendment Violation

171.    All preceding paragraphs are incorporated herein by reference.

172.    Plaintiffs alternatively assert a violation of their Due Process rights under the Fourteenth Amendment to be free from unlawful arrest as a result of false and misleading

statements that were knowingly, or with reckless disregard, included in the probable cause affidavits. The Due Process Clause of the Fourteenth Amendment was intended to prevent the government from abusing its power or employing it as an instrument of oppression.

173.     Specifically, Plaintiffs have rights guaranteed by the Fourteenth Amendment not to have law enforcement deliberately fabricate evidence, including the insertion of facts in affidavits and arrest documents (and provide testimony based on those "facts" to secure an indictment), that Defendants know to be false.

174.     As a result of their arrest and the charges that Defendants maintained against them long after they were aware that they lacked probable cause to arrest in the first place, as well as ongoing, disparaging statements made through mass media, Plaintiffs were involuntarily and detrimentally thrust into the public eye, placing Plaintiffs in a false light and causing them to suffer reputational and actual harm that impinged upon their fundamental right to personal liberty.

175.     As a result of their arrest and the charges that Defendants maintained against them long after they were aware that they lacked probable cause to arrest in the first place, Plaintiffs were deprived of their right to privacy, specifically the intrusion upon their seclusion or solitude and private affairs.

## COUNT 4:
## CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS
### *TURNER V. UPTON CO.*, 915 F.2D 133 (5TH CIR. 1990)

176.     Defendant Nodolf and at least one other co-conspirator agreed to violate Midland County residents', including Plaintiffs', civil rights in violation of Section 1983, as detailed in the preceding counts.

177.     Specifically, Defendant Nodolf and her co-conspirator assistant district attorneys and law enforcement officers agreed to, and in many cases did, violate Midland residents' (including Plaintiffs'):

a) Fourth Amendment Rights to be free from unreasonable searches, seizures, and arrests but for warrants based on probable cause untainted by misleading and false information;

b) Sixth Amendment Rights to speedy trials by abusing the grand jury process and conspiring to delay trials when she was not ready or realized she could not prove her case;

c) Sixth Amendment Rights to counsel by advising police not to allow arrested defendants to visit with their lawyer when the lawyer was present and requesting to speak to the client (e.g., Plaintiffs Myers and Clifton);

d) Fourteenth Amendment Rights to Due Process by abusing her grand jury powers and presenting false and misleading information to grand juries in order to secure indictments against citizens when probable cause did not exist.

178.     Defendant Nodolf knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose.

179.     Defendant Nodolf and/or at least one of the co-conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the counts above, in order to accomplish some object or purpose of the conspiracy.

### 42 U.S.C. § 1983 – County Liability and Municipal Liability

Two configurations can lead to a municipality's liability under section 1983 for the acts of its officials. In the first, typified by the district court's reference to *Praprotnik,* a municipality's final policymakers are held effectively to have made policy or condoned creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees. In the second, the municipality may be held liable for the illegal or unconstitutional actions of its final policymakers themselves as they engage in the setting of goals and the determination of how those goals will be achieved. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). We find the latter, not the former, to be applicable in the instant case.

*Turner v. Upton Cnty., Tex.*, 915 F.2d 133, 136 (5th Cir. 1990).

180.  All preceding paragraphs are herein incorporated by reference.

181.  "When the official representing the ultimate repository of law enforcement power in the county makes a deliberate decision to abuse that power to the detriment of its citizens, county liability under section 1983 must attach . . . ." *Id.* at 138.

182.  The City of Midland and Midland County are liable under both formulations set out in *Turner.*

183.  First, as explained above, Defendant Nodolf, as final policy maker, "ratified the unconstitutional or illegal actions of subordinate officers and employees."

184.  Specifically, MPD Chief Herman has admitted it was MPD's policy to take high-profile cases to Defendant Nodolf before charging decisions for her direction. Just like here.

185.  Additionally, Defendant Nodolf herself participated in the unlawful policy by advising MPD to forego investigation and just get the warrants, even though they fell woefully short of probable cause and suffered from a reckless disregard for the truth.

186. Second, as explained above and like *Turner*, Defendant Nodolf herself engaged in setting goals and determinations of how to achieve those goals—get Plaintiffs arrested and indicted.

187. Indeed, although she never appeared in court (until appearing on paper when filing the dismissal), all decisions ran through Defendant Nodolf. Upon information and belief, she conspired and instructed co-conspirator assistant district attorney Lively to mislead the grand jury in the exact same way Alonzo misled the magistrate to get arrest warrants for Plaintiffs.

188. Defendant Nodolf ordered Defendant Alonzo to arrest Plaintiffs, despite her knowledge that there was no probable cause to charge them with any offense, and/or with deliberate indifference to the absence of such probable cause.

189. As such, the City of Midland and Midland County are liable for Plaintiffs' constitutional wrongs suffered as the individual Defendants are the policymakers for their respective governmental employers.

190. It is a widespread and persistent practice in Midland County for the District Attorney to collude with the Midland Police Department to arrest first, then investigate, and then prosecute "for cover."

191. It is a widespread and persistent practice in Midland County to allow the District Attorney (and her assistant district attorney co-conspirators) to make deliberate misrepresentations to a grand jury in order to commence prosecution against Midland residents, despite lack of probable cause and strong exculpatory evidence to the contrary.

192.    In cases involving the Trinity Administrators, Midland Christian Administrators, David Wilson, Megan McMurry, and others, this widespread and persistent practice violated Plaintiffs' and others' Fourteenth Amendment Right to Substantive Due Process, Sixth Amendment Right to Counsel and a Speedy Trial, and Fourth Amendment Rights to be free from unreasonable searches, seizures, and arrests.

## 8. Damages

193.    All preceding paragraphs are incorporated herein by reference.

194.    Defendants' actions, both jointly and severally, deprived Plaintiffs of their protected rights under the United States Constitution and federal law.

195.    As a proximate result of Defendants' actions, Plaintiffs have suffered the deprivation of liberty, reputational harm, public humiliation, distress, pain, and suffering for which they are entitled to compensatory damages, including damages for mental and emotional distress.

196.    Additionally, Defendants Nodolf and Alonzo acted with malice and with intentional disregard for Plaintiffs' constitutional rights for which Plaintiffs are entitled to punitive damages. Such damages would assist in deterring and preventing similar conduct in the future.

197.    As a result of Defendants' actions and/or inactions, Plaintiffs seek the following damages, which in the aggregate exceed $1,000,000.00:

   a) Actual damages;

   b) Compensatory damages;

c) Past and future mental anguish;

d) Past and future reputational damages;

e) Past and future lost wages;

f) Past and future loss of earning capacity;

g) Attorney's fees and costs in defending the individual Plaintiffs' criminal cases and any other accusations arising from the facts forming the basis of this suit;

h) Each Plaintiff has retained the services of the undersigned counsel, and claim entitlement to an award of reasonable and necessary attorney's fees under 42 U.S.C. § 1983 and 1988;

i) Interest;

j) Court costs;

k) All other damages, both general and special, at law and in equity, to which Plaintiffs may be justly entitled.

## 9. Punitive Damages

198.   All preceding paragraphs are incorporated herein by reference.

199.   Punitive damages may be awarded in Section 1983 cases when the defendant's conduct involves reckless or callous indifference to the federally protected rights of others.

200.   The widespread and persistent practice of Midland County and Defendant District Attorney Laura Nodolf to arrest first and then investigate, and subsequently attempt to cure this error by intentionally misrepresenting evidence to a grand jury, and then engaging in dilatory tactics to deprive defendants of a speedy trial, demonstrates a callous and reckless disregard to the constitutional rights of Midland residents.

201. Punitive damages should be awarded to deter future egregious conduct in violation of constitutional rights.

## 10. Jury Demand

202. Plaintiffs hereby request a jury trial; the appropriate jury fee will be paid at the time of filing.

## Conclusion & Prayer for Relief

FOR THESE REASONS, Plaintiffs pray upon final trial hereof they recover judgment against Defendants jointly and severally for the damages described above.

Respectfully submitted October 12, 2023:

**WESTFALL SELLERS**

/s/ Frank Sellers
**Frank Sellers**
Texas Bar No. 24080305
frank@westfallsellers.com
1612 Summit Ave., Suite 200
Fort Worth, Texas 76102
P: 817.928.4222
F: 817.385.6715

-AND-

**LAW OFFICE OF ALLISON CLAYTON**

/s/ Allison Clayton
**Allison Clayton**
Texas Bar No. 24059587
P.O. Box 64752
Lubbock, Texas 79464
P (806) 773-6889
F (888) 688-6515
E Allison@AllisonClaytonLaw.com

**ATTORNEYS FOR PLAINTIFFS**