**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

**SHELBY HAMMER,**
**ADRIANNE CLIFTON,**
**TODD FREESE, and**
**CHRYSTAL MYERS,**

   *Plaintiffs*,

**v.**             **Case No. 7:23-CV-0158-JKP**

**LAURA NODOLF;**
**MIDLAND COUNTY, TEXAS;**
**CITY OF MIDLAND, TEXAS, and**
**JENNIE ALONZO,**

   *Defendants*.

<u>**MEMORANDUM OPINION AND ORDER**</u>

  Before the Court are three motions: (1) *Defendant Laura Nodolf's Motion to Dismiss* (ECF No. 33); (2) *Defendants Alonzo's and City of Midland's Motion to Dismiss* (ECF No. 45); and (3) *Defendant Midland County's Motion to Dismiss* (ECF No. 46). Each movant seeks dismissal under Fed. R. Civ. P. 12(b)(6). Plaintiffs have not filed a response and the time for doing so has passed. After considering the motions, operative pleading, and applicable law, the Court partially grants each motion.

**I. BACKGROUND[1]**

  This is a federal civil rights case stemming from a February 25, 2022 arrest of Plaintiffs Shelby Hammer, Adrianne Clifton, Todd Freese, and Chrystal Myers (collectively referred to as "the Trinity Four"). While Plaintiffs make multiple allegations, the underlying premise of their claims is that Defendants violated their constitutional rights by arresting and indicting them without probable cause or a proper investigation.

---

[1] The operative pleading, as supplemented by matters properly considered by the Court, provides the background facts, which the Court views in the light most favorable to Plaintiffs as required under Fed. R. Civ. P. 12(b)(6).

On November 27, 2023, Plaintiffs filed a sixty-six-page amended complaint. *See* ECF No. 29. Defendant Nodolf moved to dismiss this complaint, ECF No. 33, Plaintiffs failed to respond, and when the Court granted them leave to file another amended complaint, it stated that it would address Nodolf's motion without additional briefing, *see* ECF No. 43. It also noted that the seventy-seven-page Second Amended Complaint ("SAC") made minimal changes with respect to claims against Defendant Nodolf. The SAC (ECF No. 44) is the operative complaint, and the differences between the two amended complaints have no material significance to Nodolf's motion to dismiss. The other defendants have moved to dismiss the SAC. *See* ECF Nos. 45-46.

Defendant Laura Nodolf "is employed by the County of Midland as its elected district attorney [("DA")] who, at all times relevant to this action, was acting under the color of law and within the scope of her employment." SAC ¶ 27. Defendant City of Midland ("the City") employs Defendant Jennie Alonzo as a Sergeant with the Midland Police Department, "who, at all times relevant to this action, was acting under the color of law and within the scope of her employment." *Id.* ¶ 30. Plaintiffs sue Nodolf and Alonzo in their individual capacity only, but also sue both entities. *See id.* ¶¶ 27-30.

During the time in question, Plaintiffs were educators at Trinity School of Midland ("Trinity"), a private school in Midland, Texas. *Id.* ¶¶ 2, 23-26, 128. Hammer was the "Head of School at Trinity"; Clifton "was the Assistant Head of School for Administration / Director of Admissions at Trinity"; Freese was the "Middle School and Upper School Dean of Students" (hereinafter "Dean"); and Myers was "Trinity's Head of the Middle School." *Id.* ¶¶ 23-26. Each educator has extensive experience in the school setting with three having master level educations—the fourth (Dean Freese) was a pastor before serving as an educator for more than fifteen years. *See id.*

Pursuant to 42 U.S.C. § 1983, Plaintiffs assert five claims[2] as well as seeking county and

---

[2] Although Plaintiffs use the phrase "malicious prosecution" to describe some acts of defendants, *see* SAC ¶¶ 83-84, 192, they do not pursue a separate malicious prosecution claim. Notably, the Fifth Circuit "explicitly denied the

municipal liability. *See id*. ¶¶ 139-240. Plaintiffs assert that Defendants Nodolf and Alonzo falsely arrested them in violation of the Fourth and Fourteenth Amendments. *See id*. ¶¶ 139-62 (Claim 1 against Nodolf based on *Malley v. Briggs*, 475 U.S. 335 (1986)); 163-73 (Claim 2 against Alonzo based on *Malley*); and 174-93 (Claim 3 against both based on *Franks v. Delaware*, 438 U.S. 154 (1978)). With Claim 4, they separately assert that Defendants violated their due process rights under the Fourteenth Amendment. *See id*. ¶¶ 194-98. Claim 5 asserts that Nodolf and at least one other co-conspirator conspired to violate Plaintiffs' constitutional rights under the Fourth, Sixth, and Fourteenth Amendments. *See id*. ¶¶ 199-202 (relying on *Turner v. Upton Co.*, 915 F.2d 133 (5th Cir. 1990)). Lastly, Plaintiffs assert claims for county and municipality liability against Defendants Midland County and the City of Midland. *See id*. ¶¶ 203-40.

Plaintiffs set out the elements of the arrest charge—failure to report with intent to conceal—and allege that neither Officer Alonzo nor DA Nodolf had information to provide a reasonable belief that any plaintiff had a specific intent to conceal at the time of the alleged offense, i.e., the time-period from December 2019 through January 2020. *Id*. ¶¶ 145-52. They further allege that the warrant affidavit lacks any "showing of a knowing failure to report." *Id*. ¶¶ 155, 168. They also allege that the affidavit in support of the arrest warrants provides an insufficient basis to find that any plaintiff had "cause to believe" as required by the offense charged. *Id*. ¶ 75.

Prior to arresting Plaintiffs, Alonzo had conducted a three-part investigation: (1) witnessing a forensic interview of the complaining student ("B.B.") conducted by the Child Advocacy Center ("CAC"); (2) conducting a one-hour (approximately) joint interview of the student's parents; and (3) reviewing documents provided by the parents, including a September 2020 "Confidential

---

possibility of a constitutional malicious prosecution claim" between 2003 and 2021. *Guerra v. Castillo*, 82 F.4th 278, 289 (5th Cir. 2023). But this changed when, on April 4, 2022, "the Supreme Court 'held that litigants may bring a Fourth Amendment malicious prosecution claim under § 1983.'" *Espinal v. City of Houston*, 96 F.4th 741, 748 (5th Cir. 2024) (quoting *Armstrong v. Ashley*, 60 F.4th 262, 278 (5th Cir. 2023), which in turn cited *Thompson v. Clark*, 596 U.S. 36 (2022)). Defendant Nodolf contends that malicious prosecution remains abolished, ECF No. 33 at 19, but that contention is erroneous.

Waiver and Release of all Claims," sometimes referred to as a "gag order," that Plaintiff Hammer had sent to the parents. *Id.* ¶¶ 53, 144, 165, 167. Alonzo did not independently interview B.B. and made no pre-arrest attempt to interview any plaintiff or obtain documents from the school. *Id.* ¶ 165. Plaintiffs also allege that neither individual defendant conducted any additional investigation prior to presenting the cases to the grand jury. *Id.* ¶ 186.

Notably, however, after Alonzo arrested the Trinity Four, she reported them to Child Protective Services ("CPS") for their knowledge about the indecency with a child perpetrated on B.B. and their failure to report it with intent to conceal it. *Id.* ¶ 47. CPS investigated this report "for over two months," before concluding that "there was not even a preponderance of the evidence that any of the Plaintiffs had done anything wrong." *Id.* ¶¶ 47-48. In doing so, CPS "noted that B.B. had not made any outcry to Plaintiffs" and thus closed the investigation by "ruling out any wrongdoing by Plaintiffs." *Id.* ¶ 48.

Temporally, the arrests leading to this case closely follow the arrest of five educators at Midland Christian School, referred to as "the Midland Five," who Alonzo had arrested on Wednesday, February 16, 2022. *See id.* ¶¶ 32, 52. Those arrests resulted in separate litigation in *Lee v. Midland*, No. 7:22-CV-0185 (W.D. Tex.).

As alleged by Plaintiffs in this case, a disgruntled former Trinity school parent (B.B.'s mother) who was emboldened by the arrests of the Midland Five reported to police that B.B. had been sexually assaulted at Trinity by another student ("T.F.") during the Fall semester of 2019 and claimed that the school "had not properly handled the situation" despite knowing "about the 'sexual assault.'" *Id.* ¶¶ 32, 40 & n.10. This report led to the forensic interview of B.B. on Tuesday, February 22, 2022. *See id.* ¶¶ 33-37, 53. Alonzo observed this interview and, the same day, she interviewed the parents. *Id.* ¶ 53. Alonzo testified that she set up the forensic interview after being assigned a "crime against a child" case. Tr. 9:24-10:3 (trial transcript provided as ECF No. 45-9). The case came to her as "a possible sexual assault of a child." Tr. 11:13-16. At that point, she

considered it as one of her less detailed information cases. Tr. 12:4-6.

According to Plaintiffs, Dean Freese called B.B. to his office, and at the time of that meeting, she "had not told anyone the extent of her and T.F.'s interactions." *Id*. ¶ 40. Also, B.B.'s father emailed Freese in December 2019 to memorialize the parents' conversation with B.B. in which she told her parents about T.F. *Id*. at 13 n.10. In that email, the father said that "T.F. had slapped and pinched B.B.'s buttock four times and had asked for B.B. to send pictures of her buttocks to T.F." *Id*.

Plaintiffs allege that B.B. mentioned only Plaintiff Freese during the CAC interview, and the issue of whether he reported any incident did not arise. *Id*. ¶ 166. The interview also did not touch upon the issue of specific intent to conceal. *Id*. But, as discussed later, the Court properly considers the full video of this interview that Alonzo and the City have provided. *See* ECF No. 45-10 (submitted under seal in native format). The video shows that Plaintiffs are correct that the issue of reporting any incident did not arise and that no one touched upon any specific intent to conceal. This is so, even though B.B. explained the circumstances of the "gag order." *See* CAC Interview at 1:02:20 (discussing "gag order").[3] But the video also shows that B.B. mentioned Plaintiff Myers and also stated that she did not speak to Plaintiff Hammer, but her parents did.[4]

During the interview with the parents, "the issue of what the Plaintiffs knew and when they knew it came up several times." SAC ¶ 166. The first exchange was between the parents, Dean Freese and the Head of the Middle School (Myers). *Id*. The questioning as to what Freese and Myers knew at that time could have been clearer, but as of that conversation, the parents stated that when Freese/Myers said they were still investigating, those educators knew that T.F. had

---

[3]The Court has fully reviewed the video. It will often provide citation to specific times within the video. But because it lacks a transcript of the contents, it will at times simply cite to its general recollection of the video's contents. Further due to the difficulty in hearing every word from the recording, some quoted text may be an imprecise paraphrase without changing the meaning.

[4]As discussed later, the Court may accept video evidence over allegations of the Plaintiffs in certain circumstances.

touched B.B. inappropriately over clothes. *Id*. Because Alonzo phrased the question as whether they knew T.F. had touched her "Vagina or whatever," the affirmative answer provides less clarity than it might have had. *See id*.

Alonzo also asked the parents about whether the Head of School (Hammer) also "knew what had happened with [their] daughter." *Id*. The parents stated that she knew but Freese and Myers did not "tell her for quite some time," which the mother thought was "shitty." *Id*. The father indicated that the parents dealt solely with Freese and Myers "for weeks." *Id*. Further, as to Myers, "she wasn't really involved," she was just "in that one meeting." *Id*. But the parents agreed that Hammer, Freese, and Myers "definitely knew about the incident" and the educators "did their own investigation." *Id*.

Alonzo also discussed the non-disclosure agreement with the parents. *Id*. ¶ 167. Essentially the proposed agreement came about when in September 2020, the parents decided to withdraw B.B. from Trinity; they asked for a tuition refund knowing that they were contractually past the point where they were entitled to a refund; and in an effort to resolve the contractual dispute over tuition, Hammer sent the parents "a release of liability and non-disclosure agreement." *Id*. Plaintiffs allege that the proposed confidentiality agreement did not prevent anyone from reporting criminal liability. *Id*. The parents questioned whether such trade-off was "extortion," but seemed to accept that they were contractually bound to pay the tuition. *Id*. Alonzo, however, had "a big issue with" the school requiring the signed non-disclosure agreement in exchange for return of the tuition. *Id*. At or before the criminal trial of the Trinity Four, the trial court excluded the agreement. *Id*. ¶ 84.

Although Alonzo had an outline from the parents, she asked the parents to send her whatever emails or timelines they had. *Id*. ¶ 167. Even then, she stated that "we will probably act on this tomorrow." *Id*. Within a day or two, and after conducting no additional investigation, "Alonzo approached Defendant Nodolf seeking marching orders on how to proceed with the case," and at

that meeting "Alonzo laid out for Defendant Nodolf her case against the Trinity Four." *Id*. ¶¶ 6 (quoted language), 53-54, 56. After briefing Nodolf on the investigation, Alonzo received directions to stop further investigation and to arrest Plaintiffs on the information already obtained. *Id*. ¶¶ 6, 146. Alonzo thereafter secured arrest warrants for Plaintiffs that were based on her executed affidavit. *Id*. ¶ 7.

At the time of Plaintiffs' arrests, "the only information known to Defendant Nodolf was what Defendant Alonzo could have told her," which was limited to the three-part investigation noted above. *Id*. ¶ 146. Although Alonzo had several options as to how to proceed, she followed Nodolf's directions, ceased the investigation, filed the case as a felony, and arrested Plaintiffs on February 25, 2022. *See id*. ¶¶ 57-59. Alonzo arrested them "without having all the information" at the direction of Nodolf. *Id*. ¶ 58.

The criminal case against the Trinity Four proceeded to trial in April 2023. *See id*. ¶ 14 & n.6. Alonzo testified at trial that she, Nodolf, and others "had a meeting of the minds, and all four of [them] together decided, you know, not only is this a failure to report but it's a felony version." *Id*. ¶ 55. Although Alonzo "would want [investigators] to get both sides of the story," if she had been "accused of something," she "did what [she] was advised to do" by Nodolf and others. *Id*. Nodolf instructed Alonzo "to do with the Trinity Four exactly what Alonzo had done with the Midland Five—to make arrests and then conduct any additional investigation afterwards." *Id*. ¶¶ 55, 146.

Plaintiffs allege that Alonzo's arrest affidavit contains multiple factual inaccuracies and material omissions: (1) swearing that Plaintiffs knew that T.F. had touched B.B.'s vagina when three plaintiffs found out about the alleged problems through B.B.'s mother who did not know of any indecent conduct and there is no evidence that B.B. ever told the fourth plaintiff anything amounting to indecency; (2) omitting the fact that there was no evidence indicating intentional concealment; (3) omitting protestations from Myers that the student had never told any plaintiff

about any indecency; and (4) omitting the fact that Myers did timely file a report regarding information told to Plaintiffs. *See id.* ¶¶ 8, 13, 65-73. The latter omission was a failure to state that Myers made a report on January 23, 2020, that T.F. had sent a picture of his genitals to B.B. *Id.* ¶ 70. Plaintiffs state: "Nothing about this report was included in Defendant Alonzo's affidavit." *Id.* Paragraph 73 of the SAC sets out a table of "additional material falsehoods and omissions," which the Court will discuss as needed. In light of the alleged inaccuracies and omissions, Plaintiffs contend that "Alonzo intentionally, knowingly, or with reckless disregard for the truth misled the magistrate" in securing the arrest warrants.[5] *See id.* ¶ 65.

Plaintiffs also contend that no pre-arrest investigation provided any evidence of any specific intent to conceal and "no reasonable prosecutor or police officer could ever believe this was sufficient to show probable cause the Plaintiffs had a specific intent to conceal at the time of the alleged offense." *Id.* ¶ 147. Although they recognize that the affidavit in support of the arrest warrants identifies the waiver and release stemming from the failure to report allegations, they contend that such waiver/release "cannot support the allegation of a specific intent to conceal" because the alleged offenses occurred eight months or more before the school district sent B.B.'s parents the waiver/release in connection with reimbursement of tuition. *See id.* ¶¶ 153-54.

In addition to lacking information as to the specific intent element, Plaintiffs also allege that the arrest warrants lacked any showing of a knowing failure to report. *See id.* ¶¶ 155, 168. Anticipating invocation of qualified immunity, they contend that Nodolf and Alonzo lose qualified immunity under *Malley* because they knew of these issues with probable cause but Nodolf nevertheless instructed Alonzo to cease investigating and to immediately arrest them, which she did. *Id.* ¶¶ 156, 169. While recognizing that officers are entitled to a "good faith" defense if they seek an

---

[5] As shown by the arrest warrants, a Justice of the Peace, rather than a magistrate, found probable cause in this case. Because no one contends that that makes any difference in this case, and because most caselaw speaks in terms of a magistrate, the Court will typically use the more general term, "magistrate."

arrest warrant from a magistrate or other judicial officer with authority to issue an arrest warrant, Plaintiffs contend that officers are not entitled to such defense when "no officer of 'reasonable competence' would have sought the warrant," because "the officer's error in executing that warrant constitutes gross incompetence and neglect of duty." *Id*. ¶¶ 158, 169. Plaintiffs further allege that, "like the affidavits in this case, the grand jury presentation suffered from a complete lack of additional investigation." *Id*. ¶¶ 161, 172. They thus contend that the independent intermediary doctrine does not break the chain of causation in light of the misleading information provided to the magistrate and grand jury. *Id*. ¶¶ 162, 173.

Plaintiffs make similar allegations and contentions under *Franks*. *See id*. ¶¶ 174-93. They contend that since *Franks* and *Hale v. Fish*, 899 F.2d 390 (5th Cir. 1990), "police officers and law enforcement officials have known that willful, intentional, and/or reckless misrepresentations made for the purpose of establishing probable cause violate an individual's Fourth Amendment rights." SAC ¶ 178. Stated differently, "no reasonable officer could possibly conclude that they were authorized to include known false statements and/or fail to include exculpatory information in an affidavit." *Id*.

Plaintiffs allege that Alonzo "deliberately or recklessly provided false, material information for use in the affidavits in support of Plaintiffs' arrest warrants" in contravention of *Franks* and Fifth Circuit precedent. *Id*. ¶ 180 (citing *Wilson v. Stroman*, 33 F.4th 202, 206 (5th Cir.), *cert. denied sub nom. Reyna v. Wilson*, 143 S. Ct. 425 (2022), and *cert. denied*, 143 S. Ct. 426 (2022)). They further allege that "Alonzo deliberately or recklessly made knowing and intentional omissions that resulted in warrants for Plaintiffs' arrests being issued without probable cause." *Id*. ¶ 181 (citing *Wilson*). They allege that Alonzo lacked personal knowledge as to whether any of them failed to report abuse. *Id*. ¶ 183. They allege that she lied in her affidavit that T.F. touched B.B.'s vagina and that Myers had not made a report. *Id*. ¶ 185.

Plaintiffs allege that the affidavit of Alonzo resulted from specific direction from Nodolf

and a conspiracy between the two individuals to mislead the grand jury in the same way the affi-davit misled the magistrate. *Id.* ¶¶ 185-87. They further allege that "the grand jury presentation suffered from a complete lack of additional investigation." *Id.* ¶ 186. They allege that "in every high-profile case, including during the investigation phase, must go through" Nodolf and that she was "truly pulling the strings and making all decisions" throughout the pending cases against Plaintiffs. *Id.* ¶¶ 188 (first quote), 190 (second quote). They allege Nodolf "knowingly provided false information to a grand jury to secure an unjust and malicious prosecution against" them "by repeating the lies contained in Alonzo's arrest warrant affidavits, and concealing exculpatory in-formation included in the CPS report and forensic interview." *Id.* ¶ 192. As they did under *Malley*, they contend that the independent intermediary doctrine does not break the chain of causation in light of the misleading information provided to the magistrate and grand jury. *Id.* ¶ 193.

Because Plaintiffs have not responded to the motions and the time for doing so has passed, the motions are ripe for ruling.

## II. APPLICABLE LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), litigants may move to dismiss asserted claims for "failure to state a claim for which relief can be granted." As required by Fed. R. Civ. P. 8(a)(2), every pleading that states a claim for relief must contain "a short and plain statement of the claim show-ing that the pleader is entitled to relief." Such requirement provides opposing parties "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In general, a court addressing a motion under Rule 12(b)(6) "must limit itself to the con-tents of the pleadings, including attachments thereto." *Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) (citation omitted). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference,

and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). When the operative pleading references a document, "and the parties do not dispute that it is properly before the court on th[e] motion to dismiss," the Court may consider the referenced document. *Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 252 n.2 (5th Cir. 2021) (per curiam).

With her motion to dismiss, Defendant Nodolf has provided the arrest warrants and related affidavits referenced in Plaintiffs' pleading. *See* ECF No. 33-1 (Ex. A). The Court may consider these documents because they are central to Plaintiffs' false arrest claim. *See Gonzales v. Hunt Cnty. Sheriff's Dep't*, No. 3:20-CV-3279-K, 2021 WL 2337143, at *9 (N.D. Tex. June 8, 2021). Defendants Alonzo and the City also attach a number of exhibits to their motion to dismiss. *See* ECF No. 45-1 through 45-11. They first attach the warrants and related affidavits for each Plaintiff, *see* ECF No. 45-1 through 45-4, then the indictments for each Plaintiff, *see* ECF No. 45-5 through 45-8, followed by a trial transcript (ECF No. 45-9); the CAC interview video (ECF No. 45-10 filed under seal), and the one reported incident (ECF No. 45-11). Given the allegations and references to such documents in the Second Amended Complaint, the Court finds that it may properly consider all of these attached items without converting any motion to one for summary judgment.

When ruling on a motion to dismiss, courts "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff." *White v. U.S. Corr., LLC*, 996 F.3d 302, 306-07 (5th Cir. 2021). But courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020) (citations and internal quotation marks omitted). And despite the natural focus on the allegations of the operative pleading, the party moving for dismissal under Rule 12(b)(6) has the burden to show that dismissal is warranted. *Cantu v. Guerra*, No. SA-20-CV-0746-JKP-HJB, 2021 WL 2636017, at *1 (W.D. Tex. June 25, 2021).

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof

of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*,

550 U.S. at 556 (citation omitted). Nevertheless, plaintiffs must provide "more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555;

*accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

Plaintiffs need not plead the legal basis for a claim, but they "must plead facts sufficient to show

that [the] claim has substantive plausibility." *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014)

(per curiam). And they satisfy that standard when they allege "simply, concisely, and directly

events" that are sufficient to inform the defendant of the "factual basis" of their claim. *Id.*

Facts alleged by the plaintiff must "raise a right to relief above the speculative level."

*Twombly*, 550 U.S. at 555.

> To withstand a motion to dismiss under Rule 12(b)(6), a complaint must present
> enough facts to state a plausible claim to relief. A plaintiff need not provide ex-
> haustive detail to avoid dismissal, but the pleaded facts must allow a reasonable
> inference that the plaintiff should prevail. Facts that only conceivably give rise to
> relief don't suffice. Thus, though [courts] generally take as true what a complaint
> alleges, [they] do not credit a complaint's legal conclusions or threadbare recitals
> of the elements of a cause of action.

*Smith v. Heap*, 31 F. 4th 905, 910 (5th Cir. 2022) (quoting *Mandawala v. Ne. Baptist Hosp.*, 16

F.4th 1144, 1150 (5th Cir. 2021)). As *Twombly* states, to avoid dismissal under Rule 12(b)(6),

plaintiffs must allege facts that "nudge" an asserted claim "across the line from conceivable to

plausible." 550 U.S. at 570. The focus is not on whether the plaintiff will ultimately prevail, but

whether the Court should permit that party to present evidence to support adequately asserted

claims. *Id.* at 563 n.8. Further, determining plausibility is a "context-specific task," that courts

perform in light of their "judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Additionally, while asserted defenses may support dismissal under Rule 12(b)(6), they only

do so when the operative "pleading conclusively establishes the affirmative defense." *Reagan v.

U.S. Bank, Nat. Ass'n*, No. CIV.A. H-13-00043, 2013 WL 510154, at *2 (S.D. Tex. Feb. 12, 2013)

(addressing res judicata defense). And when a "motion to dismiss raises the defense of qualified immunity, the plaintiff 'must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm . . . alleged and that defeat a qualified immunity defense with equal specificity.'" *McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017) (quoting *Zapata v. Melson*, 750 F.3d 481, 485 (5th Cir. 2014)); *accord Guerra v. Castillo*, 82 F.4th 278, 285 (5th Cir. 2023); *Terwilliger v. Reyna*, 4 F.4th 270, 280 (5th Cir. 2021). Although parties may raise defenses through a motion to dismiss under Rule 12(b)(6), the courts view them through the standards applicable to such motions. This includes viewing the alleged facts in the light most favorable to Plaintiffs, even when considering the qualified immunity defense.

### III. LACK OF RESPONSE

When there is no timely response, "the court may grant the motion as unopposed." *See* W.D. Tex. Civ. R. 7(d)(2). By its terms, courts may apply this local rule to dispositive motions. *See Suarez v. Ocwen Loan Servicing, LLC*, No. 5:15-CV-664-DAE, 2015 WL 7076674, at *2 (W.D. Tex. Nov. 12, 2015); *Hernandez v. Deutsche Bank Tr. Co.*, No. EP-12-CV-282-DB, 2012 WL 12887898, at *2 (W.D. Tex. Aug. 21, 2012). Indeed, the Fifth Circuit has "recognized the power of district courts to 'adopt local rules requiring parties who oppose motions to file statements of opposition.'" *Johnson v. Pettiford*, 442 F.3d 917, 918 (5th Cir. 2006) (per curiam) (quoting *John v. Louisiana*, 757 F.2d 698, 708 (5th Cir. 1985) (addressing matter in context of summary judgment)). But it "ha[s] not approved the automatic grant, upon failure to comply with such rules, of motions that are dispositive of the litigation." *John*, 757 F.2d at 709 (discussing various dispositive motions). Furthermore, regardless of the local rule, courts may address an unopposed motion on the merits "in the interests of thoroughness." *See Suarez*, 2015 WL 7076674, at *2.

"The mere failure to respond to a motion is not sufficient to justify a dismissal with prejudice." *Watson v. U.S. ex rel. Lerma*, 285 F. App'x 140, 143 (5th Cir. 2008) (per curiam). Courts should consider "some sanction other than dismissal with prejudice for failure to observe a filing deadline."

*Ramsey v. Signal Delivery Serv., Inc.*, 631 F.2d 1210, 1214 (5th Cir. 1980). On the other hand, courts may deem a claim abandoned when a party fails to pursue it beyond the complaint. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (citing *Vela v. City of Houston*, 276 F.3d 659, 679 (5th Cir. 2001)). Abandonment, however, does not arise from a complete failure to respond. It instead arises when the party omits a claim from later pertinent filings. *See id.*; *Vela*, 276 F.3d at 679.

In this case, Plaintiffs have completely failed to respond to motions to dismiss filed on December 11, 2023, (ECF No. 33), and March 12, 2024, (ECF Nos. 45 and 46). When granting Plaintiffs leave to file a second proposed amended complaint, the Court stated that it would address the earlier-filed motion without additional briefing at a later time. *See* ECF No. 43 at 3. Although Plaintiffs have twice amended their complaint, they continue to fail to respond to filed motions to dismiss. Defendants have filed a total of seven motions to dismiss, none of which have garnered a response from Plaintiffs, except for seeking to amend their complaint. Such inaction is unusual given the apparent high-profile nature of this case along with representation by two law firms. In any event, the delays in this case do not warrant a dismissal with prejudice based solely on Plaintiffs' failures to respond.

Under the circumstances of this case, the Court declines to grant any of the motions merely because Plaintiffs have not responded. It instead examines the merits of the motions and applies the well-established standards for stating a claim set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Generally, given the lack of a response, there is no need to set out a detailed analysis of the law or legal issues. In this case, however, Plaintiffs proceed under a thorough and lengthy operative pleading. Such pleading differs from ones typically seen when a plaintiff fails to respond to a motion to dismiss.

Despite the foregoing, a lack of response may detrimentally impact the qualified immunity analysis. One court has recently "emphasized that, while an unexcused failure to respond to a motion to dismiss is a serious matter under any circumstances, it is uniquely damaging in the context of a qualified immunity." *Huggins v. Cnty. of Tishomingo*, 662 F. Supp. 3d 683, 688 (N.D. Miss. 2023). Long ago, the Fifth Circuit recognized that when a "defendant pleads qualified immunity and shows

he is a governmental official whose position involves the exercise of discretion, the plaintiff then has the burden 'to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law.'" *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997) (quoting *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992)). The Fifth Circuit does "not require that an official demonstrate that he did not violate clearly established federal rights;" it instead "places that burden upon plaintiffs." *Id.* (same). "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021) (per curiam) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam)); *accord Guerra v. Castillo*, 82 F.4th 278, 285 (5th Cir. 2023); *Terwilliger v. Reyna*, 4 F.4th 270, 280 (5th Cir. 2021).

To rebut the qualified immunity defense, the plaintiff must show: (1) that he has alleged a violation of a clearly established constitutional right, and (2) that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident." *Waltman v. Payne*, 535 F.3d 342, 346 (5th Cir. 2008). In the context of a motion to dismiss, plaintiffs carry this burden when their operative pleading alleges that (1) "defendants committed a constitutional violation under current law" and (2) "the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." *Club Retro, LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (quoting *McClendon*, 305 F.3d at 323). "It is the plaintiff's burden to demonstrate that qualified immunity is inappropriate." *Terwilliger*, 4 F.4th at 280. And it is important to recognize that to plausibly allege a clearly established violation requires caselaw specific to the facts alleged. *See Ramirez*, 3 F.4th at 133-37.

To carry their burden "to overcome qualified immunity," plaintiffs must "'identify a case'— usually, a 'body of relevant case law'—in which 'an officer acting under similar circumstances . . . was held to have violated the [Constitution].'" *Joseph ex rel. Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). Although "there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular arrest

beyond debate." *Wesby*, 583 U.S. at 64 (citations and internal quotation marks omitted). And naturally, "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id*. (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam )). Absent such an obvious case, plaintiffs must "find a case in [their] favor that does not define the law at a high level of generality" as part of their burden to show that qualified immunity does not apply. *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (per curiam) (internal quotation marks and citation omitted). Plaintiffs may satisfy this burden through their response to a motion to dismiss. *See Ramirez*, 3 F.4th at 135-37 (considering cases cited in response while ultimately finding that the cases did not carry the plaintiff's burden at the motion to dismiss stage). Naturally, this option to carry the burden regarding qualified immunity is forfeited when a plaintiff fails to respond to a motion to dismiss. Such forfeiture is not a sanction imposed due to the failure to respond—it is instead merely a by-product of the relevant burdens on a motion to dismiss in which a movant invokes qualified immunity. Still, the operative pleading may of itself be sufficient to overcome the assertion of qualified immunity despite a failure to respond to a motion to dismiss.

Notably, Defendants filed their motions after Defendant Nodolf provided notice to Plaintiffs in accordance with this Court's Standing Order in Civil Cases Assigned to Judge Jason Pulliam. That notice prompted Plaintiffs to file their first amended complaint. With that amendment, Plaintiffs' pleading expanded from fifty-eight to sixty-six pages. After two additional defendants moved for dismissal, Plaintiffs sought to file their Second Amended Complaint, further expanding the pleading to seventy-seven pages. The procedure envisioned through the Standing Order is to alert plaintiffs of perceived pleading deficiencies so as to allow for an amended pleading that cures the noted deficiencies. In this case, the procedure has resulted in added allegations to the original complaint. Nevertheless, by continuing to move for dismissal, Defendants contend that Plaintiffs have not done enough to avoid dismissal under Fed. R. Civ. P. 12(b)(6).

Failing to respond to a motion to dismiss is a dangerous and ill-advised strategy. That is

especially so when qualified immunity is at issue. But if one is going to traverse this potentially perilous path it had best arm oneself with a well-pleaded operative pleading. And Plaintiffs in this case have armed themselves with a pleading sufficient to partially overcome the motions to dismiss even without further response. Still, rather than considering the issues presented through the three motions to dismiss in the crucible of full and thorough briefing, the Court is left to consider the issues through the lens of unopposed motions that challenge a thorough and extensive operative pleading. Such consideration is less than optimal for reviewing the important and difficult issues raised in this case.

## IV. RELEVANT STATE LAW

Before proceeding further, it is important to understand the charges brought against Plaintiffs given the claims and allegations in this case. For each plaintiff, Exhibit A (ECF No. 33-1) includes a signed arrest warrant dated February 24, 2022, directing the arrest of the plaintiff for a failure to report. Each signed warrant is supported by Alonzo's averment that "on or about the **17th** day of **December**, A.D. **2019**," (Plaintiff Freese), or "on or about the **15th** day of **January**, A.D. **2020**," (Plaintiff Myers) or "on or about the **22nd** day of **January**, A.D. **2020**," (other Plaintiffs), each plaintiff

> did then and there having reasonable cause to believe that the physical and mental health and welfare of **12-YEAR OLD CHILD**, a child had been and may be adversely affected by the offense of **INDECENCY WITH CHILD SEXUAL CONTACT**, and the said then and there knowingly as a professional failed to report as provided by law, and has a duty to report under 261.101(a) of the Texas Family Code, and is a state jail felony under 261.109(c) of the Texas Family Code, the actor intended to conceal the abuse or neglect against the peace and dignity of the State.

Alonzo secured each arrest warrant by signing and presenting a sworn Affidavit for Arrest Warrant, which the Court will discuss in more detail in the next section.

Section 261.101 addresses who is required to report and sets out the time for doing so. The statute and other relevant statutes have undergone amendments since the events in question. Even

though the arrest warrants seem to parallel post-amendment language, the statutes in effect during the relevant time actually apply to the alleged failures to report.

At the time of the events in question (December 2019 and January 2020), subsection (a) provided: "A person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person shall immediately make a report as provided by this subchapter." Section 261.101(b) applies to professionals and, at the relevant time, provided in pertinent part:

> If a professional has cause to believe that a child has been abused or neglected or may be abused or neglected, or that a child is a victim of an offense under Section 21.11, Penal Code, and the professional has cause to believe that the child has been abused as defined by Section 261.001, the professional shall make a report not later than the 48th hour after the hour the professional first suspects that the child has been or may be abused or neglected or is a victim of an offense under Section 21.11, Penal Code. A professional may not delegate to or rely on another person to make the report. . . .

Knowingly[6] failing to make a report required under Section 261.101(a) is typically a "Class A misdemeanor" under Texas law. *See* Tex. Fam. Code § 261.109(a) and (b). A professional, as defined in Section 261.101(b), likewise commits an offense by knowingly failing to make a report under that section. *See id.* § 261.109(a-1). This latter offense "is a state jail felony" if "the actor intended to conceal the abuse or neglect." *See id.* § 261.109(c).

This case has no neglect component. Phrased in the context of this case, Plaintiffs had a duty to report under Section 261.101(a) if they had cause to believe that B.B.'s "physical or mental health or welfare" had "been adversely affected by abuse." Similarly, Plaintiffs had a duty to report under Section 261.101(b) if they had cause to believe that B.B. (i) had been abused, (ii) "may be abused," or (iii) was a victim of a Section 21.11 offense; and (2) had cause to believe that B.B. had been "abused as defined by Section 261.001." Of course, in cases when a child has been abused,

---

[6] Under Texas law, "[a] person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." Tex. Pen. Code Ann. § 6.03(b).

these two beliefs largely merge into one with the understanding that prong two requires the abuse to be as specifically defined by the cited statutory provision. Furthermore, since 1995, Texas law has required the following matters to be reported: "A report should reflect the reporter's belief that a child has been or may be abused or neglected or has died of abuse or neglect." Tex. Fam. Code § 261.102.

Section 261.001 provides applicable definitions for various terms, including "abuse," with respect to the reporting requirements of Section 261.101. Abuse includes thirteen listed "acts or omissions by a person," but only one appears potentially relevant under the facts here: "sexual conduct harmful to a child's mental, emotional, or physical welfare," with such conduct encompassing "conduct that constitutes the offense of . . . indecency with a child under Section 21.11, Penal Code." *See* Tex. Fam. Code § 261.001(1)(E). Notably, for Chapter 261, Investigation of Report of Child Abuse or Neglect, of the Texas Family Code, abuse is "defined broadly and non-exclusively." *In re E.C.R.*, 402 S.W.3d 239, 246 (Tex. 2013). Under Texas law, the terms "'[i]ncludes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded." Tex. Gov't Code Ann. § 311.005(13).

Thus, in general, Section 261.001(1) does not provide an exclusive list. But because Section 261.101(b) uses the term "abused" multiple times—only one of which is specifically and directly tied to the definitional provision of Section 261.001—the specific "as defined by Section 261.001," creates an exclusive and exhaustive list of the types of abuse that qualify for that use of "abused." To hold otherwise would render the phrase "as defined by Section 261.001" superfluous because the broad definitional section of 261.001 applies generally to all references of abuse within the chapter.

Section 21.11(a) sets out two ways for a person to commit the offense of indecency with a child (defined as "younger than 17 years of age"): (1) the person "engages in sexual contact with

the child or causes the child to engage in sexual contact" or (2) the person, "with intent to arouse or gratify the sexual desire of any person, (A) exposes the person's anus or any part of the person's genitals, knowing the child is present; or (B) causes the child to expose the child's anus or any part of the child's genitals." The affidavit in support of the arrest warrants provides no basis to view the second of these two ways as applicable under the facts of this case.

Thus, in the context of this case, the question is whether "T.F." engaged in sexual contact with B.B. or whether he caused B.B. to engage in sexual contact. For § 21.11, "sexual contact" means "(1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child" or "(2) any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person." Tex. Penal Code § 21.11(c). But to qualify as "sexual contact" the aforementioned touching must be "committed with the intent to arouse or gratify the sexual desire of any person." *See id.* As described in the affidavit in support of the arrest warrants, T.F. both engaged in sexual contact and caused B.B. to engage in sexual contact with the intent to arouse or gratify his sexual desire.

The arrest warrants specifically allege a violation of Texas Family Code § 261.101(a), while also identifying the accused as a professional who intended to conceal the abuse or neglect thus elevating the offense to a felony under Section 261.109(c). Despite the reference to Section 261.101(a), the reference to professionals and intent to conceal clearly reflect that Section 261.101(b) is the actual offense charged. In the next section, the Court will set out the details of the affidavit presented in support of the arrest warrants.

## V. ARREST AFFIDAVIT

In federal court, Fed. R. Crim. P. 41 applies to search and arrest warrants. The "federal 'four corners' rule . . . requires the information necessary to support probable cause to be contained in the affidavit or in recorded oral testimony." *United States v. Chew*, 1 F.3d 1238, 1993 WL 309932, at *2 (5th Cir. May 13, 1993) (unpublished op.); 5th Cir. R. 47.5.3 (unpublished ops.

before Jan. 1, 1996 are precedent). However, since amendments in 1972, none of the federal "requirements apply to state warrants." *United States v. McKeever*, 905 F.2d 829, 832 (5th Cir. 1990) (en banc).

In any event, Texas also limits review "to the four corners of the affidavit" when "assessing the sufficiency of an affidavit for an arrest warrant." *Gurrusquieta v. State*, 244 S.W.3d 450, 452 (Tex. App. – Fort Worth 2007, pet. ref'd) (citing *Hankins v. State*, 132 S.W.3d 380, 388 (Tex. Crim. App. 2004), *overruled on other grounds*, *Mosley v. State*, 983 S.W.2d 249, 264 n.18 (Tex. Crim. App. 1998)). Further, in Texas, reviewing courts "should interpret the affidavit in a common sense and realistic manner, recognizing that the magistrate was permitted to draw reasonable inferences." *Id*. Affidavits "need not contain sufficient evidence that would convince a jury of the defendant's guilty [sic] beyond a reasonable doubt." *Glaze v. State*, 230 S.W.3d 258, 260 (Tex. App. – Waco 2007, pet. ref'd) (quoting *McFarland v. State*, 928 S.W.2d 482, 509 (Tex. Crim. App. 1996)). So long as the affidavit "satisfies the other constitutional and statutory requisites," an affidavit "need not show anything beyond the elements of the offense (*i.e.*, 'surplusage')." *Id*. at 262. Although this Court is reviewing the arrest affidavit in the context of a civil action brought under 42 U.S.C. § 1983, rather than a criminal proceeding, the Court finds the same review applicable here as set out in *Gurrusquieta* and *Glaze*.

Moreover, the Texas standards for reviewing warrant affidavits are consistent with Supreme Court precedent. *See Illinois v. Gates*, 462 U.S. 213, 235-38 (1983). Because affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation . . . [t]echnical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area." *Id*. at 235 (citation omitted). In fact, "warrants are—quite properly—issued on the basis of nontechnical, common-sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." *Id*. at 235-36 (citation omitted). Further, reviewing courts should pay "great deference" to a probable cause determination of a magistrate and

they "should not invalidate . . . warrants by interpreting affidavit[s] in a hypertechnical, rather than a commonsense manner." *Id.* at 236 (citation omitted).

In *Gates*, the Supreme Court reaffirmed "the traditional standard for review of an issuing magistrate's probable cause determination"—the magistrate must have a "substantial basis" for the probable cause finding, "the Fourth Amendment requires no more." *Id.* at 236-37. Stated differently, it "reaffirm[ed] the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations." *Id.* at 238. Because a substantial basis requires more than a bare bones affidavit, *id.* at 239, affiants must provide "supporting facts from which a magistrate could independently determine probable cause," *Blake v. Lambert*, 921 F.3d 215, 220 (5th Cir. 2019). To rise above an insufficient, bare bones affidavit, an officer must describe "the sources of his information and their reliability." *Id.* As affidavits "move beyond" such bare bones affidavits, *Gates* found that "the flexible, common-sense standard . . . better serves the purposes of the Fourth Amendment's probable cause requirement." 462 U.S. at 239. In light of this totality-of-the-circumstances analysis, the Court thus summarizes the warrant affidavits at issue in this case.

While identifying the "Suspected Party" differently to describe each of the Trinity Four educators and stating a belief that each Suspected Party had committed the offense of failure to report on or about various dates, Alonzo as affiant charged and accused each educator of such offense. Her five-page affidavit provides the same facts for each arrest warrant.[7] Although she used the term "suspect" throughout her affidavit, the suspect was not the Suspected Party as identified at the beginning of the affidavit. Reading the affidavit as a whole in a common sense and realistic manner, any reader would understand that the "suspect" was another student at Trinity,

---

[7] Under Texas law, "[a]n affidavit supporting an arrest warrant is denominated as a complaint." *Glaze v. State*, 230 S.W.3d 258, 260 (Tex. App. – Waco 2007, pet. ref'd) (citing Tex. Code Crim. Proc. Ann. arts. 15.04, 15.05; *Weems v. State*, 167 S.W.3d 350, 355 (Tex. App. – Houston [14th Dist.] 2005, pet. ref'd)). Among other things, the complaint "must show that the accused has committed some offense against the laws of the State, either directly or that the affiant has good reason to believe, and does believe, that the accused has committed such offense." Tex. Code Crim. Proc. Ann. art. 15.05(2).

not any educator identified at the outset. Still, it is poor form and potentially misleading to charge one person with a crime, and within the warrant affidavit use the term "suspect" for an entirely different person ("T.F") that was not being charged with the crime alleged.

Within her arrest affidavit, Alonzo states that she has probable cause to believe that each Suspected Party has committed the failure to report offense based on facts she sets out from the CAC interview and her subsequent interview of B.B.'s parents. The Court sets out those facts below.

## A. Facts from CAC Interview

Among other things, Alonzo states within the affidavit that B.B. (identified therein as "MV" for "minor victim") underwent a forensic interview on February 22, 2022, stated that she knew the difference between truth and lies, and promised to only speak about true matters. According to Alonzo, B.B. stated that she had been sexually assaulted while at Trinity and "that the incident occurred every other day for four months."

The "first time something happened" occurred when B.B. and T.F. were leaving Spanish class and T.F. grabbed B.B.'s butt. This resulted in T.F. asking "if he could grab her butt daily," to which B.B. agreed. B.B. stated that things escalated from that point forward and she spoke about another incident when T.F. grabbed her breasts while leaving class. The events escalated from T.F. grabbing her butt in September 2019, to grabbing her thigh, to make her hand touch his penis in October or November 2019.

B.B. described the first time that T.F. tried to put her hand on his penis. It happened in Spanish class. Through his clothes, she could feel his hard penis moving. She also described an incident that occurred after their Physical Education class—T.F. grabbed her breasts while moving his hands over clothes and moving his hard penis up and down her backside as he pressed it against her. These actions caused T.F. to breath hard. She said that T.F. frightened her because he was much larger than her, and she was afraid that something would happen that she could not stop.

23

Alonzo also noted that T.F. "is known to be very well-liked and lies a lot." B.B. mentioned multiple times when she would look at T.F. and say "uh, uh," to indicate "No," which should have caused him to not touch her. Alonzo stated that whether T.F. understood it to mean "No" is immaterial because B.B. could not consent to sexual contact given her age at the time.

B.B. related that "the last time the incident occurred . . . was the worst" and Alonzo believed that was December 17, 2019, about a week after the incident following Physical Education. The final incident occurred in Spanish class while the teacher was out of the room. Essentially, T.F. stuck his hand in B.B's pants trying to reach her vagina. During the incident, B.B. "began to tear up" and "mouthed to another student for help." According to Alonzo, "MV stated suspect's hand did touch her vagina and did so over the clothes" during this incident. After class, "MV finally broke down (emotionally) and told a friend when they left the classroom." This friend then told Dean Freese who summoned the suspect to his office.

The next day, B.B. told Dean Freese "everything that had happened" that semester. According to Alonzo, on that day, Freese was notified of the offense of indecency with a child, an offense to which he had a duty to report as a professional, and he did not report the offense which violated Texas Family Code § 261.109 and was a state jail felony.

**B. Facts from Parents Interview**

The mother told Alonzo that, as she reviewed text messages on B.B.'s phone in December 2019, she became aware of inappropriate touching between the two students. After the mother discussed this with B.B., the mother believed that T.F. was "just touching [her] butt." Still, the parents contacted Freese via a December 12, 2019 email that they provided to Alonzo. Freese denied receiving the email. The same day of the last incident between B.B. and T.F., which Alonzo identified as December 16, 2019, a friend called the mother apologizing for what had happened that day to B.B. At that point, the mother was made aware of T.F. touching her daughter, which prompted the parents to speak to B.B. later that evening.

On December 17, 2019, the parents met with Freese to discuss the incident. Freese ex-plained that he had interviewed T.F. and "the child that came forward," would look for any video evidence, but also downplayed the incident as a "he said she said situation." After this meeting, the school went into winter break, the parents waited for the school's findings, and the mother emailed Hammer on January 14, 2020, about policies in place for future incidents. A meeting was scheduled for January 20, 2020.

In the interim, the parents had had enough on January 15, 2020, and arranged a meeting with Myers and Freese. The mother was upset that Freese had not removed T.F. from her daugh-ter's classes. The mother explained that B.B. was struggling with the fact that she and T.F. were in the same class again. According to Alonzo, on that day, Myers was notified of the offense of indecency with a child, an offense to which she had a duty to report as a professional, and she did not report the offense which violated Texas Family Code § 261.109 and was a state jail felony.

On January 21, 2020, the school conducted multiple interviews with male students who were taken out of B.B.'s classes one by one. The next day, the mother had a meeting with Hammer about sexual misconduct. Plaintiff Clifton was present and took notes. According to Alonzo, on that day, Hammer and Clifton were notified of the offense of indecency with a child, an offense to which they had a duty to report as a professional, and they did not report the offense which violated Texas Family Code § 261.109 and was a state jail felony.

The remaining part of that school year provided little reason for concern about the events, due to COVID and other matters. But upon returning to campus the next Fall, B.B. "did not respond well" when she saw T.F. so the family decided to move her to another school. On September 18, 2020, Hammer sent the parents a "Confidential Waiver and Release of all Claims," which if signed would allow the parents to receive a portion of the tuition paid for the 2020-2021 school year. The parents stated that Trinity wanted them to sign the "document agreeing they would not come after the school, for the 'incident.'" The parents ultimately decided against signing because they did not

want to prevent B.B. from talking about what had happened to her.

## VI. REVIEW OF VIDEO

With their motion to dismiss, the City and Alonzo provide a video of the CAC interview. *See* ECF No. 45-10 (submitted under seal in native format). "Factual allegations arising out of events captured on video are viewed 'in the light depicted by the videotape.'" *Lance v. City of San Antonio*, ___ F. Supp. 3d ___, ____, Case No. SA-21-CV-00837-JKP, 2024 WL 714327, at *3 (W.D. Tex. Feb. 20, 2024) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 381. Further, even "when consider-ing video evidence" on a motion to dismiss, "courts are 'not required to favor plaintiff's allegations over video evidence.'" *Willis v. Amifast*, No. 5:23-CV-1408-JKP, 2024 WL 1543232, at *11 (W.D. Tex. Apr. 9, 2024) (citing *Hartman v. Walker*, 685 F. App'x 366, 368 (5th Cir. 2017) (per curiam)).

The Court has reviewed the entirety of the CAC interview. Therein, B.B. presents as a young lady who was naïve about sexual matters during the time in question. The video does not unambiguously support Officer Alonzo's recitation of the matters set out in her warrant affidavit. Furthermore, although Alonzo testified that, during that interview, she had the opportunity to have the interviewer ask any follow-up questions that might be needed to clarify something the child stated in the interview, Tr. 10:21-11:5, nothing indicates that she sought to clarify anything from the interview. However, the interviewer did step out of the interview for a few moments at the end and returned with some additional questions. *See* CAC Interview 1:14:33.

For the most part, the Court has merely reviewed the video in the light depicted in the video. But when the video is ambiguous, it reviews the video and reasonable inferences therefrom in the light most favorable to Plaintiffs. And while the Court may state that the video shows certain facts, it goes without saying that such showing is generally shorthand for what B.B. has stated in

her interview.

While the video recording initially leaves some uncertainty as to the extent of contact by T.F. during the Spanish class incident, i.e., whether he touched her vagina, it is clear that he tried to do so. She later states that he "almost touched her vagina." CAC Interview 1:09:15. When asked about other times when he actually touched there, she stated that "he would kind of come up some-times and sort of rub his hands over it, but her pants were on." *Id.* 1:09:16 to 1:09:25. She described one time, when he rubbed his hand across that area as he came up behind her as he was running by in the hall. *Id.* 1:09:25 to 1:09:36. When questioned further, she stated that such an incident had occurred just one time. *Id.* 1:10:01. For that incident, there was no indication that it was done to arouse or gratify the sexual desire of any person.

The uncertainty regarding vaginal touching aside, the recording clearly exhibits that the alleged abuse occurred during one semester, involved classmates, and escalated from T.F. touching or grabbing B.B.'s butt, then her breasts, and ultimately to his attempt to put his hand down her pants to reach her vagina. B.B. also described two incidents when T.F. put her hand on his hard penis and one when he rubbed his hard penis against her backside while caressing her breasts. All incidents were overclothes except for T.F.'s attempt to put his hand down her pants, which suc-ceeded in going beneath clothes but only to B.B.'s panty line.

B.B. clearly states that she never specifically told him that he could not touch her and at times she specifically told him it was okay. But she also clearly indicates that she would tell him "no" or "to stop" in other ways. She discussed those ways during the follow-up questioning. Still, at one point earlier, she had indicated that she did not view it as "a big deal" because she was the one who "could have said no if [she] had the backbone." *Id.* 49:32 to 49:34. And she was angry at herself for not having enough information to know what to do in those circumstances. During her interview she did not appear to become upset or exhibit signs of emotional issues from the inci-dents. The interview provided mixed views of whether the incidents affected her emotional state

during the time in question. She did state that when she came back for the 2020-2021 school year, seeing T.F. caused her anxiety and PTSD ("post-traumatic stress disorder"). *Id*. 1:01:37.

Regardless, according to B.B., she teared up during the Spanish class incident and finally told a friend after class. In describing this conversation, she said she was "kind of like freaking out," and her friend asked her what was going on until she told him that T.F. "just keeps on touching me and won't stop" and had been doing so since September. *Id*. 1:04:08 to 1:04:40. Earlier in the interview, B.B. had described this outcry as she "broke in the hall," told a friend "what had happened" and told him not to tell anyone, but he told the Dean who called T.F. out from their next class. *Id*. 20:04 to 20:48. Prior to this outcry in the hall, B.B. said she had only told one person about any incident with T.F.—she had texted a different friend that T.F. "just keeps on touching my butt." *Id*. 1:03:12 to 1:03:47.

The day after her friend told the Dean, the Dean called B.B. to his office where she told him "everything that had happened," from September to December, even though she was "uncomfortable" telling a male alone. *Id*. 20:54 to 21:15. She stated she told him "everything in detail" and "at this point, my parents did not even know, because I had not told anyone." *Id*. 22:20 to 22:27. She later stated that her parents "had no idea this was going on." *Id*. 1:07:05

## VII. SECTION 1983

Plaintiffs bring this action under 42 U.S.C. § 1983. "Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (citation and internal quotation marks omitted). "[T]here can be no § 1983 liability unless" the plaintiff has "suffered a constitutional violation . . . at the hands of . . . a state actor." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 867 (5th Cir. 2012) (en banc).

"Accordingly, for a § 1983 claim to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the plaintiff must allege that (1) a state actor, i.e., a person or entity acting under color of

state law, (2) deprived the plaintiff of a federal constitutional right." *Alvarado v. Tex. Health & Hum. Servs. Comm'n*, No. 5:19-CV-0106-JKP, 2020 WL 4677304, at *4 (W.D. Tex. Aug. 12, 2020) (citation and internal quotation marks omitted). And, as mentioned earlier, when qualified immunity is at issue, the operative pleading must allege enough facts to defeat the defense. *McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017).

Defendants have each moved for dismissal under Fed. R. Civ. P. 12(b)(6). As a District Attorney, Defendant Nodolf claims absolute and qualified immunity and argues that Plaintiffs have pleaded insufficient facts to support a claim against her. Defendants Alonzo and the City likewise argue similar pleading deficiencies while also asserting qualified immunity (Alonzo) and deficiencies specific to municipal liability (the City). Along with immunity, the individual defendants primarily argue that probable cause supports the arrests and Plaintiffs' claims are barred by the independent intermediary doctrine. The County urges dismissal because Plaintiffs merely attempt to link it to the underlying arrests and prosecutions through DA Nodolf, but her actions were on behalf of the State of Texas, not Midland County.

Plaintiffs' claims overlap to a large extent, as do defenses asserted by the individual defendants. The Court will begin with the individual defendants before discussing the entities.

## A. Prosecutorial Immunity

Defendant Nodolf argues that she is entitled to absolute immunity as a prosecutor for all claims asserted against her. More particularly, she asserts absolute immunity for (1) instructing Defendant Alonzo to arrest Plaintiffs on a felony charge without conducting additional investigation (SAC ¶ 6) and (2) presenting false information and misrepresentations to the grand jury (SAC at ¶ 13).

Courts "accept the allegations of [the] complaint as true," when "determining immunity." *Kalina v. Fletcher*, 522 U.S. 118, 122 (1997). Moreover, "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v.*

*Reed*, 500 U.S. 478, 486 (1991). The Supreme Court recognizes that "prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" *Id*. (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976)). This includes "alleged knowing use of false testimony at trial and the alleged deliberate suppression of exculpatory evidence." *Id*. It also includes appearing "in court in support of an application for a search warrant and the presentation of evidence at that hearing." *Id*. at 492. But "advising the police in the investigative phase of a criminal case" does not qualify for absolute immunity. *Id*. at 493; *accord Terwilliger v. Reyna*, 4 F.4th 270, 280 (5th Cir. 2021).

As Plaintiffs point out, SAC ¶ 156, Nodolf lacks the benefit of absolute immunity on the facts alleged to the extent she was directing a police investigation rather than acting in her role as a prosecutor, *see Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (recognizing that absolute immunity does not cover investigatory acts of a prosecutor). At most, Nodolf is only entitled to qualified immunity for her investigatory duties. *See id*. at 273-74; *accord Terwilliger*, 4 F.4th at 280 ("Based on the pleadings pertaining to his investigative activity, D.A. Reyna's immunity is limited to that of a law enforcement officer."). Nodolf has not carried her burden to show that she is entitled to absolute immunity for her direction to Alonzo to arrest Plaintiffs without additional investigation. However, absolute immunity protects her from liability regarding the allegations of presenting false information and misrepresentations to the grand jury. Presentation of evidence is advocatory and thus protected by absolute immunity. *Wearry v. Foster*, 33 F.4th 260, 272 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 2459 (2023).

## B. Qualified Immunity

Nodolf and Alonzo have invoked qualified immunity. Nothing suggests that they have not invoked it in good faith. As emphasized earlier, plaintiffs have the burden of demonstrating the inapplicability of the qualified immunity defense. A failure to respond to a motion to dismiss

asserting qualified immunity would in most circumstances result in a failure to carry that burden. But in this case, Plaintiffs anticipated the qualified immunity defense and asserts their challenge within their pleadings, including the SAC.

As to Defendants Nodolf and Alonzo, Plaintiffs assert that they were falsely arrested in violation of the Fourth and Fourteenth Amendments. SAC ¶¶ 139-73 (relying on *Malley v. Briggs*, 475 U.S. 335 (1986)); 174-93 (relying on *Franks v. Delaware*, 438 U.S. 154 (1978)). Separately, the assert a violation of their due process rights under the Fourteenth Amendment. *See id*. ¶¶ 194-98. The due process claim is initially premised on the right "to be free from unlawful arrest," *id*. ¶ 194, but Plaintiffs also allege that they were "deprived of their right to privacy, specifically the intrusion upon their seclusion or solitude and private affairs," *id*. ¶ 198. Regardless, the alleged deprivation resulted from their alleged unlawful and false arrest.

Plaintiffs assert that deficiencies with the warrant affidavit signed by Officer Alonzo caused their false arrests. They contend that they can hold both DA Nodolf and Alonzo liable for the shortcomings of the affidavit. Assessing such "liability claims and the Defendants' responsive qualified immunity claims on the bare pleadings is difficult." *See Terwilliger v. Reyna*, 4 F.4th 270, 281 (5th Cir. 2021). Still, both the Supreme Court and the Fifth Circuit stress that issues of qualified immunity application "should be resolved 'at the earliest possible state in the litigation.'" *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Regardless, as recognized in *Pearson*, "the precise factual basis for the plaintiff's claim or claims may be hard to identify," when a defendant asserts "qualified immunity . . . at the pleading stage." 555 U.S. at 238-39.

As the Supreme Court held long ago, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Whether qualified immunity can be

invoked turns on the 'objective legal reasonableness' of the official's acts." *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (quoting *Harlow*, 457 U.S. at 819). And "the objective reasonableness of an official's conduct [is] measured by reference to clearly established law" as of "the time an action occurred." *Harlow*, 457 U.S. at 818. If the law is not clearly established when conduct occurs, officials cannot "reasonably be expected to anticipate subsequent legal developments, nor could [they] fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.*

The "requirement—that an official loses qualified immunity only for violating clearly established law—protects officials accused of violating 'extremely abstract rights.'" *Ziglar*, 582 U.S. at 151 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

> By defining the limits of qualified immunity essentially in objective terms, [courts] provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences."

*Harlow*, 457 U.S. at 819 (omitting footnote and quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)).

"The Fourth Amendment provides an example of how qualified immunity functions with respect to abstract rights." *Ziglar*, 582 U.S. at 151. While the plain language of the "Amendment forbids unreasonable searches and seizures . . . it may be difficult for an officer to know whether a search or seizure will be deemed reasonable given the precise situation encountered." *Id.* Thus, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam ) (adding emphasis while quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)). "That is because qualified immunity is inappropriate only where the officer had 'fair notice'—'in light of the specific context of the case, not as

a broad general proposition'—that his particular conduct was unlawful." *Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

Courts "must frame the constitutional question with specificity and granularity." *Morrow*, 917 F.3d at 874-75. The Supreme court has "repeatedly" guided courts "not to define clearly established law at a high level of generality." *al–Kidd*, 563 U.S. at 742 (citing cases); *accord City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam). It has stated

> that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640 (citations omitted). This means that it is insufficient "that a rule be suggested by then-existing precedent." *Bond*, 595 U.S. at 12. Stated slightly differently, "clearly established" means "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up while omitting citation). Thus, there need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al–Kidd*, 563 U.S. at 741.

"Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley*, 475 U.S. at 341). "To determine whether a given officer falls into either of those two categories, a court must ask whether it would have been clear to a reasonable officer that the alleged conduct "was unlawful in the

situation he confronted." *Ziglar*, 582 U.S. at 152 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). An affirmative answer means that "the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity." *Id*. Otherwise, "however—i.e., if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Id*.

The same standards for qualified immunity apply to a prosecutor as police officers conducting the investigation. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 273-74 (1993). "When the functions of prosecutors and detectives are the same . . . the immunity that protects them is also the same." *Id*. at 276. While Plaintiffs recognize that Nodolf might have qualified immunity for directing Alonzo's investigation, SAC ¶ 156, they seek to overcome the assertions of qualified immunity through *Malley* and *Franks*. Relying on *Malley*, Plaintiffs contend that Nodolf and Alonzo lose qualified immunity protection. *See id*. ¶¶ 158, 163-73. They also rely on *Franks* as to claimed violations of the Fourth and Fourteenth Amendments. *See id*. ¶¶ 174-93. While they initially assert the *Franks* claim solely against Defendant Alonzo, *see id*. ¶ 175, they later make several allegations as to Defendant Nodolf, *see id*. ¶ 185-92.

Overcoming an asserted qualified immunity defense and satisfying their burden to show the defense is unavailable, Plaintiffs "must satisfy a two-prong test." *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc) (citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc)). Step 1 requires plaintiffs to "show 'that the official violated a statutory or constitutional right.'" *Id*. (quoting *Morgan*, 659 F.3d at 371); *accord Pearson*, 555 U.S. at 232 (identifying Step 1 as requiring courts to "decide whether the facts that a plaintiff has alleged (*see* Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right"). Under Step 2, plaintiffs "must show that 'the right was clearly established at the time of the challenged conduct." *Melton*, 875 F.3d at 261 (citation and internal quotation marks omitted); *accord Pearson*, 555 U.S. at 232 (identifying Step 2 as requiring courts to "decide whether the right at

issue was clearly established at the time of defendant's alleged misconduct"). Although *Melton* does not speak in terms of objective reasonableness, *see* 875 F.3d at 259-66, *Pearson* clearly reflects that the Step 2 "inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken,'" 555 U.S. at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

### 1. Fourteenth Amendment

At the outset, the Court recognizes that Plaintiffs' reliance on the Fourteenth Amendment is "foreclosed by the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266, 114 S. Ct. 807, 127 L.Ed.2d 114 (1994)." *See Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 814 (5th Cir. 2010). As noted in *Cuadra*, the Supreme Court held in *Albright* "that there was no Fourteenth Amendment 'liberty interest' or substantive due process right to be free from criminal prosecution unsupported by probable cause." *Id.* (quoting *Albright*, 510 U.S. at 270-71). Instead, when "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process must be the guide for analyzing these claims." *Albright*, 510 U.S. at 273 (citations and internal quotation marks omitted). Claims based on prosecution without probable cause are best analyzed under the Fourth Amendment, as the "Framers [of the Constitution] considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it." *Id.* at 274.

Here, Plaintiffs' Fourteenth Amendment claims are based on the same alleged pretrial deprivations as their Fourth Amendment claims. Accordingly, under *Albright*, the Court analyzes such claims under the Fourth Amendment. Despite the invocation of the Fourteenth Amendment, the Fourth Amendment provides the proper constitutional basis for Plaintiffs' claims of false arrest.

### 2. **Fourth Amendment**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 56 (2018) (quoting *Payton v. New York*, 445 U.S. 573, 585, (1980)). Consistent with this Amendment an arrest must be "supported by probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Probable cause is "a necessary component" of false arrest claims. *See Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010). "The constitutional claim of false arrest requires a showing of no probable cause." *Club Retro, LLC v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009).

Probable cause justifies an arrest when "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *accord Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017); *Parker v. State*, 206 S.W.3d 593, 596 (Tex. Crim. App. 2006) (setting out same standard under Texas law). An officer's personal knowledge as well as "reasonably trustworthy information" known to the officer may both support a finding of probable cause. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009); *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964); *Grisham v. Valenciano*, 93 F.4th 903, 908 (5th Cir. 2024); *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003). "The long-prevailing standard of probable cause protects 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime,' while giving 'fair leeway for enforcing the law in the community's protection.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

The existence of probable cause "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152.

Courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Wesby*, 583 U.S. at 56-57 (citation and internal quotation marks omitted). In other words, when determining the existence of probable cause, courts consider "the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest." *United States v. McCowan*, 469 F.3d 386, 390 (5th Cir. 2006).

While the existence of probable cause "depends on the totality of the circumstances," its core substance "is a reasonable ground for belief of guilt and that belief of guilt must be particularized with respect to the person to be searched or seized." *Pringle*, 540 U.S. at 371 (citations and internal quotation marks omitted). "It requires not merely a reasonable suspicion that a crime has been committed, but a reasonable basis under the circumstances for reaching that conclusion and for acting on it." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988). Additionally, "while law enforcement personnel 'may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.'" *Evett*, 330 F.3d at 688 (quoting *Bigford*, 834 F.2d at 1218). Nor may they forego further investigation when a reasonable and prudent officer would not have made the arrest based on the available information at the time of the arrest. *Id*. The Fifth Circuit has "recognized that police officers may be liable for illegal detention under § 1983 for deliberately ignoring exonerative evidence or conducting a reckless investigation." *Hernandez v. Terrones*, 397 F. App'x 954, 965-66 (5th Cir. 2010) (per curiam) (citing *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992), *overruled on other grounds by Albright v. Oliver*, 510 U.S. 266 (1994)). Stated simply, some circumstances may remove probable cause when further investigation would have been pursued by a reasonable and prudent officer.

Nevertheless, "an arresting officer's state of mind (except for the facts that he [(or she)] knows) is irrelevant to the existence of probable cause." *Devenpeck*, 543 U.S. at 153. The Supreme Court has "repeatedly explained" that "the fact that the officer does not have the state of mind

which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id*. (citation and internal quotation marks omitted).

Probable cause, furthermore, is "a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules," because it "deals with probabilities and depends on the totality of the circumstances." *Wesby*, 583 U.S. at 57 (citations and internal quotation marks omitted). Probable cause is satisfied with less than "an actual showing of" criminal activity—it only requires "a probability or substantial chance of criminal activity," which "is not a high bar." *Id*. (citations omitted). Additionally, "probable cause may be for any crime and is not limited to the crime that the officers subjectively considered at the time they perform an arrest." *Davidson*, 848 F.3d 392.

Alonzo and Nodolf argue that probable cause supports the arrests and the independent intermediary doctrine bars Plaintiffs' claims. But, as previously mentioned, Plaintiffs premise their Fourth Amendment false arrest claims on a lack of probable cause resulting from an insufficient investigation, a facially insufficient warrant affidavit as addressed in *Malley*, and intentional or reckless falsehoods or omissions within the warrant affidavit as addressed in *Franks*. Plaintiffs allege that the individual defendants did not care whether probable cause existed. *See* SAC ¶ 146. Nodolf simply told "Alonzo to stop her investigation and arrest the Plaintiffs—telling her they could fill in any holes later." *Id*. And Alonzo complied. *Id*. ¶¶ 55, 58-59.

*Malley* and *Franks* provide distinct avenues for alleged Fourth Amendment violations. *Malley* is concerned with allegations that a warrant affidavit facially fails to establish probable cause, whereas *Franks* concerns intentional or reckless statements in the warrant resulting in the warrant lacking probable cause. *See Terwilliger v. Reyna*, 4 F.4th 270, 279 (5th Cir. 2021) (setting out basis for *Malley* and *Franks* claims). A claimed insufficient investigation may present a basis for a Fourth Amendment violation through *Franks*. *See Bledsoe v. Willis*, No. 23-30238, 2023 WL 8184814, at \*6 (5th Cir. Nov. 27, 2023) (per curiam). Indeed, since at least 2003, the Fifth Circuit

has recognized that officers may not forego a reasonable investigation when there is no time ur-

gency to make an arrest. *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003). And since at least

1988, the Fifth Circuit has recognized that officers "may not disregard facts tending to dissipate

probable cause," even though they may rely on the totality of available facts to establish probable

cause. *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988).

In *Malley*, the Supreme Court held that "the shield of immunity" is lost when a "warrant

application is so lacking in indicia of probable cause as to render official belief in its existence

unreasonable." 475 U.S. at 345. The pertinent inquiry is "whether a reasonably well-trained officer

in [the officer's] position would have known that his affidavit failed to establish probable cause

and that he should not have applied for the warrant." *Id.* "*Malley* specifically decided only whether

the officer who actually presents or applies for the warrant is liable." *Michalik v. Hermann*, 422

F.3d 252, 259 (5th Cir. 2005). But the Fifth Circuit has extended *Malley* to apply to "an officer

who actually prepares the warrant application with knowledge that a warrant would be based solely

on the document prepared." *Id.* at 261. Such extension is warranted because such preparer "is in a

position to see the whole picture, to understand his responsibility, and thus fully to assess probable

cause questions." *Id.* The Fifth Circuit, however, declined to extend application of *Malley* "beyond

the affiant and person who actually prepared, or was fully responsible for the preparation of, the

warrant application." *Id.*

"The *Malley* wrong is not the presentment of false evidence, but the obvious failure of

accurately presented evidence to support the probable cause required for the issuance of a warrant."

*Melton v. Phillips*, 875 F.3d 256, 264 (5th Cir. 2017) (en banc). When adopting the "totality of the

circumstances" test for determining probable cause, the Supreme Court recognized:

> The task of the issuing magistrate is simply to make a practical, common-sense
> decision whether, given all the circumstances set forth in the affidavit before him,
> including the "veracity" and "basis of knowledge" of persons supplying hearsay
> information, there is a fair probability that contraband or evidence of a crime will
> be found in a particular place. And the duty of a reviewing court is simply to ensure

that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause
existed.

*Illinois v. Gates*, 462 U.S. 213, 239-40 (1983) (citation omitted). "Although *Gates* dealt with the

issue of whether a search warrant was properly issued, it has been applied to cases involving arrest

warrants as well." *Hale v. Fish*, 899 F.2d 390, 399 (5th Cir. 1990).

      While "an officer can avoid liability under *Malley* if he presents a warrant affidavit that

facially supplies probable cause to arrest the subject of the warrant," the "officer can still be liable

under *Franks* if the apparent probable cause is the result of 'material misstatements or material

omissions.'" *Wilson v. Stroman*, 33 F.4th 202, 206 (5th Cir.) (quoting *Terwilliger*, 4 F.4th at 281),

*cert. denied sub nom. Reyna v. Wilson*, 143 S. Ct. 425 (2022), and *cert. denied*, 143 S. Ct. 426

(2022). An officer who "deliberately or recklessly provides false, material information for use in

an affidavit in support of [a warrant]" or "makes knowing and intentional omissions that result in

a warrant being issued without probable cause" is liable under *Franks*. *Id.* (quoting *Melton*, 875

F.3d at 264 (alteration in original) (emphasis removed)). "If the facts omitted from an affidavit are

'clearly critical' to a finding of probable cause, then recklessness may be inferred from the proof

of the omission itself." *Hale*, 899 F.2d at 400 (quoting *United States v. Martin*, 615 F.2d 318, 329

(5th Cir. 1980)).

      When there is a facially deficient affidavit under *Malley*, the *Franks* analysis is not trig-

gered. *See Blake v. Lambert*, 921 F.3d 215, 222 (5th Cir. 2019). In other words, there is no liability

"under *Franks* for intentionally omitting important exculpatory information from a warrant affi-

davit when the officer has also committed a *Malley* violation by presenting a facially deficient

warrant affidavit to the issuing judge." *Kohler v. Englade*, 470 F.3d 1104, 1114-15 (5th Cir. 2006).

These legal principles do not eliminate claims in the alternative.

      District attorneys acting in an investigatory role generate the basic facts for a probable

cause affidavit when, with full knowledge of the investigation, they direct officers to cease

investigating and to make arrests. *See Terwilliger*, 4 F.4th at 284. Allegations of such circumstances "are sufficient to tie [the DA] to potential *Franks* liability." *Id*. The DA's "causal role as the driving force behind the false affidavits and arrests," along with information that certain individuals should not be arrested on the facts known, provides an adequate basis to find that the DA "generated the basic facts set out in the probable cause affidavit." *Id*.; *accord Guerra v. Castillo*, 82 F.4th 278, 288 (5th Cir. 2023).

While *Franks* and *Malley* have been described in various ways, the Fifth Circuit has recognized them "as functional exceptions to the independent intermediary doctrine." *Wilson*, 33 F.4th at 208 (citing cases with various descriptors). As noted by the Fifth Circuit, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party." *Terwilliger*, 4 F.4th at 281 (quoting *Cuadra*, 626 F.3d at 813). "But the independent-intermediary doctrine is not absolute." *Loftin v. City of Prentiss,* 33 F.4th 774, 782 (5th Cir. 2022). When "an officer taints the intermediary's decision" through violations recognized in *Franks*, "[t]he chain of causation remains intact." *Id*. Consequently, "if a plaintiff adequately pleads that an officer has obtained an arrest warrant from a magistrate in violation of *Malley* or *Franks*, then nothing more is required to show that the independent intermediary doctrine does not apply with respect to that intermediary's decision." *Wilson*, 33 F.4th at 208. However, that "does not necessarily prevent a *second* intermediary's decision—such as a grand jury's subsequent indictment— from triggering the independent intermediary doctrine to ultimately insulate the officer from liability." *Id*.

In any event, "in a *Franks* case where a second intermediary is involved, a plaintiff need only show that the deliberations of the intermediary were tainted such that the second intermediary, like the first, did not have 'all the facts' before it necessary to render an independent determination of probable cause." *Id*. (quoting *Winfrey v. Rogers*, 901 F.3d 483, 497 (5th Cir. 2018)). In sum,

> just as an adequately pled *Malley* or *Franks* claim will also suffice to functionally
> apply the taint exception to the magistrate's decision, if a plaintiff adequately pleads
> that a second intermediary, such as a grand jury, has been misled in similar fashion,
> then the taint exception will apply to that intermediary's decision as well.

*Id*. at 212 (citation omitted).

The Fifth Circuit, moreover, "has squarely addressed a plaintiff's burden at the pleading stage with respect to the taint exception." *Id*. In this respect, "mere allegations of taint may be adequate to survive a motion to dismiss where the complaint alleges other facts supporting the inference." *Id*. (citation, internal quotation marks, and ellipses omitted). It has also recognized that grand jury proceedings are shrouded in secrecy, thus making it "understandably difficult for a plaintiff to know what was said—or wasn't said—to the grand jury absent any form of discovery." *Id*. Such secrecy "mean[s] that allegations about what was presented or omitted in the grand jury room will in some sense be speculative," but plaintiffs may overcome that reality by "alleg[ing] 'other facts supporting the inference' of what they allege to have occurred in the grand jury room." *Id*. (quoting *McLin v. Ard*, 866 F.3d 682, 690 (5th Cir. 2017)).

The Fifth Circuit has accepted the following allegations as supporting such an inference: (1) some officials who participated in the challenged warrant affidavit also testified before the grand jury, (2) those "officials made similar representations and omissions to the grand jury as they made to the magistrate," (3) the same officials made similar testimony in other proceedings, (4) exculpatory evidence was withheld from both the magistrate and the grand jury, and (5) plaintiffs "attempted to gain lawful access to records of the grand jury proceedings but were told that no transcript of the proceedings exists, nor any other recording from which a transcript could be made." *See id* at 212-13. Further, once "plaintiffs allege that specific representations and omissions that were made to the magistrate were also made to the grand jury and they allege 'other facts' that support that inference," courts consider "whether those representations were *false* and whether the omitted information was material to the probable cause *with respect to these plaintiffs*." *Id*. at 213. And that question "overlaps with whether plaintiffs have adequately alleged a *Franks* violation

with respect to the warrant application presented to the magistrate." *Id.*

### a. *Malley* Claims

Through their operative pleading, Plaintiffs contend that no reasonable officer would believe that probable cause supports their arrests because the information within the knowledge of Alonzo and Nodolf was insufficient to show (a) the "specific intent to conceal at the time of the alleged offense" that was necessary to make the offense a felony as charged and (b) "a knowing failure to report." SAC ¶¶ 154-55. The latter insufficiency encompasses multiple related deficiencies concerning probable cause all arising from the alleged insufficient investigation conducted prior to arresting the Trinity Four. These arguments arise from *Malley*.

Because Alonzo prepared and presented her affidavit to the Justice of the Peace, *Malley* removes her qualified immunity if Plaintiffs have shown that the warrant applications against them were "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." 475 U.S. at 345. The key to Nodolf losing qualified immunity under *Malley* is whether Plaintiffs have provided enough factual allegations to find her fully responsible for the preparation of the arrest warrant applications even though Officer Alonzo signed them.

Under the alleged facts in this case, Officer Alonzo took her limited investigation to the district attorney who instructed her to cease further investigation and to seek felony arrest warrants. Viewing the alleged facts in the light most favorable to Plaintiffs, Nodolf was the driving force behind the arrest affidavit and ultimate arrests of the Trinity Four. She took on a causal role through her directions to Alonzo. These alleged facts are sufficient to hold her liable as a generator of the arrest affidavit. *See Guerra v. Castillo*, 82 F.4th 278, 285-88 (5th Cir. 2023); *Terwilliger v. Reyna*, 4 F.4th 270, 280-84 (5th Cir. 2021). Accordingly, under the facts alleged, viewed in the light most favorable to Plaintiffs, the Court may consider DA Nodolf as fully responsible for the preparation of the warrant applications. *See Michalik v. Hermann*, 422 F.3d 252, 261 (5th Cir. 2005).

Alonzo counters the first alleged insufficiency by arguing that probable cause for arresting

Plaintiffs "is controlled by Tex. Family Code § 261.101, which makes no reference to intention to conceal." ECF No. 45 at 10. In actuality, Alonzo arrested the Trinity Four for allegedly failing to make required reports in violation of Texas Family Code § 261.109. As previously set out in detail, that statute makes it a misdemeanor for (a) any person who knowingly fails to make a required report under Section 261.101(a) and (a-1) any professional, as defined by Section 261.101(b), who knowingly fails to make a required report under Section 261.101(b). While the statute refers to Section 261.101 for determining when a report is required for all persons and for professionals specifically, it not only mandates that an accused be "required to make a report under Section 261.101(a)" or (b), but there must be a knowing failure to do so.

Although an offense committed by a professional may be elevated to "a state jail felony" and the arrest warrants here alleged such felony, Section 261.109 does not require any "intent to conceal" to determine whether one has committed an offense. At this level, intent to conceal is simply immaterial to the issue of probable cause in this case. This makes sense because one commits an offense—albeit a misdemeanor—under Section 261.109 regardless of any such intent. Additionally, even if the Court were to consider such intent as a required element for the felonious failure to report that Alonzo sought arrest warrants (which it does not), probable cause is not limited to the crime Alonzo may have subjectively considered when making the arrests or when seeking the arrest warrants.

These principles end the discussion regarding intent to conceal with respect to Plaintiffs proceeding with their Fourth Amendment claim under *Malley*. Application of these principles are sufficient to find that warrant affidavit is not "so lacking in indicia of probable cause as to render official belief in tis existence entirely unreasonable." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)).

Under *Malley*, the arguments about a knowing failure to report and cause to believe fare no better. On its face, the affidavit prepared and presented to the Justice of the Peace exhibits

probable cause for a knowing failure to report. Based on the matters set out in the affidavit, probable cause likewise exists for finding the requisite cause to believe. When the Court views the affidavit through the lens of "accurately presented" information, it finds no "obvious failure" regarding probable cause as required to find a *Malley* violation. *See Melton v. Phillips*, 875 F.3d 256, 264 (5th Cir. 2017) (en banc).

The Court thus dismisses Plaintiffs' Fourth Amendment claims pursued under *Malley*. It will revisit intent to conceal, knowing failure to report, and cause to believe in the next section when considering the totality of the circumstances under *Franks*.

### b. *Franks* Claims

Even though the warrant affidavit in this case facially supplies probable cause to arrest the Trinity Four, *Franks* comes into play when the apparent probable cause is the result of material misstatements or omissions.

> The elements of a *Franks* claim are: "(1) the affidavit supporting a warrant contained false statements or material omissions; (2) the affiant made such false statements or omissions knowingly and intentionally, or with reckless disregard for the truth; and (3) the false statements or material omissions were necessary to the finding of probable cause."

*Laviage v. Fite*, 47 F.4th 402, 406 (5th Cir. 2022) (quoting *Davis v. Hodgkiss*, 11 F.4th 329, 333 (5th Cir. 2021) (per curiam)).

Plaintiffs have alleged a number of material misstatements and omissions. *See* SAC ¶¶ 13 (four listed errors in affidavit); 67-71 (falsehoods regarding T.F. touching B.B.'s vagina and Myers not making a report); 73 (table of additional material falsehoods and omissions). They further allege that Alonzo made false statements or material omissions knowingly and intentionally or with reckless disregard for the truth. *Id.* ¶¶ 8, 65, 180-81, 195. They allege that the false statements and omissions were material to the finding of probable cause. *Id.* ¶¶ 8, 65-73, 180-81. They connect Nodolf to the affidavit as one fully knowledgeable about it and as the driving force behind the investigation. *Id.* ¶¶ 186-93.

Plaintiffs further argue that the affidavit lacks information to provide a reasonable officer to believe that (1) any plaintiff had the requisite "cause to believe" to prompt mandatory reporting requirements; (2) any failure to report occurred simultaneously with any intent to conceal; and (3) three of the four plaintiffs had any basis for concluding that they knew of any abuse or indecency. *Id*. ¶¶ 74-85. In addition, they allege that Alonzo lacked personal knowledge of her affirmative statements within her affidavit that each of the Trinity Four did not report reportable abuse. *See id*. ¶ 183. Throughout their operative pleading, they also allege that the individual defendants conducted an insufficient investigation.

Plaintiffs directly connect some allegations to their alleged *Malley* violation. Nevertheless, the totality of the circumstances warrants further consideration of them under *Franks*. Revisiting the intent component of the charges against the Trinity Four, it is apparent that, although the alleged failures to report occurred in December 2019 and January 2020, the arrests did not occur until more than two years later. As Plaintiffs allege, Alonzo had to obtain a warrant for a felonious failure to report because a simple failure to report has a two-year statute of limitations, whereas a felony has a three-year limitations period. *See* SAC ¶ 78 & nn.31-32; Tex. Code Crim. Proc. art. 12.01 and 12.02. Further, Nodolf specifically instructed Alonzo to obtain warrants for felony charges. *See* SAC ¶ 79. At trial, Alonzo testified that, "based on the advice from the D.A.'s office [she] filed it as a felony." Tr. 161:9-11.

These facts undoubtedly would affect probable cause if Texas law still required, as had been previously "held repeatedly that the State must always prove, as part of its burden of proof in a criminal prosecution, that the prosecution is not limitations-barred, even if the defendant does not raise the issue." *Proctor v. State*, 967 S.W.2d 840, 843 (Tex. Crim. App. 1998). But since the *Proctor* decision, Texas law now views a criminal statute of limitations as a defense that "is forfeited if not asserted at or before the guilt/innocence stage of trial." *Id.* at 844 (overruling all "prior decisions to the contrary"). And as other courts have noted, "[t]he existence of a statute of

limitations bar is a legal question that is appropriately evaluated by the district attorney or by a court after a prosecution is begun." *Newcomb v. Oktibbeha Cnty.*, No. 3:16-CV-119-MPM-DAS, 2018 WL 1404272, at *2 (N.D. Miss. Mar. 20, 2018) (quoting *Sands v. McCormick*, 502 F.3d 263, 269 (3d Cir. 2007); *Pickens v. Hollowell*, 59 F.3d 1203, 1207-08 (11th Cir. 1995)). Law enforcement "officers have no responsibility to determine the viability of a statute of limitations defense when executing a valid arrest warrant." *Pickens*, 59 F.3d at 1207. Officers

> should not be held personally liable for presenting this evidence to the district attorney who has the authority to make the ultimate decision whether to seek an indictment. Whether the statute of limitations bars a prosecution is a question of law. The officers properly deferred legal decisions to the district attorney.

*Williams v. City of Albany*, 936 F.2d 1256, 1260 (11th Cir. 1991).

Still, the allegations in this case include a district attorney who was involved in the investigation and had full knowledge of facts garnered through the limited investigation. As recognized in the previous section, Alonzo presented her limited investigation to Nodolf who, as the driving force behind the arrest affidavit, instructed Alonzo to cease additional investigation and to seek felony arrest warrants. From the facts alleged, not only did Nodolf know that there was no basis to arrest on a misdemeanor failure to report due to the statute of limitations, but she also lacked evidence of the requisite intent to conceal needed to elevate the offense to a felony. As alleged by Plaintiffs, Alonzo deferred to the district attorney who directed her to get arrest warrants for felony failure to report. The officer had no need to determine the viability of a limitations defense, but she and Nodolf did need probable cause independent of the limitations issue.

Given the instruction to obtain arrest warrants only for felony failure to report and the passing of two years since the alleged offenses, the Court may make a reasonable inference that the district attorney determined that there was no probable cause to arrest any plaintiff on a misdemeanor failure to report. With that reasonable inference and viewing the facts in the light most favorable to Plaintiffs, the only viable charge was the felonious version which requires an intent

to conceal at the time of the failure to report. And without a basis to conclude that any plaintiff had the requisite intent, there is no probable cause to support an arrest for the charged felony—the only charge available due to the statute of limitations.

The only indication of any intent to conceal known by either Alonzo or Nodolf was the waiver and release of claims received by the parents in September 2020, as part of the negotiations for the parents to obtain a partial refund of tuition for the 2020-2021 school year. The confidentiality agreement as part of that waiver and release provides no probable cause that any plaintiff had an intent to conceal at the time they allegedly committed the failure to report offense in December 2019 or January 2020.

In general, the Court does not agree with Plaintiffs that the warrant affidavit must contain facts regarding specific intent. Still, under these unusual circumstances, the Court sees the potential for their argument. Thus, to the extent the facts of this case permit consideration of whether there was probable cause for the charged felony failure to report, the Court finds such probable cause missing. The warrant affidavit failed to state that the only viable charge was the enhanced felonious failure to report. It did not mention that the officer had been directed by a district attorney to seek the felony version after the district attorney was fully informed of the investigation leading to the warrant affidavit. The Court finds these omissions material to the finding of probable cause. And viewing the alleged facts in the light most favorable to the Plaintiffs, the Court finds the other elements of a *Franks* claim satisfied. Thus, to the extent that Alonzo and Nodolf needed probable cause for the felony failure to report as analyzed in the foregoing paragraphs, Plaintiffs appear to satisfy the *Franks* elements.

But the Court need not (and does not) make any conclusive determination as to the felony enhancement in this case. It instead includes the above analysis to fully consider the totality of circumstances faced by Alonzo and Nodolf. As Plaintiffs assert, there are other issues with probable cause under the facts of this case. While the Court recognizes that some of these stated issues,

including the above analysis, are fairly technical for considerations of probable cause, especially when standing alone, it finds it prudent to address each issue so as to fully set out the totality of the circumstances. It understands that is review of the affidavit is to be in a realistic and common-sense manner so as to assure that there is a substantial basis for finding probable cause.

Plaintiffs contend that there is no probable cause that any of them knowingly failed to file a required report. Neither individual defendant directly addresses the "knowing" requirement even though they both maintain that probable cause supports the arrests. Alonzo specifically maintains that she had probable cause for the arrests under Section 261.101(a) and (b). She also contends that she had probable cause under subsection (a) without regard to subsection (b) or any enhanced reporting requirement for educators. ECF No. 45 at 9. She argues that "Plaintiffs allegations show they were informed of child abuse and chose not to report it." *Id.* at 13.

That argument misses the point. Even a misdemeanor offense requires more than simple notice of abuse. And what may be revealed in a civil pleading may differ from what the officer knew at the time of the arrest. As already set out, Section § 261.101(a) requires Plaintiffs to have cause to believe that B.B.'s "physical or mental health or welfare" had "been adversely affected by abuse." The required belief is considered as of the time of an alleged failure to report. When the alleged report should have been made, the accused had to have formed a belief that abuse by T.F. adversely affected B.B.'s physical or mental health or welfare. The matter required to be reported is "the reporter's belief that a child has been or may be abused or neglected or has died of abuse or neglect." Tex. Fam. Code § 261.102.

In conjunction with the required matters to be reported as set out in Section 261.102, the duty to report within Section 261.101(a) requires the reporter to have believed that T.F. abused B.B. and such abuse must fall within the definition of Texas Family Code § 261.001(1). In addition, Section 261.101(a) also requires the reporter to believe that the abuse by T.F. adversely affected B.B.'s physical or mental health or welfare. Thus, for purposes of Section 261.101(a),

49

B.B.'s health or welfare is only relevant as of December 2019 and January 2020, when the Trinity Fourt failed to make a report of abuse.

Alonzo contends that her arrests may be supported by "*any* abuse that affected the child victim's physical or mental health." ECF No. 45 at 9-10 (citing Tex. Fam. Code § 261.109). While nothing in Section 261.109 supports that contention, the applicable definitional section, Texas Family Code § 261.001(1) defines abuse as including those acts and omissions listed within the definitional statute. As previously explained, this generally makes the listed acts and omissions nonexclusive. *See In re E.C.R.*, 402 S.W.3d 239, 246 (Tex. 2013); Tex. Gov't Code § 311.005(13). And, for purposes of Section 261.101(a), "abuse" is not limited to the thirteen listed acts or omissions of Section 261.001(1).

Regardless of the breadth of the term, "abuse," and even though Section 261.101(a) applies broadly to any person, it still requires such person to have cause to believe. Given the breadth of the statute, many factors may impact whether a person has cause to believe that abuse has occurred. The credibility of the accuser, and if interviewed, the accused. The alleged circumstances—for instance, the accuser alleges circumstances that could not have provided an opportunity for the alleged abuse.

Dealing with a predecessor statute, the Texas Supreme Court long ago recognized that the reporting requirements of the Texas Family Code are "triggered when a person 'has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect.'" *Perry v. S.N.*, 973 S.W.2d 301, 307 (Tex. 1998) (quoting Tex. Fam. Code § 261.109(a), which was in effect at that time). Both then and as relevant to this case, a possible future adverse effect only pertains to reporting requirements for professionals. Importantly, "[d]etermining whether abuse is or may be occurring in a particular case is likely to be especially difficult for untrained laypersons." *Id.* at 308 n.6.

The Texas Supreme Court further recognized that "Texas is one of a minority of states that

require any person who suspects child abuse to report it." *Id.* For an eyewitness of sexual abuse, it is an easy conclusion to find such person to have cause to believe abuse was happening. *Id.* at 308. "In many other cases, however, a person may become aware of a possible case of child abuse only through second-hand reports or ambiguous physical symptoms, and it is unclear whether these circumstances are 'cause to believe' that such conduct 'may be' taking place." *Id.* While a statute, such as Texas Family Code § 261.109(a), "that conditions the requirement to report on these difficult judgment calls does not clearly define what conduct is required in many conceivable situations," such statute is not necessarily "unconstitutionally vague." *Id.* at 307-08 & n.7.

Here, no one suggests that any plaintiff is not a professional within the meaning of Section 261.101(b), which applies only to professionals. Professionals are trained to better determine whether abuse is or may be occurring under particular circumstances. This subsection also requires cause to believe—in fact it has two required causes to believe—one of three alternate bases including cause to believe that B.B. was a victim of a Section 21.11 offense and a second more encompassing requirement that B.B. had been "abused as defined by Section 261.001." As already discussed, this latter requirement makes the thirteen listed types of abuse exhaustive. And the only listed type of abuse that appears relevant in this case is within Texas Family Code § 261.001(1)(E)--"sexual conduct harmful to a child's mental, emotional, or physical welfare," with such conduct encompassing "conduct that constitutes the offense of . . . indecency with a child under Section 21.11, Penal Code."

Cause to believe is a vital component of any violation of the reporting requirements of Texas Family Code § 261.101(a) or (b). But, as Plaintiffs point out, *see* SAC ¶ 75, for each plaintiff, Alonzo only once mentions "cause to believe" and this is within the introductory paragraph of her averment which supports each signed warrant and sets out the necessary elements of the failure to report offense. At no point in her warrant affidavit does she state that any plaintiff formed the requisite belief. Instead, the warrant affidavit does no more than state that a particular plaintiff

was "notified" or "made aware" of the abuse alleged by B.B. and her parents.

As discussed above, cause to believe is not an easily defined element. And it does not necessarily equate to simply receiving notice or being made aware of allegations of abuse. Cause to believe, like probable cause, is determined from the totality of the circumstances. And this is true for the offense applicable to all persons and the one applicable specifically to professionals. Probable cause focuses on the information known to the arresting officer, whereas cause to believe under Section 261.101 focuses on the information known to the accused or potential accused. A professional's training may provide insights that favor forming such belief based on certain information or that raise questions which hinder the formation of such a belief. In other words, some information may enhance formation of the belief whereas other information may detract from forming such belief. Without hearing the whole story from both sides in a given situation, one may not have cause to believe.

Unlike witnessing abuse firsthand, hearing one side of a recitation of events may be insufficient to cause a person, even a professional, to form the requisite belief. Here, Alonzo and Nodolf knew that Freese had spoken to both T.F. and B.B., yet according to the parents, Freese viewed the incident as "he said she said." Based on this knowledge it is not clear Freese reached any conclusion regarding B.B's allegation of abuse. And, if as alleged in the operative pleading, B.B. and her parents actually had not mentioned any reportable abuse, then the statute's reporting requirements may not have been triggered at that time. Butt grabbing with intent to arouse or gratify the sexual desire of any person qualifies as sexual contact under Texas Penal Code 21.11, whereas butt grabbing without such intent does not qualify. At the CAC interview, the only sexual contact reported by B.B. which included the required intent were the incidents when T.F. touched her breasts and when he had her touch his penis. There was no indication that any butt grabbing by T.F. was accompanied by any sexual gratification intent. While Defendants might view butt grabbing as always accompanied by such gratifying intent, they instead focus on the other alleged

abuse. In any event, the Court will not indulge such a presumption of intent.

Similarly, whether any other plaintiff had cause to believe is equally uncertain under the facts set out in Alonzo's affidavit and known to Nodolf. Of course, an officer needs only probable cause before making an arrest. And probable cause is often present without obtaining all relevant information. Officers certainly do not need all the information before they can make an arrest supported by probable cause. In a given failure-to-report case, an officer may view the facts known to him or her and have enough basis to have probable cause that the accused had the requisite cause to believe.

A good faith mistake regarding probable cause should not subject the officer to civil liability when the officer has "acted in reasonable reliance on [a] warrant" issued by magistrate. *United States v. Alvarez*, 127 F.3d 372, 373 (5th Cir. 1997) (citing *United States v. Leon*, 468 U.S. 897, 920 (1984)). "The good faith exception requires answering the question of 'whether a reasonably well-trained officer would have known that the search [(or arrest)] was illegal despite the magistrate's authorization." *United States v. Triplett*, 684 F.3d 500, 504 (5th Cir. 2012) (quoting *Leon*, 468 U.S. at 922 n.23). The good faith exception does not apply in four circumstances:

> (1) If the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth; (2) where the issuing magistrate/judge wholly abandoned his or her judicial role; (3) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid.

*Id*. at 504 (quoting *United States v. Payne*, 341 F.3d 393, 399-400 (5th Cir. 2003)). The second and fourth circumstances are irrelevant on the facts of this case. Of course, the first circumstance is simply a *Franks* violation, and the third circumstance is a *Malley* violation. An officer cannot rely on objective good faith when an objectively reasonable officer would not have sought the arrest warrant. Moreover, as discussed in more detail later, an officer may not forego a reasonable

investigation when a reasonable and prudent officer in the same circumstances would not make the arrest without additional investigation.

Viewing alleged facts in the light most favorable to Plaintiffs, the Court is not convinced that probable cause existed to arrest any of the Trinity Four based on a failure to make a report under Texas Family Code § 261.101(a) or (b). To be sure, B.B. stated that T.F. had sexually assaulted her. But she defined "being sexually assaulted" broadly as "touching in places that you don't want to be touched or not giving consent." CAC Interview at 11:40 to 11:47. Despite that overly broad definition of sexual assault, she nevertheless provides enough facts at her CAC interview to find abuse as relevant for a duty to report under Section 261.101. Further, even though there might be some uncertainty as to how much she was affected emotionally, the Court finds enough facts to presume that the actions of T.F. affected her emotionally for purposes of the instant motions. No one suggests otherwise. Even with that presumption, however, the totality of the circumstances known to Alonzo and Nodolf at the time of the arrests requires consideration of other facts.

First, there was absolutely no urgency, no need to rush or truncate an investigation, and no need to proceed solely on the information gained from the limited investigation that had been conducted. Although the parents of a student had filed a police report in February 2022 concerning an alleged sexual assault, the alleged events had occurred more than two years previously when their daughter attended a different school. There were no allegations of any ongoing abuse, indeed even the limited investigation conducted by Alonzo showed that the last incident had occurred in December 2019. Even while the alleged victim remained at the same school as the alleged perpetrator there were no additional incidents.

Second, entities like CAC are statutorily required to "make a prompt and thorough investigation of a report of child abuse or neglect" committed by certain persons. Tex. Fam. Code § 261.301(a). While such entities are "not required to investigate" reports alleged committed "by a

person other than a person responsible for a child's care, custody, or welfare," law enforcement agencies "shall investigate that report if the agency determines an investigation should be conducted." *Id*. § 261.301(c). When the CAC investigates alleged abuse, "[t]he primary purpose of the investigation shall be the protection of the child." *Id*. § 261.301(d).

Thus, when the CAC conducted its interview its goals were to ascertain what had happened, who was involved, and whether the child was in any additional danger of abuse. Two years after alleged abuse, the focus was not on specifically what was reported or to whom. Nor were there any inquiries about whether any educator made any report of abuse, much less any inquiries about whether anyone knowingly failed to make a required report. Alonzo's trial testimony indicates that her initial focus was on whether there were facts to support a sexual assault offense. Tr. 11:13-16; 12:22-13:1. The failure to report offense did not come to mind until B.B. disclosed that she had reported the indecency-with-a-child offense to Freese. Tr. 21:9-20. Had Alonzo wanted matters from the interview clarified she could have had the interviewer ask follow-up questions. While some follow-up questions were asked after a break, they did not clarify all the uncertain matters arising from the interview.

Third, and perhaps most importantly, Alonzo and Nodolf knew that they were proceeding on limited information. They knew that Freese had spoken to T.F. and that the parents had stated that Freese viewed the situation as "he said, she said." But Alonzo did not interview either T.F. or Freese to see whether that affected her assessment of B.B. regarding whether a reportable incident or event had occurred. The CAC interviewer had B.B. define what truth and lies mean to her. CAC Interview 9:14 to 9:44. For B.B., one aspect of truth was "not something that someone has put in your head." *Id*. 9:14. This aspect takes on more importance because when she was defining what is a lie, she stated "like with me, people were putting things in my head, so I thought that was the truth for a long time . . . but that is not what happened." *Id*. 9:44 to 10:02. She later added, and "if you lie then people can't help you . . . and in this situation that actually happened . . . when you

are not being truthful it hurts." *Id.* 10:22 to 10:44. These statements raise appropriate questions, such as when did B.B. determine that people were filling her head with lies and did she tell school officials the same things that she was telling the CAC interviewer. For instance, telling Freese "everything" in 2019 could at least in theory differ from "everything" she was saying at her interview more than two years later after realizing at some point that someone was filling her head with things that were not true.

Alonzo also stated in her affidavit that T.F. "is very well-liked and lies a lot." But during a critical portion of the video of the CAC interview while B.B. was explaining why T.F. was scary to her, she stated that "everyone loved him," "everyone would believe him," and not her "because [she] was just a little cheerleader . . . who 'lies a lot.'" CAC Interview 34:15 to 34:35. She used "air quotes" while saying "lies a lot" presumably to indicate that people may think she lies a lot even though she does not share that view. It thus appears that Alonzo assigned the "lies a lot" to the wrong person. Alonzo also testified at trial that she had no personal knowledge regarding B.B., her parents, or "whether or not they were credible, honest, truthful people." Tr. 60:14-22. She also conceded at trial that she missed B.B. self-describing herself as "a little cheerleader who lies a lot." Tr. 110:22-25. She further conceded that that is "[k]ind of an important thing to leave out" of her affidavit. Tr. 111:11-17.

Even recognizing that Alonzo may have innocently missed the self-description and mistakenly viewed T.F. as the one who lies a lot, she knew the other facts, and still did not interview any classmates or friends to ascertain whether information from B.B. could be considered reasonably trustworthy such that Alonzo could rely on her statements for probable cause. Viewing the facts in the light most favorable to Plaintiffs, Alonzo merely accepted B.B.'s version without ascertaining whether she was credible. Even if not intentional, this appears to be reckless disregard for the truth.

The failure to investigate more thoroughly is even more concerning when one considers

what Alonzo and Nodolf knew regarding whether any educator had failed to make a required report. The affidavit Alonzo submitted to secure the arrest warrants sets out what her limited investigation indicated each educator knew that according to Alonzo qualified as indecency with a child. Alonzo also states that each educator did not report such offense in violation of Section 261.109. But, as Plaintiffs argue in their pleading, Alonzo's statements that the four educators did not report an indecency offense despite having knowledge of it, are conclusory and provide no basis for a magistrate to make a judgment regarding probable cause. *See* SAC ¶ 183 & n.52.

As the Supreme Court has held, a warrant "affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239 (1983). Alonzo makes conclusory statements that the educators did not report the indecency offense reported to them and thus provides "the magistrate virtually no basis at all for making a judgment regarding probable cause." *See id*. Officers must present enough information "to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Id*. Courts are obligated "to ensure that such an abdication of the magistrate's duty does not occur," by continuing "to conscientiously review the sufficiency of affidavits on which warrants are issued." *Id*. Naturally, as an affidavit "move[s] beyond 'bare bones'" statements, "this area simply does not lend itself to a prescribed set of rules . . . [i]nstead, the flexible, common-sense standard . . . better serves the purposes of the Fourth Amendment's probable cause requirement." *Id*.

In this case, it is uncertain on what basis Alonzo perceived a failure to report. According to the allegations of Plaintiffs, which are viewed in the light most favorable to them at this stage of the litigation, Alonzo's investigation consisted of observing an interview of B.B., conducting an interview of the parents, and reviewing some documents provided by them. But B.B. had made no statement that any educator failed to make a required report. Her interview simply did not address that aspect of the charged offense. Likewise, the parents would not be privy to information

that a report had not been filed, and nothing indicates that their interview provided a reasonable basis for Alonzo or Nodolf to believe that any educator had failed to make a required report. Plaintiffs specifically allege that Alonzo lacked personal knowledge to support her statements that each charged educator did not report the indecency-with-a-child offense. SAC ¶ 183.

Perhaps the individual defendants perceived a failure to report based on the inaction perceived by the parents. Perhaps they knew that no report had been filed with a law enforcement agency. But neither of these speculative possibilities provide a reasonable basis for Alonzo to charge a failure to report. For an offense such as failure to report that does not impose any urgency upon a law enforcement officer and is easily verified through a proper inquiry to the accused or through appropriate agency channels, it is simply unreasonable and reckless to not make appropriate inquiry into whether the accused has indeed failed to make a required report. In these circumstances, probable cause needs more than what Alonzo and Nodolf had. The Court can discern no circumstances where an officer would need to act in such haste that there is no time to make a simple inquiry about whether a report has been filed. And even if there might be such circumstances, they are not present in this case.

Section 261.103(a) of the Texas Family Code requires that any report be made to one of three alternate agencies. Thus, one can make a report without submitting it to any law enforcement agency. If a report were made to the department, defined as Department of Family and Protective Services, *see* Tex. Fam. Code § 261.001(2), the department is mandated to "immediately notify the appropriate state or local law enforcement agency of any report it receives." *See id.* § 261.105(b). Similarly, if a district attorney has informed the department that he or she wishes to receive notification of abuse reports, the department has a similar mandate to notify the district attorney. *See id.* § 261.1055. But, of course, any failure of the department to provide notification under Sections 261.105 or 261.1055 would not mean that a report was not made in accordance with Section 261.101(a) or (b). Absence of such notification would merely prompt a reasonable

and prudent officer to inquire further. Had Alonzo made a reasonable inquiry as to whether a report had been filed, any ambiguity in the alleged failure to report would have dissipated.

If the educators said they had made no report then there would be no question about that aspect of the charge. If they claimed to have made a report, then Alonzo could easily follow up on that claim to either verify it or not. In this instance, although not included in the warrant affidavit, Myers had made a report related to a photo T.F. had sent to B.B. which Myers learned about through the investigation of the incidents between B.B. and T.F.[8] No one asserts or alleges that any other report was made in relation to B.B. Citing to a pleading in this case, Nodolf even states that "it is undisputed that [Freese] did not report any [indecency with a child]." ECF No. 33 at 14. But such lack of dispute in the pleadings of this case has no bearing on the matters known to Alonzo and Nodolf when Alonzo made her arrests. Viewing the allegations in the light most favorable to Plaintiffs, that information was not known to either Nodolf or Alonzo at the time of the arrests.

From the alleged facts, it appears that Alonzo and Nodolf inferred a failure to report without a reasonable basis to do so. Such an inference might be acceptable when a quick decision is necessary to protect a child from ongoing abuse or anticipated future abuse. But that urgency is

---

[8] Nodolf argues that "even if Alonzo was mistaken in failing to include this statement, Plaintiffs do not state that Nodolf conspired to omit this statement 'with the intent to mislead the magistrate' or that its inclusion would have negated probable cause to find that Myers filed the report within 48 hours as required by the statute." ECF No. 38 at 8 (quoting *United States v. Torres*, 694 F. App'x 937, 944 (5th Cir. 2017)). The Court interprets this last clause as meaning that Myers did not file the report within 48 hours. But even with that interpretation, Nodolf does not mention that the 48 hours runs from the "the hour the professional first has cause to believe that the child has been or may be abused or neglected or is a victim of an offense under Section 21.11, Penal Code." Tex. Fam. Code § 216.101(b). As discussed more fully in the body of this Memorandum Opinion and Order, questions surrounding "cause to believe" would likewise create questions regarding the 48-hour deadline for filing a report. It is interesting to see the theory for arrest change from a complete failure to file a report by each of the educators to Myers failing to file a report within 48 hours. Either Alonzo and Nodolf knew of the Myers' report and intentionally failed to mention it, or they did not know of it, which exhibits a reckless disregard for the truth. The Fifth Circuit has recognized that "recklessness can in some circumstances be inferred directly from the omission itself." *United States v. Tomblin*, 46 F.3d 1369, 1377 (5th Cir. 1995).

Plaintiffs, furthermore, did specifically allege that Alonzo "intentionally, knowingly, or with reckless disregard for the truth misled the magistrate . . .." SAC ¶ 65. As previously discussed, they also present enough factual allegations to find that Nodolf was fully responsible for the warrant affidavit and can be held liable as a generator of the affidavit through her role in the investigation. As addressed later, Plaintiffs additionally allege that Nodolf conspired with Alonzo, which can also make Nodolf responsible for misleading the magistrate.

absent here. In the circumstances confronted by Alonzo and Nodolf in this case, a reasonable and prudent office would have sought a reasonable basis to conclude that the accused educators actually failed to make a required report. Of course, if there is no basis to conclude that the accused failed to make a required report, there is no basis for charging them with a knowing failure to report. The affidavit in support of the arrest warrants does not touch upon whether any educator knowingly failed to make a report—it merely states without a reasonable basis that the educators did not report the indecency-with-a-child offense. The charged offense, however, requires that the failure be a knowing failure. Because, under the limited investigation conducted by Alonzo, there is no reasonable basis for concluding that any educator failed to make a required report, there is no need to explore what is required for a knowing failure to report.

Still, had Alonzo made a reasonable inquiry into whether anyone had made a report, she would have learned about the report that Myers did make. Interviewing Myers would have revealed that "the only thing B.B. ever told her was that T.F. 'swatted' her on her backside," and that "no other child confirmed this nor did any camera footage." SAC ¶ 71. Because that report arose from the circumstances surrounding B.B. and T.F. the report appears pertinent to the state of mind of Myers at the relevant time. The school and the Trinity Four in particular had investigated the incidents in question and Myers alone filed a report. At this stage of the proceedings, a reasonable inference from such filing is that the school believed that the circumstances only warranted that report. Another reasonable inference is that, based on the school's investigation, Myers believed that such report satisfied her reporting duty. As to a report required by Section 261.101(a), each of the Trinity Four could reasonably believe that such report satisfied their duty to report.

However, because Section 261.101(b) specifically states that a "professional may not delegate or rely on another person to make the report," the Court cannot reasonably infer that the report filed by Myers satisfied the reporting requirement of subsection (b). But, viewing the factual allegations in the light most favorable to Plaintiffs, the report from Myers can provide a reasonable

inference at this stage that they believed the report filed by Myers satisfied all their reporting duties. And with such inference, one can reasonably infer that the knowing component is lacking.

The reckless and inadequate investigation permeated the entirety of the events surrounding this case. As the prior paragraphs indicate, additional investigation could have clarified whether those suspected of failing to report abuse had actually failed to make a report, and if so, whether such failure was knowingly. Further, although a key component to a failure-to-report offense in this case is that those accused have cause to believe that abuse has occurred, Nodolf instructed Alonzo to make the arrests without interviewing any accused educator. But in a case such as this, how does an officer have probable cause to support a conclusion that a professional has cause to believe that abuse has occurred if the officer does not investigate what the professional knows? At trial, Alonzo even conceded that if she did not know what B.B. told the school officials, then she did not "know that they had any cause to believe abuse." Tr. 111:24-112:4. But despite knowing that, Alonzo simply accepted B.B.'s version even though there were reasons and time for additional investigation. While the Court recognizes that this can be a common occurrence among officers, absent some urgent need for an arrest that is not present on the facts of this case, a reasonable and prudent officer would not ignore an investigatory path that could shed light on a primary element of a contemplated charged offense.

Of course, this does not mean that the officer, after conducting a proper investigation must defer to an educator's stance regarding cause to believe. After a reasonable investigation, an officer may not believe Myers' version of what she was told. But a reasonable and prudent officer under the circumstances present in this case would obtain statements from each accused so as to ascertain what they knew. At that point, the officer could make an informed decision as to probable cause. Just as an officer "may not disregard facts tending to dissipate probable cause," *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003), such officer cannot recklessly forego a reasonable investigation that may lead to facts tending to dissipate probable cause. The urgency of a given situation

naturally affects the reasonableness of additional investigation. But again, there was no urgency relevant to this case.

Similarly, with respect to whether B.B. had suffered abuse by T.F., Alonzo and Nodolf essentially had the word of B.B., whose credibility went unquestioned despite indicators that would cause a reasonable and prudent officer to investigate further. First and foremost, B.B.'s own interview provided reasons to investigate her credibility as already discussed. Second, Freese interviewed both T.F. and B.B., yet according to the parents, he viewed the situation as "he said, she said." Of course, a "he said, she said" situation does not necessarily negate a duty to report. But it can affect whether the educator formed the requisite cause to believe that would prompt such duty. And it provides a strong, if not definite, inference that the two young participants gave differing statements as to what transpired between them. To be sure, an officer need not accept a statement that one is innocent of asserted allegations. But that alone does not permit an officer to ignore reasons for additional, reasonable investigation or to simply take the word of one person without ascertaining that person's reputation for truthfulness.

With respect to her interactions with T.F. and her meeting with Dean Freese, B.B. is an eyewitness to those events. Had T.F. been the suspect of a crime, her identification of him could constitute sufficient probable cause for his arrest. *See United States v. Burbridge*, 252 F.3d 775, 778 (5th Cir. 2001) (discussing probable cause and eyewitness statements). But B.B. did not identify Freese or anyone else as someone who had failed to report her asserted abuse by T.F. Her interview simply did not go into who may have reported what other than that she stated that she told Freese "everything." Even then, no one asked her specifically what everything entailed. As mentioned previously, did "everything" in 2022 mean the same thing as "everything" in 2019 when B.B. spoke to Freese? Further, Alonzo had reason to at least look into B.B.'s credibility. Eyewitness statements are insufficient to establish probable cause if, "at the time of arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately

describe what he [or she] had seen, or was in some fashion mistaken regarding his [or her] recol-lection." *Id.* (quoting *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)). Absent a need for urgency, it is reckless for an officer to forego a reasonable investigation into the circumstances surrounding an alleged failure to report abuse, including ascertaining whether to consider a witness to be reasonable trustworthy source of information.

The pleadings and evidence presented to the Court leaves no doubt that T.F. touched B.B. in an impermissible manner. The Court's task is not to determine whether probable cause exists regarding T.F.'s touching of B.B. The relevant legal inquiry here centers on whether sufficient facts were presented to the educators to trigger their reporting requirements to justify their arrests.

When Alonzo reported the Trinity Four to CPS, that agency investigated the matter for more than two months before "ruling out any wrongdoing by Plaintiffs." SAC ¶¶ 47-48. Had law enforcement taken a reasonable and prudent approach to the circumstances existing in February 2022 perhaps their investigation would have led to the same results. And if not, any delayed arrest of the Trinity Four would have occurred after a reasonable and prudent investigation warranted under the circumstances.

Based on the limited, pre-arrest investigation, Alonzo and Nodolf had cause to investigate further, but they did not. At times, cause to investigate further may merge with probable cause for arrest. But under the circumstances alleged in this case, this is not one of those times.

As alleged in this case, Alonzo both participated in the preparation of the warrant affidavit and testified before the grand jury. SAC ¶¶ 7, 10. She prepared the affidavit presented to the Justice of the Peace with her application for arrest warrants for each of the Trinity Four. *Id.* ¶ 7. She prepared the warrant affidavit based on her three-part investigation after fully sharing the investi-gation with DA Nodolf who instructed her to proceed with obtaining arrest warrants without ad-ditional investigation. *Id.* ¶¶ 6-7.

The District Attorney's office presented Alonzo as a witness before the grand jury. Upon

information and belief, Alonzo testified before the grand jury in November 2022 consistently with her sworn affidavit in February 2022, which allegedly presented false information and misrepresented facts. *Id.* ¶ 13. Nearly nine months after the arrests, a grand jury indicted each of the Trinity Four for a felony failure to report. To the extent Alonzo or the prosecution knew the results of Alonzo's CPS report, such result appears pertinent to the issue of probable cause, but nothing indicates that its conclusions were mentioned during the grand jury proceedings.

Alonzo and Nodolf did all of these things while knowing that their investigation was incomplete at best, and completely insufficient at worst. Under the facts of this case viewed in the light most favorable to Plaintiffs, it was reckless of them to proceed without additional investigation.

The facts of this case are similar to those at issue in *Bledsoe v. Willis*, No. 23-30238, 2023 WL 8184814 (5th Cir. Nov. 27, 2023) (per curiam). As here, *Bledsoe* dealt with an alleged wrongful arrest without probable cause resulting from a reckless investigation that did not provide the full scope of information available to the Justice of the Peace. *See* 2023 WL 8184814, at *1-5. "At this stage of the proceedings, [Plaintiffs have] sufficiently alleged that the officers deliberately or recklessly omitted relevant information." *See id.* at *5. Based on Plaintiffs' "allegations, there is a plausible inference of reckless omission—and that is all [they] must show." *See id.* Plaintiffs here plausibly allege that an arrest warrant would not have been issued but for the reckless investigation that resulted in a warrant affidavit containing material misstatements or omissions.

As alleged by Plaintiffs, excluding the *Franks* errors and omissions to create a hypothetical "corrected affidavit" would not establish probable cause for issuing an arrest warrant for any of the Trinity Four. At the very least, such a "corrected affidavit" would (1) state that T.F. did not touch B.B.'s vagina during the "worst" incident which was reported to have taken place in Spanish class; (2) avoid any misperception that any touching of her vagina included any intent to gratify the sexual desire of any person because the only such incident mentioned by B.B. occurred during

an isolated run-by touching with no perceived intent required by the relevant statute; (3) indicate that B.B.'s friend who first reported anything to Dean Freese only knew that T.F. would not stop touching B.B.; (4) state B.B. (rather than T.F.) had potential credibility issues, which Alonzo did not investigate; (5) state that Myers did file a report based on the school's internal investigation; and (6) explain that a felony failure to report could not be pursued due to the passing of the statute of limitations, that the requisite intent for the felony enhancement was only based on a confidentiality provision set forth during negotiations of a civil matter eight months after the alleged failures to report, and only Hammer sent the confidentiality agreement to B.B.'s parents. With these corrections, the affidavit would not establish probable cause. Even discounting the correction related to statute of limitations and specific intent, the corrected affidavit would not establish probable cause.

Consequently, through *Franks*, the independent intermediary doctrine does not insulate Alonzo or Nodolf from liability. *See id.* *5-6. Officers who recklessly provide "false, material information for use in an affidavit in support of [a warrant]" or make "knowing and intentional omissions that result in a warrant being issued without probable cause" are liable under *Franks*. *Wilson v. Stroman*, 33 F.4th 202, 206 (5th Cir.) (quoting *Melton v. Phillips*, 875 F.3d 256, 264 (5th Cir. 2017) (en banc) (alteration in original) (emphasis removed)), *cert. denied sub nom. Reyna v. Wilson*, 143 S. Ct. 425 (2022), and *cert. denied*, 143 S. Ct. 426 (2022).

Because Plaintiffs have adequately pled that the arrest warrants here were obtained from the Justice of the Peace in violation of *Franks*, "nothing more is required to show that the independent intermediary doctrine does not apply with respect to that intermediary's decision." *Wilson*, 33 F.4th at 208. The Court, however, must determine whether the subsequent grand jury indictments trigger that doctrine and thus insulate Nodolf and Alonzo from liability. *See id.* But at this stage of the litigation, this is not an onerous burden on Plaintiffs. They "need only show that the deliberations of the intermediary were tainted such that the second intermediary, like the first, did

not have 'all the facts' before it necessary to render an independent determination of probable cause." *Id.* (quoting *Winfrey v. Rogers*, 901 F.3d 483, 497 (5th Cir. 2018)). When the operative pleading alleges other facts supporting the inference of taint, "mere allegations of taint may be adequate to survive a motion to dismiss." *Id.*

As in *Wilson*, Plaintiffs have satisfied their pleading burden. *See id.* They have alleged that Alonzo participated in the challenged warrant affidavit, testified before the grand jury, and made similar misrepresentations to both the grand jury and their criminal jury. They further allege that Alonzo withheld evidence from both the Justice of the Peace and the grand jury. Lastly, Plaintiffs allege that there is no recording of the grand jury proceedings because DA Nodolf instituted a policy against recording or transcribing such proceedings after a prior case ended in an acquittal when grand jury statements were repeatedly raised at trial. SAC ¶ 10 & n.2. Under the facts alleged in this case and viewed in the light most favorable to Plaintiffs, the Court finds that neither Alonzo nor Nodolf are shielded by the independent intermediary doctrine.

For the foregoing reasons, Plaintiffs have stated a plausible Fourth Amendment false arrest claim against Alonzo and Nodolf. But that is only the first step in overcoming the asserted qualified immunity defense. Plaintiffs must also show that the individual defendants are not entitled to qualified immunity based on clearly established law at the time of the arrests of the Trinity Four.

"There can be no doubt that the right not to be arrested absent probable cause was clearly established at the time" Alonzo arrested the Trinity Four. *See Alexander v. City of Round Rock*, 854 F.3d 298, 306-07 (5th Cir. 2017) (citing cases). As recognized in *Bledsoe*, furthermore, the Fifth Circuit "has stated repeatedly that the 'Fourth Amendment right to be free from arrest without probable cause is clearly established.'" 2023 WL 8184814, at *6 (quoting *Guerra v. Castillo*, 82 F.4th 278, 286 (5th Cir. 2023)). Relying on *Franks* and *Winfrey v. Rogers*, 901 F.3d 483 (5th Cir. 2018), the Fifth Circuit agreed that the officers in *Bledsoe* were not shielded by qualified immunity. *See* 2023 WL 8184814, at *6. In *Winfrey*, the Fifth Circuit held that since *Franks*,

66

it has been clearly established that . . . Fourth Amendment rights are violated if (1) the affiant, in support of the warrant, includes "a false statement knowingly and intentionally, or with reckless disregard for the truth" and (2) "the allegedly false statement is necessary to the finding of probable cause."

901 F.3d at 494 (quoting *Franks*, 438 U.S. at 155-56). *Winfrey* made that holding while recognizing that (1) courts must not determine clearly established law "at a high level of generality" and (2) the focus is on whether "*particular* conduct is clearly established" as to its violative nature. *Id.* at 493 (citations omitted). The violative conduct at issue in *Franks* is at issue here.

Further, the Fifth Circuit has clearly articulated that *Franks* liability extends to an officer, like Alonzo, who "signed the warrant affidavit and swore to the validity of the facts included in it." *Terwilliger v. Reyna*, 4 F.4th 270, 283 (5th Cir. 2021). Additionally, *Franks* liability extends to district attorneys acting in an investigator's role who can be considered as a generator of the arrest affidavit. *Id.* at 284. In *Terwilliger*, the Fifth Circuit "emphasized" the district attorney's "causal role as the driving force behind the false affidavits and arrests." *See Guerra v. Castillo*, 82 F.4th 278, 287 (5th Cir. 2023). As *Guerra* recognizes, the conduct of the district attorney at issue in *Terwilliger* "violated the 'clearly established right to be free from arrest without a good faith showing of probable cause'" as of the time the district attorney acted in 2015. *Id.* at 288. Because the actions of the district attorney in *Terwilliger* "violated clearly established law in 2015," the district attorney's actions in Guerro "violated clearly established law in 2018 and 2019." *Id.* The Court finds that *Terwilliger* and *Guerra* provide fair notice that Nodolf's conduct was unconstitutional at the time of her actions.

Not only was the conduct violative of *Franks* clearly established when Alonzo and Nodolf acted in 2022, but the Fifth Circuit had also clearly established that "a clearly deficient investigation" causing an arrest and criminal proceedings without probable cause violates the Fourth Amendment through *Franks*. *Bledsoe*, 2023 WL 8184814, at *6. Even without reference to *Franks*, it has been clearly established since 2001 that an officer who has time for a reasonable investigation

violates the Fourth Amendment by making a warrantless arrest when "[o]fficers acting reasonably and prudently based on all of the available information at the time of the arrest, would not have [made the arrest] without further investigation." *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003).

Naturally, the clearly established component requires consideration of whether the actions of Nodolf and Alonzo "were objectively reasonable under the circumstances." *See id.* Because qualified immunity may still protect law enforcement personnel "who reasonably but mistakenly conclude that probable cause is present," the Court must "determine whether it was objectively reasonable" for Alonzo and Nodolf "to conclude that probable cause existed to arrest" the Trinity Four for failing to make a required report. *See Alexander*, 854 F.3d at 307 (quoting *Club Retro, LLC v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009)). At this point, the Court is "no longer concerned with the fact that there was no probable cause" to arrest the Trintiy Four, because such "mistake alone cannot open [an officer] to liability." *Evett*, 330 F.3d at 688. "Law enforcement officers are only human, and these mistakes alone do not open officers to personal liability." *Wren v. Towe*, 130 F.3d 1154, 1159 (5th Cir. 1997). Instead, courts "must look to the facts to determine whether a reasonably competent officer in [Nodolf's or Alonzo's] position could reasonably have thought [their] actions to be consistent with the rights [they are] alleged to have violated." *Evett*, 330 F.3d at 688. "Objective reasonableness is assessed in light of legal rules clearly established at the time of the incident." *Alexander*, 854 F.3d at 307 (quoting *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994)).

Under the circumstances of this case, neither Alonzo nor Nodolf are entitled to qualified immunity. As was the case in *Evett*, "this is not a situation in which [the court] must be concerned with second-guessing an officer's decision that was required to be made in a split second." *See Evett*, 330 F.3d at 689. Indeed, as the Court has stressed over and over, the circumstances of this case presented no urgency whatsoever. The alleged crime had occurred more than two years before

the arrests, and it was not of an ongoing nature.

Armed with statements from a student and her parents regarding (1) alleged sexual contact between the student and another student and (2) what information they told to school officials, Nodolf ended further investigation and directed Alonzo to obtain felony arrest warrants on the limited information presented by B.B. and her parents. They did this while knowing the limited nature of their investigation. They did not investigate whether any educator actually failed to make a required report. They instead seem to have presumed a failure to report based on the limited information they knew. They did not even allege a knowing failure to report as required by the relevant statute. They pursued felony arrest warrants even though they had nothing to suggest any intent to conceal at the time of the alleged failures to report. Furthermore, although there were signs that would cause a reasonable and prudent officer to verify the statements of the interviewed student, no one looked into potential credibility issues in a described "he said she said case." Nor did anyone interview any accused educator even though a primary element for the charged offense is whether the educator had cause to believe that abuse had occurred. Cause to believe is determined from the totality of the circumstances, and one witness statement may not be indicative of the totality of the information known to the accused.

Under these circumstances, the Court cannot conclude that based on the limited investigation "in an unhurried setting such as in this case," that arresting any of the Trinity Four "was objectively reasonable." *See id.* In short, "a reasonable office would have investigated further." *Id.* When a district attorney has gotten involved in the investigative phase, a reasonable investigating district attorney would not have directed the termination of the investigation or directed an officer to obtain arrest warrants on the limited information they had.

In summary, neither individual defendant is entitled to qualified immunity. Nodolf argues that "[q]ualified immunity 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" ECF No. 33 at 22 (quoting *Malley*

*v. Briggs*, 475 U.S. 335, 343 (1986)). However, viewing the facts alleged by Plaintiffs in the light most favorable to them, the conduct of Nodolf and Alonzo was not merely negligent. Viewed in that light, the individual defendants were either plainly incompetent or chose to knowingly violate the Fourth Amendment. Neither Officer Alonzo nor DA Nodolf possessed sufficient information to qualify as probable cause under the circumstances of this case. "Officers acting reasonably and prudently, based on all of the available information at the time of the arrest, would not have arrested [the Trinity Four] without further investigation." *Evett*, 330 F.3d at 688. And their decision to proceed with the arrests was objectively unreasonable under all the circumstances. It was a rush to judgment, and an unnecessary one at that. The circumstances of this case did not warrant proceeding without additional investigation.

The duty of a prosecutor is to "seek justice." *Hillman v. Nueces Cnty.*, 579 S.W.3d 354, 365 (Tex. 2019). "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). And while "Justice delayed is justice denied," *Dupriest v. Nimitz Props., LLC*, No. 10-18-00327-CV, 2022 WL 15522065, at *5 (Tex. App. – Waco Oct. 26, 2022, reh'g and review denied) (quoting William Gladstone), that principle is not infringed by completing a reasonable investigation before making arrests. And naturally, the reasonableness of a given investigation is often dictated by the time constraints imposed by the circumstances. Indeed, the concept of justice itself requires reasonable investigations under the circumstances before arrest so that the accused are treated fairly.

For the reasons already set out, a reasonably well-trained officer in Alonzo's position would have known that her affidavit failed to establish probable cause and that she should not have applied for the warrants on the limited investigation conducted prior to arrest. Similarly, one in Nodolf's position would have known the affidavit failed to establish probable cause for the same reasons. It was reckless for Nodolf to end the investigation and direct Alonzo to seek arrest

warrants on the information they had. And it was reckless for Alonzo to seek the arrest warrants without additional reasonable investigation.

In summary, the Court grants dismissal of claims premised on the Fourteenth Amendment and grants dismissal of Fourth Amendment claims premised on *Malley*, but otherwise denies both motions brought by the individual defendants on the basis of qualified immunity protection against claims under the Fourth Amendment. Under the facts alleged, they are not entitled to qualified immunity for the alleged Fourth Amendment violations under *Franks*. Courts do not err in denying qualified immunity when a defendant has "submitted an affidavit found by the district court to contain material misstatements and omissions of such character that no reasonable official would have submitted it to a magistrate." *Hale v. Fish*, 899 F.2d 390, 402 (5th Cir. 1990). The Court considers Plaintiffs' conspiracy claim separately in the next section.

## C. Conspiracy Claim

Plaintiffs also claim that DA Nodolf conspired to violate their rights under the Fourth, Sixth, and Fourteenth Amendments. SAC ¶¶ 100-202. They identify Nodolf, Alonzo, Assistant District Attorney Lively, Officer Rosemary Sharp, and other unnamed district attorneys and officers as co-conspirators. *See id*. ¶¶ 13-14, 131.

Plaintiffs may pursue a conspiracy claim under 42 U.S.C. § 1983. *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019). These "claims are unique," in that the party asserting such claim "must not only allege facts that 'establish (1) the existence of a conspiracy involving state action,' but also '(2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy.'" *Id*. (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990), *abrogated on other grounds by Martin v. Thomas*, 973 F.2d 449 (5th Cir. 1992)); *accord Armstrong v. Ashley*, 60 F.4th 262, 278 (5th Cir. 2023). The Fifth Circuit has recognized since at least 1990 that officials of one governmental entity may be held liable for misdeeds of a different county official under a conspiracy theory. *See Hale v. Fish*, 899 F.2d 390, 401 (5th Cir. 1990).

The prior discussion regarding the Fourth Amendment shows that Plaintiffs' allegations are sufficient for the second prong. In addition, viewing Plaintiffs' allegations in the light most favorable to them, the Court finds enough allegations to support the first prong. Plaintiffs provide more than mere conclusory allegations.

Nodolf attempts to avoid the conspiracy claim by asserting that Plaintiffs have failed to allege any personal involvement on her part. *See* ECF No. 33 at 21. Such assertion completely ignores the allegations that she directed Alonzo to cease further investigation, obtain felony arrest warrants, and arrest the four educators. There is ample personal involvement of Nodolf alleged by Plaintiffs.

Nodolf next argues that supervisory officials are not liable under § 1983. *See id*. Even though some co-conspirators are assistant district attorneys, this is not a case of supervisory liability. A conspiracy claim differs from merely holding a supervisor liable for the acts of a subordinate. A supervisor cannot avoid a properly pled conspiracy claim based on a theory of supervisor liability. A conspiracy claim differs materially from mere supervisor liability.

Because the Court has already found that Plaintiffs' Fourteenth Amendment claim is properly considered under the Fourth Amendment, it likewise finds that the Fourteenth Amendment will not support the conspiracy claim. With respect to the claimed conspiracy to violate their Sixth Amendment rights, Nodolf invokes qualified immunity. *See id* at 18-19. But unlike the Fourth Amendment claim, Plaintiffs fail to carry their burden to overcome the invocation of qualified immunity. They rely on *Turner v. Upton Co.*, 915 F.2d 133 (5th Cir. 1990), *see* SAC at 65, but that case does not address any conspiracy relative to the Sixth Amendment.

For these reasons, the Court dismisses the conspiracy claim except to the extent it is based upon violations of the Fourth Amendment.

**D. Claims Against County**

Even though Plaintiffs allege that Nodolf is a county district attorney acting as a final

policymaker of the county, such allegation is merely a legal conclusion to which this court need not accept as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). But contrary to the County's reading of the operative pleading, Plaintiffs make several factual allegations beyond mere legal conclusions.

When determining whether a governmental official is a final policymaker, the courts look to "the official's 'actual function' under 'relevant *state* law." *Arnone v. Cnty. of Dallas Cnty.*, 29 F.4th 262, 266 (5th Cir. 2022) (quoting *McMillian v. Monroe Cnty.*, 520 U.S. 781, 786 (1997)). And under such review, "Texas law inescapably" supports finding that Nodolf, as an elected district attorney, "acts for the state," not the county, in matters concerning criminal prosecutions. *See id*. at 268-70. As recognized long ago, "Texas law makes clear . . . that when acting in the prosecutorial capacity to enforce state penal law, a district attorney is an agent of the state, not of the county in which the criminal case happens to be prosecuted." *Esteves v. Brock*, 106 F.3d 674, 678 (5th Cir. 1997); *accord* Tex. Code Crim. Proc. Ann. art 2.01 (setting out general duties of district attorneys, including "represent[ing] the State in all criminal cases in the district courts of his district and in appeals therefrom"); Tex. Gov't Code Ann. § 43.157(b) ("The district attorney represents the state in criminal cases in all district and inferior courts other than municipal courts having jurisdiction in Midland County.").

But, as the Supreme Court has recognized, "the question is not whether" a named official acts for the State or for a county "in some categorical, 'all or nothing' manner"; instead, courts must "ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." *McMillian*, 520 U.S. at 785. Of course, some officials may act for the State in particular areas or issues and for the County in other respects. *Daves v. Dallas Cnty.*, 22 F.4th 522, 536 (5th Cir. 2022) (en banc). While county officials pursue their duties as state agents when "enforcing state law or policy," they "act as a county agent when [they

are] enforcing county law or policy," and it is "possible for the officer to wear both state and county hats at the same time." *Echols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990).

The County essentially wants to categorize all of Nodolf's alleged actions as falling within her role as a prosecutor for the State. But Plaintiffs' clam against the County goes beyond Nodolf enforcing state law or policy. *See* SAC ¶¶ 203-40. On the facts alleged, the Court finds that Plaintiffs have made sufficient allegations against the County to support a plausible claim of municipal liability under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Based on the allegations of Plaintiffs, to the extent that Nodolf was acting in an investigatory role and acting pursuant to a county policy, she was acting as a county official. Plaintiffs have made enough allegations to support a plausible *Monell* against the County based upon Nodolf's acts as a county rather than state official. On the flipside, there is no *Monell* liability for her acts as a prosecutor. As with her personal absolute immunity defense, Nodolf was acting both within and outside of her prosecutorial role. The Court thus grants the County's motion in part and denies it in part. The motion is granted to the extent that Nodolf was acting in her role as prosecutor for the State, but it is otherwise denied.

### E. Claims Against City

The City makes four arguments for dismissing claims asserted against it. First, it argues that "its policy did not cause any constitutional deprivation." ECF No. 45 at 15. However, the prior discussion of the Fourth Amendment shows that Plaintiffs have alleged a plausible false arrest claim.

Second, the City argues that Plaintiffs have not alleged facts to plausibly show an unconstitutional policy. *Id*. at 15-16. The City identifies the alleged unconstitutional policy as seeking investigative direction from county prosecutors. *See id*. at 15. And to some extent that characterization is accurate. *See* SAC ¶¶ 49-60, 233-35. But the City's characterization ignores Plaintiffs' allegations that the policy was "to arrest first, then investigate, and then prosecute 'for cover.'"

*See* SAC ¶ 203. It also ignores the identified policy of failing to adequately train and supervise Alonzo. *See id*. ¶¶ 236-40.

Next, the City argues that Plaintiffs fail to plausibly allege policymaker culpability. ECF No. 45 at 16-17. And finally, it argues that Plaintiffs fail to plausibly show deliberate indifference of the policymaker caused a deprivation of their rights. *Id*. at 17-18. The Court, however, finds Plaintiffs' allegations sufficient to avoid dismissal at this juncture.

Although the Court finds Plaintiffs' allegations sufficient at this point, it agrees with the City that Plaintiffs cannot recover punitive damages against it. The City, as a "a municipality is immune from punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Accordingly, Plaintiffs may not recover such damages from the City in this action.

## VIII. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** *Defendant Laura Nodolf's Motion to Dismiss* (ECF No. 33); **GRANTS IN PART AND DENIES IN PART** *Defendants Alonzo's and City of Midland's Motion to Dismiss* (ECF No. 45); and **GRANTS IN PART AND DENIES IN PART** *Defendant Midland County's Motion to Dismiss* (ECF No. 46). In accordance with Fed. R. Civ. P. 12(a)(4), each defendant shall file their responsive pleading to Plaintiffs' Second Amended Complaint **on or before October 8, 2024**. Now that these dispositive motions have been resolved, the Court directs the parties to submit a joint proposed scheduling plan **on or before November 5, 2024**.

**IT is so ORDERED this 24th day of September 2024.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**