### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### MIDLAND-ODESSA DIVISION

**FILED**

June 10, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____KG_____

DEPUTY

SHELBY HAMMER,
ADRIANNE CLIFTON,
TODD FREESE, AND
CHRYSTAL MYERS,
            ***PLAINTIFFS*,**

v.

LAURA NODOLF;
MIDLAND COUNTY, TEXAS;
CITY OF MIDLAND, TEXAS;
JENNIE ALONZO;
ROSEMARY SHARP; AND
JENNIFER LIVELY,
            ***DEFENDANTS*.**

CAUSE NO. 7:23-CV-158
**JURY TRIAL DEMANDED**

### PLAINTIFFS' THIRD AMENDED COMPLAINT

TO THE HONORABLE COURT:

Comes now Shelby Hammer, Adrianne Clifton, Todd Freese, and Chrystal Myers, Plaintiffs, by and through counsel, and file this amended civil rights action against Laura Nodolf individually; the City of Midland, Texas; Midland County, Texas; and Jennie Alonzo, Rosemary Sharp, and Jennifer Lively individually for Defendants' violations of the United States Constitution and the laws of the United States, and for cause of action would show the Court as follows:

## 1. Background

1.     Plaintiffs Adrianne Clifton, Todd Freese, Shelby Hammer, and Chrystal Myers (the "Trinity Four") all have lengthy and distinguished careers as devoted educators. In February 2022, the Trinity Four were working at Trinity School of Midland in Midland, Texas. Each of the Trinity Four was a beloved and respected member of their community.

2.     On February 25, 2022, in the middle of a school day and in the presence of students, employees, and parents, Defendant Jennie Alonzo had the Trinity Four arrested at Trinity School of Midland. They were handcuffed—hands behind their backs—and all but Plaintiff Hammer led through the front doors of the school to the waiting patrol cars.

3.     Adrianne Clifton and Todd Freese were escorted by uniformed, armed officers in front of the kindergarteners and first graders eating lunch. They were walked by parents bringing their children lunch.

4.     A handcuffed Chrystal Myers had to dodge upperclassman (including her own son) headed back to class from chapel services.

5.     After leading uniformed, armed police all over the campus in full view of students, employees, and parents, Shelby Hammer was also eventually arrested. Shelby was handcuffed in sight of at least one middle school class and teacher, the technology director, and the President of the Board of Trustees. She was walked in handcuffs with her hands behind her back to the patrol car.

6.     Prior to Plaintiffs' arrests, Defendants Sharp and Alonzo went to the District Attorney's office for an in-person meeting with Defendants Nodolf and Lively. Pursuant

to the District Attorney's and police department's custom or policy, Alonzo and Sharp approached Nodolf and Lively seeking marching orders on how to proceed with the case. As detailed below, in that meeting Defendant Alonzo laid out for Defendants Nodolf and Lively her case against the Trinity Four. She then asked how she should proceed. Defendants Nodolf and Lively instructed Defendant Alonzo to arrest Plaintiffs on the felony of failure to report child abuse with the intent to conceal, without conducting any further investigation.

7.      Accordingly, Defendant Alonzo obtained arrest warrants for each of the Trinity Four. Those warrants were based on an affidavit Alonzo executed, which Sharp reviewed prior to execution. The affidavit Alonzo submitted with the arrest warrants failed to state probable cause to support one at least one of the necessary elements of the charged offense – that the offenses were committed with a specific intent to conceal.

8.      As detailed below, that affidavit also contained multiple lies and serious material omissions. Those lies and omissions formed the basis for the eventual charges faced by all four Plaintiffs: failure to report sexual indecency with a child with the intent to conceal—a horrific, potentially career-ending allegation. Had Alonzo's affidavit been truthful, there would not have been probable cause for an arrest in the first place. Defendants Sharp and/or Alonzo testified before the grand jury consistent with Alonzo's arrest affidavit.

9.      Consistent with Defendant Nodolf's recently implemented policy or custom to stop recording grand jury presentations in any way,[1] this presentation was not recorded or transcribed.

10.     At the time, this was the second case Ms. Nodolf's office presented against private school administrators for failure to report with intent to conceal abuse of a child, as that phrase is defined in Section 261.001(1) of the Texas Family Code. When the first case against five administrators from Midland Christian School (the "Midland Christian Five") was presented, no officers testified before the grand jury. The case was no-billed, and the Midland Police Department went into an uproar.[2] Following that no-bill, the Midland Municipal Police Officers Association released the following statement:

> MMPOA (Midland Municipal Police Officers Association [sic] has historically been an advocacy organization. Most of our activities are focused on supporting our members as they serve their community. In fact, we cannot recall a single news release or official statement made by this association in at least the past eight years. The nature of these recent events compels the leadership of MMPOA to release this statement.
>
> There have been many who have commented on the facts or merits of this case without being privy to them. MMPOA will not be one of them. MMPOA does advocate for a relentless pursuit of truth, for sound investigations, and for fair

---

[1] Previously, Defendant Nodolf had grand jury proceedings both videotaped and transcribed. The transcript and recording from one of her grand jury presentations revealed Nodolf herself had seriously misled the grand jury in that case when it issued an indictment for murder. Nodolf's statements to the grand jury were brought up repeatedly in the trial itself. That case, styled *State v. David Wilson* (a case discussed more below), ended in an acquittal. After those memorialized grand jury proceedings from Wilson were so dramatically used against Nodolf, she instituted a custom or policy that unless required by law, the State's grand jury proceedings were to never be recorded or transcribed.

[2] Micah Allen, *Midland Municipal Police Officers Assoc. releases statement on Midland Christian*, CBS7 News (May 13, 2022), https://www.cbs7.com/2022/05/13/midland-municipal-police-officers-assoc-releases-statement-midland-christian/ (last visited Oct. 10, 2023).

and trustworthy processes. To that end, MMPOA has serious concerns about the Grand Jury process as it was handled by the Midland County District Attorney's Office in this case.

It is difficult to "let the process work itself out" as Mayor Payton asked of the city when the Midland County District Attorney's Office does not have the lead detective from the Midland Police Department testify before the Grand Jury. Such testimonies are commonplace especially in sensitive, complex, or high-profile cases.

Not having the lead detective appear before the Grand Jury to present the case and answer questions from the Grand Jury does a disservice to all parties by potentially limiting the Grand Jury's ability to make a full and fair determination of probable cause.

Regardless, we, the members of MMPOA, will continue our efforts to selflessly, tirelessly, relentlessly and sacrificially serve our city. We are grateful to serve under a city leadership and with fellow citizens who support our efforts to keep our city safe.

-MMPOA[3]

11.    Not wanting a repeat of the controversy from the no-bill of the Midland Christian Five, Defendant Alonzo testified when Plaintiffs' case went to the grand jury just months later. And this time, the defendants (now Plaintiffs in the instant case) got indicted. That same day, Defendant Alonzo's supervisor, Defendant Sharp, testified in front of the grand jury for the second case involving Midland Christian school administrators and a failure to report charge, which case was also indicted.

12.    At Defendant Lively's presentation of Plaintiffs' case to the grand jury, Defendants Lively, Nodolf, Alonzo, and Sharp were aware of Defendant Alonzo's knowing, reckless omissions and false averments. Upon information and belief, Defendants Alonzo, Nodolf,

---

[3] *Id.*

and Lively conspired to, and did, present false information and recklessly misrepresented facts to the grand jury. Defendant Alonzo testified to the grand jury and upon information and belief testified consistently with her sworn arrest warrant affidavit, which her supervisor Defendant Sharp reviewed before Alonzo filed it. A more complete list is offered in the following section, but some of the errors in that affidavit included:

a) Swearing Plaintiffs knew B.B.'s vagina had been touched when (i) three of the plaintiffs found out about the alleged problems through B.B.'s mother, who herself never knew of any indecent conduct and (ii) there was no evidence B.B. ever told the other plaintiff anything amounting to indecency.[4]

b) Omitting the fact that there was zero evidence indicating intentional concealment, an element which elevated the charge from a misdemeanor to a felony.[5]

c) Failing to include Plaintiff Myers' protestations to law enforcement that B.B. never told any of them this.

d) Failing to include that Plaintiff Myers in fact did timely file a report regarding the information they were told.

13.    The information and belief above are bolstered by the fact that Defendant Lively elicited this same false information from Defendant Alonzo at Plaintiffs' criminal trial:

Q. Did she disclose touching of her -- of a part of her genitals during the CAC interview?

A. Yes.

Q. Okay. And what would that be?

---

[4] B.B. refers to the minor female who was the subject of the charges brought against Plaintiffs.

[5] The affidavit specifically avers each plaintiff was notified indecency with a child had occurred, each had a duty to report that offense, and none did, in "violation of Texas Family Code section 261.109, which is a state jail felony." Alonzo Arrest Warrant Affidavit at pgs. 2, 4. The only way failure to report, as detailed in Section 261.109 of the Family Code, is a state jail felony is if "the actor intended to conceal the abuse or neglect." Tex. Fam. Code. Ann. § 261.109(c).

A. If I remember correctly, she said that he touched her -- and the word that she used was "vagina," over the clothes.

Q. Okay. And that's what she said?

A. Yes, ma'am.[6]

14.     All four Plaintiffs were indicted. All four immediately moved for speedy trials.

15.     The Trinity Four waited well over a year before they went to trial. During that time, B.B.'s parents emailed and called Defendants Lively and Nodolf. B.B.'s mother was a personal friend of Defendant Nodolf.

16.     Finally, at Plaintiffs' joint trial the State presented evidence for over a week in the 142nd Judicial District Court of Midland County, Texas. During the trial, Alonzo testified about her and Sharp's meeting with Nodolf and Lively and how after that meeting it was decided Alonzo would arrest Plaintiffs without any additional investigation. After eight days of trial, but before the Trinity Four were even able to get to their case-in-chief, the District Attorney's Office dismissed the case, stating Alonzo was no longer a credible witness who it was willing to continue sponsoring.

17.     The fallout from Defendants' illegal and unconstitutional actions has forever changed the lives of the Trinity Four. Just hours after their arrests, local headlines read.

*Affidavit States Trinity School Administrators Failed to Report Sexual Assault On Campus*[7] and

---

[6] Testimony of J. Alonzo, *Texas v. Myers, et. al*, Cause No. CR58382 – 85, at 20 (142 Dist. Ct.; Midland County, Tex., Apr. 25, 2023).

[7] CBS7 Staff, UPDATE: Affidavit states Trinity School administrators failed to report sexual assault on campus, CBS7 News, Feb. 25, 2022, at 1, https://www.cbs7.com/2022/02/25/midland-

*Affidavits Describe Trinity School Admins' Failure to Report After a Student Reportedly Sexually Assaulted Another Student*[8]

18.    The mugshots of the Trinity Four were plastered all over the news starting in February 2022 until the day the charges were dismissed in April 2023. The headlines accompanying every story and mugshot painted the Trinity Four as deceitful educators, child abusers, predators, criminals, and overall horrible people. There was community outcry for all four to be thrown into prison, with some saying they should be "locked up and fed to the inmates." Those stories remain to this day. And they were all based on the false affidavit of Defendant Alonzo, which was reviewed by Defendant Sharp.

19.    Shelby Hammer, Adrianne Clifton, Todd Freese, and Chrystal Myers are now filing this lawsuit against Laura Nodolf and Jennifer Lively; Midland County; Jennie Alonzo and Rosemary Sharp; and the City of Midland for depriving Plaintiffs of rights secured under the Constitution and Laws of the United States. They bring this case not only to vindicate their rights but also to hold accountable the government officials who violated them.

---

police-department-arrests-four-administrators-trinity-school-midland-failure-report-with-intent-conceal-neglect-or-abuse/.

[8] NewsWest 9 Staff, Affidavits describe Trinity School admins' failure to report after a student reportedly sexually assaulted another student, NewsWest 9, Feb. 25, 2022, at 1, https://www.newswest9.com/article/news/crime/trinity-school-leaders-arrested-failure-report-intent-to-conceal-neglect-or-abuse/513-35ce3cdd-1ef5-4f4d-899c-a6b8a9bab9c7.

## 2. Jurisdiction and Venue

20.    This action is brought pursuant to 42 U.S.C. § 1983. The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

21.    Venue is proper in this Court under 28 U.S.C. § 1391(b), as the Western District of Texas, Midland-Odessa Division is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## 3. Parties

22.    Plaintiff Shelby Hammer is a resident of Midland County, Texas. She has a Bachelor of Arts in History from Duke University, a Master of Education in Private School Leadership from Columbia University, and a Master of Arts in History from the University of Alabama. She has over twenty years of experience as an educator. She was hired as the Head of School at Trinity in 2018. Her son graduated from Trinity, and her daughter was a Trinity student at the time of Shelby's arrest.

23.    Plaintiff Adrianne Clifton was reared in Midland, Texas, where she resides to this day. She has a Master of Education from the University of Texas and at the time of the arrest was the Assistant Head of School for Administration / Director of Admissions at Trinity. Adrianne joined Trinity in 2008, but before that she was the principal at Santa Rita Elementary School in Midland for many years. Her reputation as an educator in Midland runs deep. Now, as the Associate Head of School, Adrianne helps with enrollment and financial aid; she helps international students submit their immigration forms; she helps

craft school policies; and she helps ensure the school complies with federal grants. Because Adrianne has always worked in the front office as an administrator, she does not have any daily, structured contact with students.

24.    Plaintiff Todd Freese is a resident of Midland County, Texas. He has been an educator for over fifteen years. Before that, he was a pastor. At Trinity, Todd is the Middle School and Upper School Dean of Students. In that role, Todd provides support for the students, oversees student life and on-campus activities, and addresses student behavior. He joined Trinity in 2015 and is a fixture of the Trinity community, beloved by parents, students, and alumni alike.

25.    Plaintiff Chrystal Myers is a resident of Midland County, Texas. She has a Bachelor of Science in Education, a Master of Science in Curriculum and Instruction, and another Master of Science in Educational Leadership, all from the University of the Southwest. She is a lifelong educator and is now in her eighth year as Trinity's Head of the Middle School. As Head of Middle School, Chrystal is responsible for over 150 students. Additionally, both Chrystal's daughter and son graduated from Trinity.

26.    Defendant Laura Nodolf is the former elected District Attorney for the Midland County, Texas. Defendant Nodolf has answered and is properly before this Court.

27.    Defendant Midland County, Texas, is a governmental unit existing under the laws of the State of Texas. Defendant Midland County has answered and is properly before this Court.

28.     Defendant City of Midland is a municipal corporation organized under the Constitution and laws of the State of Texas and located within the Western District of Texas, Midland-Odessa Division. The Midland Police Department (MPD) is a department operated by the City of Midland. Defendant City of Midland has answered and is properly before this Court.

29.     Defendant Jennie Alonzo is employed by the City of Midland as an MPD sergeant who, at all times relevant to this action, was acting under the color of law and within the scope of her employment. Defendant Alonzo has answered and is properly before this Court.

30.     Defendant Rosemary Sharp is employed by the City of Midland as an MPD sergeant and lieutenant who, at all times relevant to this action, was acting under the color of law and within the scope of her employment. Defendant Sharp may be served with process through counsel for the City of Midland, Norman Giles.

31.     Defendant Jennifer Lively is a recently retired assistant district attorney employed by Midland County and, at all times relevant to this action, was acting under the color of law and within the scope of her employment. Defendant Lively may be served with process at her home address in Williamson County, Texas.

### 4. Factual Background

#### 4.1. The Relationship Between B.B. and T.F.

32.     In February of 2022, the Midland County District Attorney, Laura Nodolf, began arresting administrators at local private schools alleging felonious violations of Texas Family Code Section 261.109.[9]

33.     Emboldened by the first round of arrests made at Midland Christian School, Darby Brown—a disgruntled former Trinity school parent—called and reported to police that her daughter (B.B.) had been "sexually assaulted" at Trinity by another student (T.F.). She claimed the school knew about the "sexual assault" and had not properly handled the situation. Defendant Sharp assigned the case to Defendant Alonzo.

34.     On February 22, 2022, a forensic interviewer at the local Children's Advocacy Center ("CAC") conducted an interview with B.B. at Alonzo's request. The by-then fifteen-year-old B.B. said she had been "sexually assaulted," but indicated that, to her, a "sexual assault" was simply being touched in places she did not want to be touched or being touched without consenting.

35.     The CAC interviewer asked where, specifically, T.F. had touched B.B. B.B. told the interviewer that T.F. would grab her hips, waist, and chest; would grab or pinch her butt; and would hug her from behind—all on top of her clothes. When asked whether T.F. ever

---

[9] Texas Family Code Section 261.109 addresses the penalties for failing to report suspected child abuse or neglect. Violation is a Class A misdemeanor but is escalated to a felony if a professional knowingly fails to report with the intent to conceal the abuse.

"actually touched" her vagina, B.B. indicated one time she was walking from band to PE, and T.F. "was like running with his friends. And he just like came up from behind me and like did it and then just like kept ranning, or running."[10] She said on another instance when T.F. was standing behind her grabbing her chest that she felt his penis.

36.    B.B. told the interviewer that T.F. had asked if he could touch her butt, and T.F. said "sure" and that when he touched her chest, she "started laughing." T.F. would text/Instagram direct message B.B. and verify whether he could continue touching her and having her touch him in such fashions. She always told him he could. She told the interviewer, "I never really said no." "Mentally I was saying no, but I didn't actually."

37.    B.B. detailed for the interviewer the worst incident with T.F. B.B. said that in Spanish class one day, T.F. unzipped her pants and worked his way down her belly until he reached her panty line, at which point he moved his hand back up. She zipped up her pants and went on about her work.

38.    In response to the interviewer's questions, B.B. clarified—not once, but twice— that T.F. never penetrated her vagina. She never even alleged that he had touched her vagina during the "worst incident" in Spanish class.

39.    At Plaintiffs' criminal trial, B.B. testified that T.F. never touched her genitals.

40.    T.F. would send nude pictures of himself to B.B. on B.B.'s social media. B.B would send pictures of herself in a bikini to T.F.

---

[10] B.B. CAC Interview at 1:09:24.

41.    At one point in December 2019, B.B. was called into Plaintiff Freese's office. At the time of that meeting, B.B. said she had not told anyone the extent of her and T.F.'s interactions.[11]

42.    The CAC interviewer never directly asked what information B.B. conveyed to Plaintiffs Clifton, Myers, or Hammer, though B.B. did directly tell the CAC interviewer that she never spoke with Plaintiff Hammer. Plaintiff Clifton's name never came up at all during the CAC interview. At the Plaintiffs' criminal trial, it was made clear that B.B. spoke with Plaintiff Myers one time and it was confirmed that B.B. never spoke with Plaintiffs Clifton or Hammer.

43.    Notably, "although Alonzo testified that, during that interview, she had the opportunity to have the interviewer ask any follow-up questions that might be needed to clarify something the child stated in the interview, Tr. 10:21-11:5, nothing indicates that she sought to clarify anything from the interview. However, the interviewer did step out of the interview for a few moments at the end and returned with some additional questions." *Hammer v. Nodolf*, No. 7:23-CV-00158-JKP, Mem. Op. and Order, ECF doc. 48, at 26 (Sept. 24, 2024) (citing CAC Interview 1:14:33). "Had Alonzo wanted matters from the interview clarified she could have had the interviewer ask follow-up questions. While some

---

[11] Also in December 2019, B.B.'s father emailed Plaintiff Freese. B.B. had told her parents about T.F., which B.B.'s father memorialized in the email to Plaintiff Freese. In that email, B.B.'s father said T.F. had slapped and pinched B.B.'s buttock four times and had asked for B.B. to send pictures of her buttocks to T.F. Touching a buttock is not a reportable act.

follow-up questions were asked after a break, they did not clarify all the uncertain matters arising from the interview." *Id.* at 55.

44.     Plaintiffs were never told anything more than the reported touching of the buttocks and exchange of pictures until *after* their arrests nearly two years later.

### 4.2. PLAINTIFFS DID REPORT THE ONE REPORTABLE INCIDENT THEY DISCOVERED.

45.     Under Section 261.101 of the Texas Family Code, if a professional has cause to believe a child has been a victim of the offense of indecency with a child, the professional must, within forty-eight hours, report those suspicions to law enforcement or to the Department of Family and Protective Services.[12]

46.     Indecency with a child occurs when a person:

(a)(1)   engages in sexual contact with the child or causes the child to engage in sexual contact; or

(a)(2)   with intent to arouse or gratify the sexual desire of any person:

(A)     exposes the person's anus or any part of the person's genitals, knowing the child is present; or

(B)     causes the child to expose the child's anus or any part of the child's genitals.

. . .

(c)     In this section, "sexual contact" means the following acts, if committed with the intent to arouse or gratify the sexual desire of any person:

---

[12] The term "reasonable" was added to § 261.101 in 2021. Persons Required to Report in Acts 2021, 87th Leg., R.S., ch. 902 § 1, eff. Sept. 1, 2021. Following the amendment, a reporter must now have "reasonable cause" to believe that a child has been neglected or abused prior to the filing of any report. Tex. Fam. Code Ann. § 261.101.

(1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child; or

(2) any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person.[13]

47.    B.B. did report *for the first time* in the above-discussed February 22, 2022, CAC interview that T.F. had touched her breast. B.B. also reported for the first time one incident where T.F. may have touched her vagina, but it was as he was running by with his friends—there was no indication of intent to gratify and no further development of that allegation. But the 2022 CAC interview was the first time B.B. ever said anything about T.F. touching her in this fashion. Even B.B. herself agreed at Plaintiffs' criminal trial that she never mentioned to any of the Plaintiffs that her breast was supposedly touched. She further indicated at Plaintiffs criminal trial that T.F. in fact never touched her vagina.

48.    It is undisputed that B.B. never conveyed to any Plaintiff at any time that she had experienced anything that is reportable under the Texas Family Code.

49.    After she arrested Plaintiffs, Defendant Alonzo contacted the Department of Family and Protective Services (CPS) herself and reported Plaintiffs for knowing about indecency with a child committed on one of their students and failing to report that indecency to law enforcement or CPS with the intent to conceal it. CPS investigated Defendant Alonzo's allegations for over two months.

---

[13] Tex. Pen. Code Ann. § 21.11.

50.    Ultimately, CPS concluded there was not even a preponderance of evidence that any of the Plaintiffs had done anything wrong. CPS noted that B.B. had not made any outcry to Plaintiffs. It closed the investigation, ruling out any wrongdoing by Plaintiffs.

### 4.3.  Per Department Custom or Policy, Defendant Alonzo Immediately Involved Defendant Nodolf

51.    As with all high-profile cases, Defendants Alonzo and Sharp took this case to Defendant Laura Nodolf and sought investigative direction from Nodolf directly or through her assistant district attorneys. This, according to Chief Herman, was the Midland Police Department's custom or policy on all high-profile cases.

52.    Similarly, through its own policy-maker Defendant Nodolf, the Midland County District Attorney's Office had its own custom or policy of involving itself in the police-side of investigations before they were concluded. During the two years preceding this lawsuit, Defendant Nodolf involved herself and advised local law enforcement co-conspirators on numerous occasions. All of this involvement occurred prior to probable cause being determined.

53.    Defendant Nodolf implemented and practiced these policies through her own actions. When pressed about this by local lawyers, Ms. Nodolf denies involving herself in investigations because "it would jeopardize [her] immunity."

54.    According to Alonzo's sworn testimony, when Sharp assigned her B.B.'s case, she knew immediately that she was dealing with a high-profile situation and well-respected members of the community. The week before arresting the Trinity Four, Defendant Alonzo

had similarly arrested the Midland Christian Five.[14] The Midland Christian Five were arrested on Wednesday, February 16, 2022. According to Alonzo, on Tuesday, February 22, Defendant Sharp assigned her to investigate B.B.'s allegations that she had been sexually assaulted on Trinity campus.

55.    That Tuesday, February 22, 2022, B.B. had gone through a forensic interview at the Child Advocacy Center ("CAC" – discussed above, detailed below). Alonzo observed that interview. She also spoke with B.B.'s parents together for a little over an hour. She did not conduct any additional investigation into B.B.'s allegations.

56.    On Wednesday or Thursday of that same week, Alonzo and Sharp went to Defendant Midland County District Attorney Laura Nodolf and her Assistant District Attorney Jennifer Lively and asked what Ms. Nodolf wanted her to do. Defendant Lively was already handling the Midland Christian Five case and had agreed to handle all cases involving school administrators not complying with their mandatory reporting duties.

57.    Defendants Nodolf and Lively instructed Alonzo and Sharp to do with the Trinity Four exactly what Alonzo had done with the Midland Christian Five—to make arrests and then conduct any additional investigation afterwards. From Plaintiffs' criminal trial transcript, Alonzo testified:

> Q. So you, Ms. Nodolf, Ms. Lively, Sergeant Sharp had a meeting of the minds, and all four of you together decided, you know, not only is this a failure to report but it's a felony version of it, right?

---

[14] Those actions are now also subject to a 42 U.S.C. § 1983 case, pending in the Court. *Lee et al. v. Midland et al.*, No. 7:22-CV-185 (W.D. Tex.).

A. Yes, sir.

Q. And then as you told us, the D.A.'s office told you to get the warrants?

A. They said, "Handle this case the way you handled the last one."

Q. Before doing any investigation?

A. Yes, sir.

Q. Before talking to any other witnesses?

A. Yes, sir.

Q. Just take this girl and her mother's word for it, and let's roll?

A. Yes, sir.

Q. Is that how you would want to be treated if you were accused of something? Would you want them to go get the other side, see if there's maybe exculpatory or, you know, evidence that might be helpful to you?

A. So the way we were treated in the first case –

Q. I'm sorry, that's not my question.

A. Well –

Q. How would you want to be treated?

A. Yes, sir, I would want them to get both sides of the story. But I did what I was advised to do.

Q. And you did what you were told to do by her [referring to Jennifer Lively, who was the prosecutor and sitting across from counsel]?

A. Not just her.

Q. And Ms. Nodolf?

A. Yes, sir.[15]

---

[15] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 119-120.

58.    Defendant Alonzo presented B.B.'s CAC interview and her interview of B.B.'s parents to Defendant Nodolf and other members of the District Attorney's Office and asked, "What do you want us to do with the case?"[16]

59.    In Defendant Alonzo's view, there were several options, any of which she would have taken: she could have written it up and left it internally with the police department, "never touch it again." She could have "grand juried" the case, or directly filed the case without arresting the Trinity Four, and if so, she could have filed it as a misdemeanor or a felony.[17]

> Q. And you could have done that or got a grand jury subpoena before you arrested them, right? Yes?
>
> A. Not in this case, I did not.
>
> Q. You could have?
>
> A. I could have. That's not what I was advised to do.
>
> Q. By who?
>
> A. The district attorney's office.
>
> Q. So the D.A.'s office told you, "Charge these people, and we'll figure it out later"?
>
> A. The D.A.'s office told me to get the warrants.
>
> Q. Who specifically told you?
>
> A. It was stated to handle the case the same way I handled the last one.
>
> Q. Who?
>
> A. Laura.

---

[16] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 184.

[17] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 183-84.

Q. Your elected district attorney?

A. Yes, sir.

Q. And "Laura" means Laura Nodolf, right?

A. Yes, sir.[18]

60.    When presented with these options, Defendant Nodolf gave Defendant Alonzo her

"marching orders,"[19] and those were to cease investigation and file the case as a felony.[20]

Q.    Your actions in this case were to arrest four people without having all the information, correct?

A.    Yes, sir.

Q.    And that was done at the direction of the district attorney?

A.    Yes, sir.[21]

61.    Accordingly, Alonzo did not conduct any further investigation. Sharp did not

independently order her to conduct further investigation. Instead, she executed affidavits

and obtained the warrants; and had all four very publicly arrested. The arrests occurred on

February 25, 2022, three days after B.B.'s CAC interview and Alonzo's interview of B.B.'s

parents. In those three days, per Nodolf's and Lively's directive, no other investigation was

done.

62.    At Plaintiffs' criminal trial, an emotional Defendant Alonzo admitted if she had it to

do over again, she would not follow such instructions from Defendant Nodolf:

---

[18] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 106-107.

[19] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 168.

[20] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 161.

[21] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 178.

Q. I mean, not that you don't. But, I mean, you feel like you're a lone ranger out here, correct?

A. Yes, sir.

Q. Upsetting?

A. Yes, sir.

THE COURT: Do you have a Kleenex?

Q. (BY [Defense counsel]) Feel like you're not getting any support?

A. Yes, sir.

Q. Sorry, Jennie. You understand, though, despite that, the frustration my clients feel?

A. Yes, sir.

Q. And the repercussions that they've suffered?

A. Yes, sir.

Q. If you had to do this all over again, would you do it?

A. No, sir.[22]

### 4.4.   DEFENDANTS REFUSED TO INDICT ANOTHER EDUCATOR, EVEN THOUGH THE GRAND JURY REQUESTED IT.

63.   Upon information and belief, the State (specifically Defendant Lively, who presented the case, and Defendant Alonzo, who testified) sold the grand jury a lie. That lie (which was first laid out in Defendant Alonzo's affidavit) is that B.B. told Plaintiff Freese in a meeting that occurred in December 2019 that she was the victim of sexual assault and/or indecency on school grounds by a fellow student. There was a meeting in Plaintiff Freese's office where B.B. discussed her relationship with T.F. Plaintiff Freese, however,

---

[22] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 185.

was not alone during that meeting. Another educator, who was B.B.'s designated "safe person," who B.B. and her parents liked, was also present for the entire meeting.[23]

64.    If the State thought B.B. recounted a reportable offense and that Plaintiff Freese was criminally liable for not reporting what B.B. said in that meeting, then the "safe person" should have also faced that same criminal liability, as she was exposed to the same information as Plaintiff Freese. In fact, the grand jury asked to consider indicting her as well.

65.    Defendant Lively contacted Defendant Nodolf and B.B.'s mother, informing both of them about the grand jury's wishes to consider whether it should indict B.B.'s safe person. B.B.'s mother emailed Lively, indicating that she (B.B.'s mother) was friends with the safe person and did not want her indicted, which Lively conveyed to Nodolf. Rather than giving the grand jury what it wanted, Defendants Nodolf and Lively gave B.B.'s mother what she wanted. Pursuant to Nodolf's instructions, Defendant Lively told the grand jury that the decision to bring them a case was solely at the discretion of the District Attorney's Office, and they would not be offering the "safe person" for the grand jury's consideration.

---

[23] This eyewitness educator testified at Plaintiffs' criminal trial on Plaintiffs' behalf and recounted that during this meeting, B.B. did not report any conduct by T.F. that was a "reportable offense." Defendants did not even interview this educator until after Plaintiffs' arrests and indictments.

66.     It also came out at trial that B.B.'s mother "despised" Plaintiff Clifton. So, Clifton, who literally sat in a corner for one parent meeting regarding school policy, got indicted while the "safe person" who sat through the exact same meeting as Plaintiff Freese did not.

### 5. Defendant Alonzo's Arrest Warrant Affidavit

#### 5.1.   The Affidavit's Multiple Factual Inaccuracies and Material Omissions

67.     Defendant Alonzo, with Defendant Sharp's either tacit or overt approval, intentionally, knowingly, or with reckless disregard for the truth misled the magistrate in the following material ways.

68.     Defendant Alonzo's arrest warrant affidavit was identical for all four Plaintiffs.

69.     To create probable cause, Defendant Alonzo lied in her affidavit claiming B.B. "stated suspect's hand did touch her vagina" during the incident when T.F. put his hand down B.B.'s pants in Spanish class.[24] Alonzo swore,

> MV stated that she was sexually assaulted a year and half ago, at Trinity School located in Midland, Texas . . . The interviewer asked MV to tell them about the last time the incident occurred. MV explained that this was the worst . . . MV explained class was in session and the teacher was not present (teacher stepped out of the classroom). MV stated that the suspect started by touching her leg and moved closer her [sic] vagina . . . MV stated the suspect stuck his hand in her pants. Suspect's hand then moved side to side so he could get further his hand [sic] in her pants. Before suspect could start doing anything, she moved his hand. MV stated **suspect's hand did touch her vagina** and did so over the clothes. [25]

---

[24] The affidavit does not offer the detail that this occurred during Spanish class, but the only time B.B. ever said T.F. put his hand down her pants was the one time in Spanish class.

[25] Alonzo Affidavit for Arrest Warrant, pg. 1 (emphasis added).

70.    In truth, B.B. indicated twice that T.F. had not touched her vagina at all (either under or over her clothes) during "the incident."[26]

71.    To create probable cause, Alonzo lied in her affidavit claiming that on January 15, 2020, Plaintiff Chrystal Myers was made aware of an indecency with a child and failed to report it.

72.    In truth, Myers did make a report to CPS when she was notified that the student (T.F.) had sent a picture of his genitals to B.B. This report was made on January 23, 2020, confirmation #605757al. Nothing about this report was included in Defendant Alonzo's affidavit.

73.    Additionally, at trial, the CAC interviewer confirmed that B.B. never said the other student had penetrated her vagina.

74.    Below are additional material falsehoods and omissions in the remainder of the affidavit:

| AFFIDAVIT | TRUTH |
|---|---|
| MV stated that she was sexually assaulted at Trinity School | B.B. told the CAC interviewer that to her "sexually assaulted" simply meant "touching in places that you don't want to be touched or not giving consent."[27] |

---

[26] B.B. CAC Interview at 18:09, 1:09:01. When the CAC Interviewer asked B.B. if T.F. "ever actually touched your vagina," B.B. said one time she was walking from band to PE, and T.F. "was like running with his friends. And he just like came up from behind me and like did it and then just like kept ranning, or running." B.B. CAC Interview at 1:09:24. This incident was not referenced in Alonzo's affidavit, nor should it have been as there was no indication of any "intent to arouse or gratify [a] sexual desire." *See* Tex. Pen. Code Ann. § 21.11(a)(2).

[27] B.B. CAC Interview at 11:32.

| | |
|---|---|
| After the Spanish class incident, "[B.B.] finally broke down (emotionally) and told a friend when they left the classroom. The friend told the Dean of Trinity School. **The Dean of Students of Trinity School was later identified as Todd Freese.**" | B.B. told the CAC interviewer she told a friend that T.F. "just keeps on touching me. He won't stop. And [the friend was] like What do you mean? Who's he? What do you mean he keeps touching you? I was like, [T.F.] will not stop touching me . . . and then [the friend] told me after PE that he had told the dean."[28] B.B. never told her friend about anything amounting to sexual indecency or assault. |
| [B.B.] had to tell Freese in detail what had occurred. Todd Freese **was notified** on this day of the offense of Indecency with a child Texas Penal Code PC 21.11. This offense is an offense listed in the Texas Family Code section 261.101 as an offense that has a duty to report by professionals. Mr. Freese did not report the offense to a state agency which is in a violation of Texas Family Code section 261.109 which is a state jail felony. | The CAC forensic interviewer never asked B.B. what she actually told Plaintiff Freese. To the extent B.B. explained her use of the term "everything," she did not describe telling Plaintiff Freese about an indecency with a child—just butt grabbing. B.B. never explicitly said she told any Plaintiff about her vagina being touched or breast being grabbed. In fact, B.B. admits in the same answer that her "parents still didn't even know because [she] hadn't told anyone"[29] |
| However, she [B.B.'s mother] and the father of [B.B.] decided to contact Freese via email that has been provided to me. **Freese claims that he did not receive the email.** | As Defendant Alonzo later confirmed, the email did actually go to Plaintiff Freese's junk folder. He did not "claim" anything; he, in fact, did not receive the email. |
| But Freese also stated it was a "he said. she said situation", **downplaying the incident.** | Freese searched diligently for camera footage to support B.B.'s claims of butt grabbing in the gym—the only thing he was told about. At that point it truly was a "he said, she said." Plaintiff Freese did not downplay the incident. |

[28] B.B. CAC Interview at 1:04:09.

[29] B.B. CAC Interview at 21:09.

| | |
|---|---|
| On this date [Jan. 15, 2020] is when Myers **was made aware** of the Indecency with a child Texas Penal Code PC 21.11. This offense is an offense listed In the Texas Family Code section 261.101 as an offense that has a duty to report by professionals. Myers did not report the offense to a state agency which is in a violation of Texas Family Code section 261.109, which is a state jail felony. | B.B. told the CAC interviewer that she had not told her parents anything other than T.F. grabbing her butt, so there is no way B.B.'s parents could have made an indecency allegation. Consequently, they did not make Plaintiff Myers "aware" of that. In truth, neither B.B. nor her parents ever told any Plaintiff about conduct amounting to indecency with a child. |
| On January 22, 2020, [B.B]'s mother had an interview with Hammer about sexual misconduct. The Assistant Head for Admin/Director of Admission - Adrianne Clifton was present and took notes by hand on a legal pad. At this point Hammer and Clifton **are aware** of the Indecency with a child Texas Penal Code PC 21.11. This offense is an offense listed in the Texas Family Codes section 261.101 as an offense that has a duty to report by professionals. Myers did not report the offense to a state agency which is in a violation of Texas Family Code section 261.109, which is a state jail felony. | B.B. did not tell her parents anything other than T.F. grabbing her butt, so there is no way B.B.'s parents could have made an indecency allegation. Consequently, they did not make Plaintiffs Clifton or Hammer "aware" of that. In truth, neither B.B. nor her parents ever told any Plaintiff about conduct amounting to indecency with a child. |
| [B.B.]'s parents stated Trinity School wanted them to sign this document agreeing they would not come after the school, for the "incident". [B.B.]'s parents hired an attorney to assist them with this process. Ultimately, [B.B.]'s parents gave up and did not to want to take the right away from her to talk about what happened to her. | The waiver and settlement agreement sent to the B.B.'s family did not contain any language prohibiting B.B. or her family from contacting police, media, or anyone else about the "incident." It did include a confidentiality clause requiring the terms of the waiver and release to remain confidential as consideration for the refund of otherwise nonrefundable tuition. It also prohibited them from disparaging Trinity School. Contrary to the implication in the affidavit, the terms of the agreement allow |

|  | B.B. and her family to "talk about what happened to her." |
|---|---|

### 5.2. Even if Everything in the Affidavit was True, No Reasonable Officer Would Believe Probable Cause Existed to Justify the Arrests

75.    Even if Defendant Alonzo's arrest warrant affidavits were not riddled with lies and omissions, no reasonable officer would believe that the information could establish probable cause to arrest the Plaintiffs.

76.    Although required by the law, Defendant Alonzo only included the phrase "cause to believe," one time in the introductory paragraph of her warrant affidavit where she explained the elements of the offense. Her affidavit never attributes to any Plaintiff anything more than being "notified" or "made aware," standards far less than the required "cause to believe."

77.    The affidavit also fails to account for the longstanding legal principle that the act and the intent must occur simultaneously.[30] Thus, any failure to report in December of 2019 or January of 2020 could not have been done with the intent to conceal because the only reference to concealment is the proposed waiver and release of all claims, which was not

---

[30] *See, e.g.*, *Morissette v. United States*, 342 U.S. 246, 274, 72 S. Ct. 240, 255, 96 L. Ed. 288 (1952) (quoting *People v. Flack*, 26 N.E. 267, 270) ("'It is alike the general rule of law, and the dictate of natural justice, that to constitute guilt there must be not only a wrongful act, but a criminal intention. Under our system, (unless in exceptional cases,) both must be found by the jury to justify a conviction for crime. . . .'").

received by B.B.'s family until September of 2020, when they requested a refund of the tuition paid for B.B.'s attendance at Trinity.

78.    Defendant Alonzo also failed to describe with particularity as to each Plaintiff how their conduct met the "intent to conceal" element. Put simply, there has never been any evidence that any of the Plaintiffs tried to conceal anything. The only possible reference in the affidavit is to Plaintiff Hammer who, upon the school attorney's recommendation, "sent" a proposed confidentiality agreement, which did not cover the (non-existent) "sexual assault" between B.B. and T.F.[31]

79.    Defendant Alonzo had to allege failure to report *with intent to conceal* for two important reasons. First, even if B.B. had said anything, the only time B.B., her mother, or her father spoke with any of the Plaintiffs was in December 2019 and January 2020. B.B.'s mother reached out to police in February 2022, over two years after the alleged incident. Simple failure to report has a two-year statute of limitations.[32] In order to get around the statute of limitations, Defendant Alonzo had to plead the "failure to report" in a way that would increase the statute of limitations time period. The only way to do that was to add the felonious "with intent to conceal" element.[33]

---

[31] The trial court in Plaintiffs' criminal trial ruled the agreement inadmissible under Tex. R. Evid. 408. Both the Trinity School of Midland and the B.B.'s family were represented by counsel in relation to this release and waiver agreement.

[32] *See* Tex. Code Crim. Proc. Ann. art. 12.02 ("charging instruments may be presented within two years from the date of the commission of the offense, and not afterward").

[33] Tex. Code Crim. Proc. Ann. art. 12.01 (limiting felony prosecutions to "three years from the date of the commission of the offense [for] all other felonies.").

80.     Second, Defendant Nodolf had instructed Defendant Alonzo to bring back felony charges.[34] Simple failure to report is a misdemeanor. Failure to report with intent to conceal, however, is a felony.[35]

81.     At no point has there ever been any indication whatsoever that Plaintiffs tried to conceal anything. Plaintiffs Clifton and Hammer never even met with B.B. directly. A complete search of Trinity's school server revealed Plaintiff Clifton never sent or received even a single email on T.F. and B.B.

82.     As detailed in the arrest warrant affidavit, B.B.'s mother reported to Defendant Alonzo that "she believed at the time the suspect was just touching MV's butt."[36] Defendant Alonzo then laid out how B.B.'s mother is the one who told Plaintiffs Myers, Hammer, and Clifton about "the incident" before concluding that because of the meeting with B.B.'s mother, each one "was made aware of the indecency with a child."[37] Even taking everything in the affidavit as true, there is no evidence Plaintiffs Myers, Hammer, and Clifton could have possibly known about any indecency if the source was someone who did not know about any indecency.

---

[34] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 161.

[35] Tex. Fam. Code Ann. § 261.109(c) ("An offense under Subsection (a-1) [failure to report] is a Class A misdemeanor, except that the offense is a state jail felony if it is shown on the trial of the offense that the actor intended to conceal the abuse or neglect.").

[36] Alonzo Affidavit for Arrest Warrant, pg. 3.

[37] Alonzo Affidavit for Arrest Warrant, pgs. 3-4,

83.    Nevertheless, on February 25, 2022, the four Trinity Administrators were handcuffed, and perp walked out of the school at around 11 a.m. in front of their colleagues and students—some of whom were their own children.

84.    Following the arrests and subsequent investigation, upon information and belief, Defendants Nodolf Lively, Sharp, and Alonzo conspired to and did make the same misrepresentations to the grand jury, recklessly and callously disregarding the rights of Plaintiffs, allowing a malicious prosecution to commence against them.[38] The grand jury indicted Plaintiffs for failing to report with intent to conceal an indecency with a child.

85.    Prior to trial, recognizing the statements in Alonzo's affidavit were false—the same narrative conveyed to the grand jury for indictment—co-conspirator Jennifer Lively moved to amend the indictment. The amended indictment accused Plaintiffs of failing to report abuse by "causing or permitting the child to be in a situation in which the child sustains a mental or emotional injury that results in an observable and material impairment in the child's growth, development, or psychological functioning and sexual conduct harmful to

---

[38] "Given that 'a general rule of secrecy shrouds the proceedings of grand juries,' *Shields v. Twiss*, 389 F.3d 142, 147 (5th Cir. 2004), it is understandably difficult for a plaintiff to know what was said—or wasn't said—to the grand jury absent any form of discovery. While that reality doesn't excuse pleading requirements, it does mean that allegations about what was presented or omitted in the grand jury room will in some sense be speculative, which is why plaintiffs like the ones here will need to allege 'other facts supporting the inference' of what they allege to have occurred in the grand jury room." *Wilson v. Stroman*, 33 F.4th 202, 212 (5th Cir. 2022), cert. denied sub nom. *Reyna v. Wilson*, 143 S. Ct. 425, 214 L. Ed. 2d 234 (2022) and cert. denied, 143 S. Ct. 426, 214 L. Ed. 2d 234 (2022) (footnote omitted).

a child's mental, emotional, or physical welfare." This expanded the allegations by adding a definition of abuse not alleged by Alonzo.[39]

86.    Even after the trial court excluded the prosecution's only evidence of concealment (the proposed tuition waiver and release), upon information and belief, District Attorney Nodolf conspired with assistant district attorneys, including Jennifer Lively, to continue the already-malicious prosecution knowing they did not have any evidence to prove the concealment element of the case.

87.    As a result of the Defendants' continued misrepresentations, Plaintiffs were subjected to the arrest, indictment, and humiliation of a highly publicized criminal trial, which has permanently affected their standing in the Midland community and in the educator community at large. But for Defendants' conduct, Plaintiffs would not have suffered these harms.

### 6. DEFENDANT NODOLF'S CUSTOM, PATTERN, AND PRACTICE OF ACTING FAR OUTSIDE THE BOUNDS OF DISTRICT ATTORNEY

88.    Prosecutors are usually absolutely immune from civil liability. Under *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), however, prosecutors are not immune when performing "administrative duties and . . . investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings."

---

[39] *Arizmendi v. Gabbert*, 919 F.3d 891,894 (5th Cir. 2019) (noting "the validity of [an] arrest c[an] not be saved by facts stated in the warrant sufficient to establish probable cause for a different charge from that sought in the warrant.").

89.    Prosecutors are absolutely immune only "for their conduct in 'initiating a prosecution and in presenting the State's case insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" *Burns v. Reed*, 500 U.S. 478, 486, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (citations omitted) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430-31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

90.    "In sum, prosecutors are not entitled to absolute immunity when 'functioning as the equivalent of a detective rather than as an advocate preparing for trial.'" *Wooten v. Roach*, 964 F.3d 395, 407 (5th Cir. 2020) (quoting *Cousin v. Small*, 325 F.3d 627, 632–33 (5th Cir. 2003) (per curiam).

91.    Relevant here, giving legal advice to police during the investigation phase of a case forfeits the protection of absolute prosecutorial immunity. *See Burns*, 500 U.S. at 482, 111 S.Ct. 1934.

92.    Similarly, an elected district attorney who advises law enforcement during the investigation, orders arrests, and at least conspires to have citizens arrested on affidavits lacking probable cause based on recklessly incomplete and/or false information is not entitled to immunity. *Wearry v. Foster*, 33 F.4th 260 (5th Cir. 2022).

93.    Finally, a prosecutor who misleads or conspires to mislead a grand jury in the same way as a constitutionally defective warrant affidavit also waives her prosecutorial immunity. *Wilson v. Stroman*, 33 F.4th 202 (5th Cir. 2022).

94.    As set out below, Defendant Nodolf has a long history of involving herself in the investigative phase of offenses, advising the police pre-probable cause, and conspiring to and violating citizens' constitutional rights, just as she has to Plaintiffs here.[40]

### 6.1.    State v. Megan McMurry

95.    The following is a factual summary of Megan McMurry's case:

In October 2018, Megan and Adam McMurry lived in a gated apartment complex in Midland, Texas with their daughter and son, J.M. and C.M. Ms. McMurry was a teacher at Abell Junior High School, part of the Midland Independent School District. Mr. McMurry served in the National Guard and was then deployed to Kuwait and Syria. J.M. was fourteen years old and homeschooled online and C.M. was twelve years old and attended AJHS at the time of the events of this case.

While Mr. McMurry was deployed, Ms. McMurry was away exploring teaching opportunities in Kuwait from October 25 to October 30, 2018; she arranged for her neighbors, Gabriel and Vanessa Vallejos, to look after J.M. and C.M., as they had done before when she was away. Mrs. McMurry also arranged for coworkers to take C.M. to school.

The day after Mrs. McMurry left, the school counselor scheduled to drive C.M. to school fell sick and asked an MISD police officer, Alexandra Weaver, if she could drive C.M. while Ms. McMurry was out of town. Weaver did not take C.M. to school, but the counselor got another AJHS faculty member to drive C.M. Meanwhile, Weaver opened an investigation into the children's welfare, and told her supervisor, Officer Kevin Brunner, of her conversation with the counselor. Brunner met in turn with other faculty members who, while confirming that Ms. McMurry was traveling, also told Brunner that neighbors were checking on the children.

Weaver meanwhile filed a complaint against Ms. McMurry with the Texas Department of Family and Protective Services (CPS). Brunner and Weaver then traveled to the McMurry apartment to conduct a welfare check on J.M. Brunner

---

[40] In fact, following Plaintiffs' arrests, co-conspirator law enforcement officers grew so skeptical of advice and orders given by Nodolf, numerous co-conspirator officers began surreptitiously recording phone calls and in-person verbal interactions with her. To be clear, police officers were recording the elected DA, Defendant Nodolf, because they did not trust the advice and counsel she was giving.

asked J.M. when Ms. Vallejos last checked on her and J.M. said Ms. Vallejos had been over that morning.1 The officers told J.M. that they would be taking her to another location. J.M. texted her father that the police were at the McMurry apartment.

The officers took J.M. to the apartment complex's conference room for further questioning and ordered J.M. not to respond to her father who repeatedly called and texted her. J.M. told an apartment complex staff member that she wanted to reach her father, but when the staff member told the officers this, Brunner refused to let J.M. call her father. Brunner called Ms. Vallejos and asked her to meet them at AJHS. Brunner and Weaver then took J.M. to the junior high school in the backseat of their police car. Ms. Vallejos called J.M., but Brunner told J.M. that she could not take the call.

At the school, Brunner placed J.M. in an office. The Vallejoses came and spoke to Brunner, stating that they had last seen the children the night before. The Vallejoses were then allowed to see J.M., and they Facetimed Mr. McMurry. That afternoon, CPS investigated the status of the children but found no neglect or unreasonable risk of harm and sent the children home with the Vallejoses.

Brunner nonetheless continued his investigation and filed probable cause affidavits on December 2 and 4, 2018, to obtain an arrest warrant for Ms. McMurry. In January 2020, a jury acquitted Ms. McMurry of the charges of abandoning or endangering her children.

After the acquittal, the McMurrys sued Brunner under 42 U.S.C. § 1983. J.M. asserted that Brunner violated her Fourth Amendment right to be free from unreasonable seizures.[41]

96.    The district court held that Officer Brunner was not entitled to qualified immunity.[42]

The Fifth Circuit affirmed. The United States Supreme Court denied a writ of certiorari.[43]

97.    The district court also held that Officer Brunner could not invoke the independent

intermediary doctrine to rely on the grand jury's indictment to establish he had acted

---

[41] *McMurry v. Brunner*, No. 21-50888, 2022 WL 17493708, at *1–2 (5th Cir. Dec. 7, 2022), cert. denied, 143 S. Ct. 2567 (2023).

[42] *Id.*

[43] *Id.*

reasonably. The Fifth Circuit affirmed. The United States Supreme Court denied a writ of

certiorari.[44]

98.    The Fifth Circuit explained the reason Officer Brunner could not rely on the

independent intermediary doctrine:

> Brunner's invocation of the independent intermediary doctrine is unavailing as
> his probable cause affidavit—presented to the grand jury—contained
> information that Brunner did not know when he removed J.M. The grand jury
> was presented with information obtained in an investigation that continued after
> Brunner removed J.M., namely how long it had actually been since Ms. Vallejos
> last checked on J.M. And it is significant that the affidavit omitted the fact that
> Mr. McMurry was available and trying to communicate and Brunner knew this.
> Given the asymmetry of information presented to the grand jury and
> information known to Brunner at the time of the alleged misconduct, the
> indictment of Ms. McMurry did not ratify Brunner's actions as reasonable, a
> conclusion refuted with an acquittal by a fully informed jury. The independent
> intermediary doctrine does not apply.[45]

99.    According to both she and her trial counsel, Defendant Nodolf violated Mrs.

McMurry's constitutional rights in the following ways:

a) Ordered her arrest on less than probable cause and based on false or recklessly
   misleading information in violation of the Fourth Amendment;

b) Deliberately withheld material information concerning Officer Brunner's violent
   history as a police officer, including either resigning or being terminated from his
   previous law enforcement position in New York due to unlawful use of force;

c) Either personally or under her direct instruction presented the same false and
   recklessly misleading information from McMurray's arrest warrant affidavit to
   the grand jury on one or more occasions;

---

[44] *Id.*

[45] *Id.* at *4.

d) Intentionally delayed her constitutionally guaranteed Sixth Amendment right to a speedy trial by;

e) Knowingly securing two defective indictments in order to prolong the prosecution;

f) When she finally secured an indictment that would survive a motion to quash, Defendant Nodolf realized she could not prove a case based on the evidence;

g) Defendant Nodolf then dumped the case onto one of her assistant district attorneys. That assistant district attorney repeatedly told McMurry and her counsel that she did not want to prosecute the case, but Nodolf was making her;

h) On the eve of the actual trial setting, upon information and belief, Nodolf and her assistant conspired to delay yet again by claiming the assistant district attorney was ill and could not be in court, even though the assistant was still working and emailing McMurry's lead detective the very day she was "out sick"—something only discovered later during Mrs. McMurry's pending civil litigation against the City of Midland.

### 6.2. State v. David Wilson

100.    David Wilson had a home security system that malfunctioned in the early morning hours of March 5, 2019. The malfunction indicated someone had tripped an alarm at Mr. Wilson's home even though no one had done so. The home was actually secure. There was no beeping, alarm, or any kind of notice given to Mr. Wilson that the alarm was malfunctioning, and the alarm company did not call Mr. Wilson to check on him. Instead, and unknown to Mr. Wilson, the alarm company dispatched police to a "POOL OH Door burglary" at Mr. Wilson's home.

101.    Neither the alarm monitoring company nor the police ever contacted—or even attempted to contact—Mr. Wilson by phone.

102.    When officers arrived at the home, they opened the front door, briefly looked around, and closed it. When they opened the front door a second time, Mr. Wilson—protecting his three young daughters, wife, and himself—fired one shot in the direction of the front door, striking and killing MPD Officer Nathan Heidelberg.

103.    At no point before the shot was fired did anyone attempt to let Mr. Wilson know that police had been dispatched to his house.

104.    Mr. Wilson did not know that the person at his front door was an officer until he was taken into custody several minutes after the shooting.

105.    Immediately afterwards, MPD sent almost every available officer to respond to the scene at Mr. Wilson's home.

106.    After ordering everyone outside, in full tactical gear, police then "cleared" the home by conducting a protective sweep.

107.    Mr. Wilson was arrested and transported to the Midland Police Department—where, over the next several hours, he gave a complete statement to investigating officers.

108.    At some point that evening, law enforcement contacted Defendant Nodolf.

109.    After being contacted by law enforcement, Defendant Nodolf and co-conspirators known and unknown, physically went to Mr. Wilson's home with multiple people who appear (on video) to be investigators employed by Nodolf's office.

110.    Even though the home had already been cleared and secured by MPD's SWAT Team and even though Mr. Wilson was already in custody, Nodolf walked inside Mr.

Wilson's home and perused around it. This was after the house had been swept and secured but before she or law enforcement sought a warrant to search the home.

111.    Mr. Wilson's home surveillance system captured the illegal search:



**Defendant Nodolf walking through the area between
Mr. Wilson's dining room and living room**



**Defendant Nodolf is looking at something on the table in Mr. Wilson's dining room**



**Defendant Nodolf still perusing Mr. Wilson's dining room**



**Defendant Nodolf, standing in Mr. Wilson's dining room, appears to be having a discussion with a Texas Ranger (to her right, wearing the hat) and Midland Police Officers**

112.    The same Texas Ranger testified at Mr. Wilson's criminal trial that it was not uncommon for Defendant Nodolf to arrive at the scene of a potential offense. He

additionally testified that he and Defendant Nodolf went into Mr. Wilson's house without a warrant.

113.    Mr. Wilson's home surveillance system also captured Nodolf alongside six police officers searching the inside of Wilson's home several hours before seeking and obtaining a search warrant.

114.    After she was done at Mr. Wilson's home (and still before seeking or obtaining any arrest or search warrant), Defendant Nodolf went to the police station where Mr. Wilson was waiting. At the station, Defendant Nodolf again actively participated in the investigation.

115.    Texas Ranger Allen testified at Mr. Wilson's criminal trial that he would step out of the interrogation room with Mr. Wilson to go ask Defendant Nodolf which questions she wanted him to ask. At that point, no warrant had issued. Defendant Nodolf was getting heavily involved in the investigation before a case had been filed.

116.    Upon information, belief, and footage from Mr. Wilson's surveillance system, at Defendant Nodolf's direction, co-conspirator employees of the District Attorney's Office drove Defendant Nodolf to and from Mr. Wilson's home and to the interrogation location.

117.    After several months of investigation, Ranger Allen and Defendant Nodolf could not find cause for the alarm malfunction nor could they find any contract between Mr. Wilson and the alarm company regarding whether he was to be contacted when an alarm went off. In fact, there was no contract at all between Mr. Wilson and the alarm installation and monitoring company.

118.    Nevertheless, in May 2019, when presenting Mr. Wilson's case to the Grand Jury, Nodolf claimed Mr. Wilson was entirely to blame for creating the deadly situation leading to Officer Heidelberg's death. Most of Defendant Nodolf's grand jury presentation was recorded by video camera. On video, one can see Ms. Nodolf showing off her custom-made bullet-proof vest to the grand jurors.

119.    Defendant Nodolf contended Mr. Wilson had, in a written contract, instructed the alarm company to not call him before dispatching police and that he therefore had no right to claim he was surprised by police showing up to his house unannounced. As established by a recording of the grand jury presentation later handed over to Mr. Wilson's defense attorneys, to be sure she got her point across, Nodolf held up some document and suggested to the grand jury it was the non-existent "contract" Mr. Wilson supposedly signed.

120.    During the same grand jury presentation, Defendant Nodolf told the grand jury that the acoustic panels on the ceiling in the living room of the home were made to amplify sounds. This was an important matter because Officer Heidelberg had entered through a door leading into Mr. Wilson's living room. Those acoustic panels are not designed to amplify sound, as Defendant Nodolf told the grand jury. To the contrary, the man who had the house built testified at Mr. Wilson's criminal trial that those panels are designed to absorb sound.

121.    On May 2, 2019, the grand jury indicted Mr. Wilson for manslaughter.

122.   After being called out for some of these false statements to the grand jury during pretrial hearings, Defendant Nodolf ceased recording grand jury presentations as a matter of policy or custom.

123.   Mr. Wilson's case was set for trial to begin November 1, 2021.

124.   On October 28, 2021, Ms. Nodolf and two co-conspirator assistant district attorneys presented a new case, to a different grand jury, and obtained an indictment for murder. Upon information and belief, Defendant Nodolf and her co-conspirators misled this grand jury exactly like Mr. Wilson's first grand jury: making materially false statements regarding the alarm, the home, and the facts of what happened. This presentation was not recorded or transcribed.

125.   Upon information and belief, Defendant Nodolf was not ready for Mr. Wilson's trial and had been dilatory in her pretrial preparation, so she used a murder indictment hoping to bait Mr. Wilson's defense team into a continuance. Indeed, Defendant Nodolf even mentioned wanting a continuance during an emergency final pretrial and murder arraignment hearing. She, again, was intentionally interfering with a defendants' right to a speedy, public jury trial in violation of the Sixth Amendment.

126.   Wilson's team did not take the bait and demanded a speedy trial. In December 2021, Mr. Wilson went to trial on charges of Officer Heidelberg's murder. He was quickly acquitted.[46]

---

[46] For personal reasons, Mr. Wilson chose to not seek 42 U.S.C. Section 1983 relief against Defendant Nodolf.

6.3.  STATE V. JARED LEE ET AL.

127.    The "Midland Christian Five," is a case with several nearly identical facts as the instant one. The civil rights lawsuit stemming from these criminal charges is pending in this Court, with The Honorable Barbara Lynn presiding.[47] This case is not only similar, it, in a way, is what started everything with the instant case.

128.    The Midland Christian Five consist of five career educators from Midland Christian school–a private Christian School in Midland: Jared Lee, Dana Ellis, Matthew Counts, Gregory McClendon, and Barry Russell. There was a false rumor going around the school that a sexual assault had occurred in the locker room. The Five investigated the allegations and determined they were, in fact, totally and completely false. Nevertheless, Defendant Alonzo conducted a very biased "investigation" into the incident.

129.    At the conclusion of the "investigation," Alonzo filed sworn warrant affidavits and criminal complaints for failure to report child abuse with the intent to conceal. Those documents, which Alonzo swore to under oath, omitted overwhelming evidence supporting the conclusion that the Five had come to—that there was no reportable abuse. Those sworn statements also contained flat-out falsehoods. Alonzo, alongside two other officers with Midland Police Department, charged the Five not just with failure to report (a misdemeanor) but with intentionally concealing the abuse (a felony).

---

[47] *See Lee et al. v. City of Midland et al.*, Cause No. 7:22-CV-00185-BL, Plaintiffs' First Amended Complaint (W.D. Tex. Dec. 6, 2022).

130.    Nevertheless, with the ill-gotten affidavits in hand, Alonzo and her colleagues, including Defendant Sharp, handcuffed, arrested, and perp walked the Five on the school campus on a Friday morning. The media had been alerted, so the arrests and charges were extremely public. In fact, they made international headlines. This very public arrest is what alerted B.B.'s mother to the idea that maybe she could get the police to publicly arrest educators who she held personal grudges against at the other big Christian private school in town (Trinity).

131.    Approximately three months later, the grand jury, which was conducted by Defendant Lively, no-billed each one of the Midland Christian Five.

132.    The Five brought a 42 U.S.C. § 1983 suit against the City of Midland, Alonzo, Sharp, and other officers, and that case is still pending.

133.    Just days after the Five filed their 1983 Complaint, they were arrested again for failure to report child abuse with intent to conceal regarding a different child. As part of the Midland Christian Five II criminal case, the trial court conducted a *Brady* hearing. At the hearing, the following was revealed by Lt. Rosemary Sharp:

    a)  Alonzo has been promoted to Sergeant following these incidents;

    b)  Defendants Nodolf and Alonzo had "many" meetings regarding both Midland Christian cases, as well as Plaintiffs' criminal case, prior to seeking arrest warrants. Co-conspirators Sharp and Lively were present;[48]

---

[48] *State v. Lee, et. al*, Cause No. CR58386, Transcript of Rosemary Sharp, *Brady* Hearing at 52, 57, 64 (441st Dist. Ct. of Midland Cty., Tex. July 21, 2023).

c) Sharp sought advice from the District Attorney's Office prior to probable cause regarding the waiver and settlement agreement because she "didn't know what a gag order was";[49]

d) Sharp confirmed the custom or policy of taking high-profile cases to Defendant Nodolf for her to direct law enforcement on how to proceed;[50]

e) Sharp confirmed Defendant Nodolf instructed Defendant Alonzo to "get warrants for the [Plaintiffs] rather than fully investigating the case."[51]

134.    Finally realizing these cases lacked merit, Defendant Nodolf recused her office from the second Midland Christian case. Within weeks, the newly appointed prosecutor dismissed these remaining cases, saying the facts "DOES [sic] NOT MEET THE ELEMENTS OF OFFENSE," in the dismissals.[52]

### 6.4. State v. Clinton Young

135.    Clinton Young was convicted of kidnapping and double murder and sentenced to death in 2003 in Midland County. After years of post-conviction litigation, in October 2017, the Midland County District Attorney's Office sought, and obtained, a death warrant. Mr. Young moved to withdraw the warrant, alleging among other things that his conviction was based on the perjured testimony of David Page, a co-conspirator. Mr. Page had been bragging in prison that he was actually the one who had committed the slayings and he had

---

[49] *Id.* at 71.

[50] *Id.* at 42.

[51] *Id.* at 66.

[52] *Id.*, Motion and Order to Dismiss (Sept. 18, 2023).

successfully framed Mr. Young. The presiding judge set the matter for a hearing and issued a bench warrant for David Page's return to Midland County.

136.   As detailed in his 2020 Application for Writ of Habeas Corpus, once Mr. Page was back in Midland County Jail, Defendant Nodolf, ever the want-to-be detective, took it upon herself to privately interview Mr. Page, without notifying anyone on Mr. Young's team that she was doing so. In a recording of that interview, Mr. Page is memorialized admitting to Defendant Nodolf that he had in fact perjured himself on several key topics at Mr. Young's trial.

137.   While Young had a death warrant pending, Defendant Nodolf did not turn this information over.

138.   Instead, Defendant Nodolf continued to *actively oppose* Mr. Young's request to withdraw the death warrant. The Court of Criminal Appeals later stayed Mr. Young's execution on different grounds. At that point, Defendant Nodolf dumped the case on a different prosecutor, who turned over the significant *Brady* evidence of Mr. Page's recorded statements. Mr. Young came within eight days of being executed. His conviction was later overturned.

### 6.5.   Other conduct evidencing Nodolf's pattern and practice of doing far more than a district attorney should

139.   Moonlighting, Defendant Nodolf has also participated in "sting" operations, occurring at police departments and/or hotels in the Western District of Texas. Defendant Nodolf provided food and beverages to law enforcement co-conspirators and her assistant

district attorney co-conspirators, while she either chatted online or texted with suspects and future defendants to lure them to the hotel to be arrested for cyber and sex crimes.

140.    Upon information and belief, she would also provide legal counsel and direction to law enforcement co-conspirators.

### 6.6.    Midland Police distrusted Nodolf & Midland DAs so much they recorded phone calls and in-person interactions

141.    Although Alonzo testified at Plaintiffs' criminal trial that no recordings existed,[53] the City of Midland has now produced numerous recorded interactions between Alonzo, Sharp, Nodolf, and Lively.

142.    In one undated in-person discussion, Alonzo and Lively discuss the entire problem here. Alonzo admits, "I did what the DAs Office told me to do. And because I did what I was told to f*cking do, I am being f*cking sued in federal court. . . . because I did what I was told to do by this office. And you know I did, and I'm the only one who's taking the hits for it. Nobody else." Co-conspirator district attorney Lively responds, "I understand."[54]

143.    In another recorded phone conversation, Defendant Nodolf can be heard saying "I hate all school administrators, and a lot of those are teachers."[55]

---

[53] Testimony of J. Alonzo, *Texas v. Myers, et. al*, at 149 ("A. No, sir. I'm not in the habit of recording the D.A.'s office. Q. Is it incorrect then to say that you have recordings of discussions between the D.A.'s office and yourself? A. Oh, yes, sir. I don't have -- not that I can recall.").

[54] City-Trinity 2328 - 10.m4a.

[55] City-Trinity 2332 - RECORDING DEC132022.m4a.

144.    In another, Defendants Alonzo and Sharp record a meeting with Defendant Lively where they prepared to present the Trinity and second Midland Christian cases to the grand jury. In that meeting, they spent over an hour discussing the statutory basis for the charge and the "facts" they planned to present, in accordance with Defendant Alonzo's false affidavit that was approved by Defendant Sharp.

145.    In still another, co-conspirator Midland police officer Sharp records a call the day after the Trinity Plaintiffs' criminal charges were dismissed.[56] The call is with co-conspirator district attorney Tim Flathers. In this call, Sharp seeks pre-probable cause investigative direction from Flathers on how to handle Alonzo's cases since Sharp will be taking them over. Importantly, Sharp asks about how to handle an outcry B.B. made against *another person* after the arrests but before the trial of the Trinity Four. B.B. alleged that A.M., a Midland Christian student and the student at the center of the first Midland Christian Five arrest, touched her improperly. Flathers indicates he is aware of this case. Sharp asks, "where do we go from there?" Flathers responds that when he is back in the office, they would figure it out together. A.M. was never arrested, charged, or indicted. Nothing about this apparently false allegation by B.B. was disclosed to criminal counsel for the Trinity Four prior to the conclusion of their criminal trial.

---

[56] City-Trinity 2331 - RECORDING APRIL282023.m4a.

## 7. Causes of Action

### Count 1:
### Fourth Amendment False Arrest under *Franks v. Delaware*
### (Defendants Nodolf, Alonzo, Sharp, Lively)

146.    All preceding paragraphs and the paragraphs set out in the Counts below are incorporated herein by reference.

147.    Plaintiffs have a clearly established constitutional right under the Fourth Amendment to be secure in their persons, homes, and property against unreasonable seizure and *to not have a warrant issued for their arrests without probable cause*. U.S. Const. amend. IV (emphasis added). As the Supreme Court of the United States has plainly stated, "[w]here the standard is probable cause, a . . . seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

148.    Pursuant to 42 U.S.C. § 1983, every person who, under color of any statute, ordinance, regulation, custom or usage of any State, subjects, or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the parties injured in an action for redress.

149.    Defendant Laura Nodolf is a "person" within the meaning of 42 U.S.C. § 1983.

150.    Defendant Jennie Alonzo is a "person" within the meaning of 42 U.S.C. § 1983.

151.    Defendant Rosemary Sharp is a "person" within the meaning of 42 U.S.C. § 1983.

152.    Defendant Jennifer Lively is a "person" within the meaning of 42 U.S.C. § 1983.

153.    Plaintiffs plead civil liability against Defendants Nodolf, Alonzo, Sharp, and Lively based on a "*Franks*" violation. *See Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); *see also Hale v. Fish*, 899 F.2d 390, 400 n. 3 (5th Cir. 1990).

154.    There are three possible ways for an officer to be held liable in a Section 1983 claim under *Franks*.

155.    First, if he or she "deliberately or recklessly provides false, material information for use in an affidavit in support of [a warrant]." *Wilson v. Stroman*, 33 F.4th 202, 206 (5th Cir. 2022), *cert. denied sub nom. Reyna v. Wilson*, 143 S. Ct. 425, 214 L. Ed. 2d 234 (2022) *cert. denied*, 143 S. Ct. 426, 214 L. Ed. 2d 234 (2022) (quoting *Melton v. Phillips*, 875 F.3d 526, 264 (5th Cir. 2017) (en banc)).

156.    Second, if he or she "makes knowing and intentional omissions that result in a warrant being issued without probable cause." *Id.*

157.    Third, in "an unhurried setting," when circumstances indicate a "reasonable officer" should "investigate[] further," *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003), but instead proceeds with arrest, they commit a *Franks* violation by recklessly omitting exculpatory information attainable by making basic inquiries. *Bledsoe v. Willis*, No. 23-30238, 2023 WL 8184814, at *5 (5th Cir. Nov. 27, 2023).

158.    Normally, under the independent intermediary doctrine, a grand jury's indictment will break the chain of causation for any false arrest claim pertaining to the affidavit and the arrest warrant issued by the magistrate judge. *See Wilson*, 33 F.4d at 206. This doctrine

does not apply, however, if "the grand jury was misled *in the very same way* as the magistrate who issued the warrants." *Id.* (emphasis in original).

159.    Defendant Alonzo began investigating this case in late February 2022. She had just investigated and affected the arrests in connection with the Midland Christian School for the same offense charged against Plaintiffs in this case. The sum total of Defendant Alonzo's investigation consisted of (1) witnessing the CAC forensic interview of B.B.; (2) conducting a joint interview of B.B.'s parents which lasted approximately one hour; and (3) reviewing some documents given to her by B.B.'s parents, including a proposed release of liability and non-disclosure agreement sent to them by Plaintiff Shelby Hammer in September 2020.

160.    The elements of Failing to Report with Intent to Conceal in violation of § 261.109 of the Texas Family Code as alleged in the arrest warrants for Plaintiffs are as follows:

(1) A professional as defined by Section 261.101(b)

(2) knowingly fails to make a report as provided in this chapter.[57]

161.    During the February 22, 2022, CAC interview, the only school staff member mentioned was Plaintiff Todd Freese. The issue of whether Plaintiff Freese reported the incident or not never even arose during the entire one hour and twenty-minute-long interview. There was no evidence whatsoever addressing any specific intent to conceal.

---

[57] The offense is elevated to a felony if the professional fails to report and intends to conceal such failure.

Worse, Plaintiffs Hammer, Clifton, and Myers were not even mentioned. They were not even referenced.

162.    Also on February 22, 2022, Defendant Alonzo spoke with B.B.'s parents. During the conversation, the issue of what the Plaintiffs knew and when they knew it came up several times. The first exchange involved a meeting between B.B.'s parents and Plaintiffs Freese and Myers:

> Darby Brown (09:28): Five days previous. We end up meeting with Chrystal and Todd and we said, you know, "What have y'all done at this point?" "Well, we're still investigating."
>
> Detective Alonzo (09:37): Mm-hmm.
>
> Darby Brown (09:37): Okay. That's great. But I need, I need my kid and this boy out of the same class.
>
> Detective Alonzo (09:42): At that point when they said that they're still investigating, did they know that he had touched her-
>
> Darby Brown (09:46): Yes.
>
> Detective Alonzo (09:46): Inappropriately? Like did they know like he had touched her-
>
> Darby Brown (09:48): Yes.
>
> Detective Alonzo (09:48): Vagina or whatever?
>
> Darby Brown (09:50): And he... Yes. And he had... And it was over clothes.
>
> Later in the interview, the following exchanges occur:
>
> Detective Alonzo (27:41): So Shelby Hammer, she also knew what had happened with your daughter, right? So she knew?
>
> Darby Brown (27:50): She did, but you know, they didn't tell her for quite some time. They didn't tell her immediately and I remember thinking, "That's shitty."
>
> Chad Brown (27:57): Yeah.
>
> Darby Brown (27:57): She's the headmaster of the school. She needs to know all these things.

Chad Brown (28:03): Yeah, for weeks it was us dealing with the Dean-

Darby Brown (28:06): Todd.

Chad Brown (28:07): . . . Todd Freese and the head of the middle school, Chrystal Myers.

Detective Alonzo (28:11): So Todd Freese knew and he's the Dean.

Chad Brown (28:14): Yeah.

Darby Brown (28:14): Mm-hmm.

Detective Alonzo (28:14): And then Chrystal?

Darby Brown (28:15): Chrystal Myers.

Detective Alonzo (28:16): And she knew also?

Darby Brown (28:17): Yeah, but she wasn't really involved. It was, she was in that one meeting and then-

Chad Brown (28:17): She wasn't, yeah, it was Todd's show.

Darby Brown (28:20): . . . yeah and then it wasn't and then she wasn't involved. She did do the interviews with the boys-

. . .

Detective Alonzo (30:12): So, we have Shelby Hammer, Todd Freese, and Chrystal Meyers definitely knew about the incident-

Darby Brown (30:12): Correct.

Detective Alonzo (30:17): They did their own investigation.

Darby Brown (30:18): Correct.

163.    During the same meeting, the subject of a "gag order" was raised. In September, 2020, almost one year after the alleged incident or incidents, B.B.'s parents made the decision they were going to withdraw her from Trinity School. They requested a refund but, under the terms of their contract, were no longer entitled to one. Nevertheless, Plaintiff Shelby Hammer, the Head of School, sent them a release of liability and non-disclosure agreement to sign, offering to let them rescind their tuition contract. The

proposed release would have refunded the tuition, but in exchange, B.B.'s parents would be prohibited from making disparaging remarks about the school—a condition prompted by their ongoing public criticism of Trinity on a range of unrelated issues. Because the school did not want to set a precedent of refunding tuition past the contractual deadline, the proposed release also required the family to keep its existence and terms confidential. Of course, criminal liability cannot be waived by private agreement, nor can a non-disclosure provision be enforced to prevent someone from reporting a crime. B.B.'s mother characterized this standard release and non-disclosure agreement as a "gag order" to keep them from speaking about what they alleged happened to their daughter.

164.    Defendant Alonzo was outraged:

>   Chad Brown (<u>31:35</u>): Yeah. I mean, they made it, she made it very clear that there was no negotiating that was about to happen. Like, I mean, she-
>
>   Detective Alonzo (<u>31:41</u>): But if you sign that document, she would send you a check?
>
>   Chad Brown (<u>31:43</u>): Yep.
>
>   Darby Brown (<u>31:43</u>): Correct.
>
>   Chad Brown (<u>31:44</u>): Yep.
>
>   Darby Brown (<u>31:45</u>): Would you consider that extortion? We did sign a contract though, saying... I mean, uh, I mean, you know. And I'm not trying to defend that we- You know we signed a contract every year saying-
>
>   Detective Alonzo (<u>31:53</u>): Right. But for her to say, "Sign this non-disclosure agreement, and we'll give you your money back" is- I have a big issue with that.
>
>   Chad Brown (<u>32:01</u>): Mm-hmm. Yep.
>
>   . . .
>
>   Detective Alonzo (<u>56:35</u>): Mm-hmm. Okay. Yeah, if you'll just go through all those emails.

Darby Brown (56:35): I will.

Detective Alonzo (56:39): And then send them, and we'll . . .

Darby Brown (56:41): Okay, yeah. 'Cause this is just-

Speaker 1 (56:43): Outline.

Detective Alonzo (56:43): Yeah, your outline, every-. . . I heard you saying timelines and stuff like that. Whatever you have.

Darby Brown (56:48): Okay.

Detective Alonzo (56:48): Just send it to me, and then . . . **but we will probably act on this tomorrow.**[58]

165.    As stated above, one of the two elements of the offense of failing to report with intent to conceal are missing from the warrant affidavit: there is no showing of a knowing failure to report.

166.    Defendants Alonzo and Sharp, as stated above, consulted with Defendants Nodolf and Lively and briefed them on the investigation, after which time Nodolf and Lively directed Alonzo to stop her investigation and arrest the Plaintiffs—telling her they could fill in any holes later. A search warrant was executed the same day and then a grand jury subpoena was later issued for the school's records. However, at the time of the decision to arrest, the only information known to Defendants Nodolf and Lively was what Defendant Alonzo could have told her, and that was limited to the CAC interview, the interview of B.B.'s parents, and some documents provided by the parents.

---

[58] The interview was the afternoon of February 22; the arrests occurred the morning of February 24, 2022.

167.    None of these sources contain evidence supporting the specific intent to conceal, the key factor elevating the offense to a felony and bringing it within the statute of limitations. There are references made in the interviews, however, to a written release of claims that Plaintiff Shelby Hammer sent to B.B.'s parents to sign as a condition for getting a refund of their tuition. However, no reasonable prosecutor or police officer could ever believe this was sufficient to show probable cause that the Plaintiffs had a specific intent to conceal at the time of the alleged offense. Indeed, the trial judge in the criminal case barred the release from being admitted into evidence and admonished B.B.'s mother that it was not a "gag order."

168.    The dates of the alleged offenses would have been in December, 2019 and January, 2020.

169.    The affidavit language setting out the offense conduct related to Plaintiff Freese is as follows:

> The next day [approximately December 18, 2019], MV was called to Freese's office. MV stated she had to explain everything that had happened in between September to December of 2019. MV explained there was an incident that occurred in front of cameras, but she did not know if that footage was located or not. This incident occurred in the gymnasium after gym. Freese told MV there were cameras in that area, and they would check for camera footage. MV had to tell Freese in detail what had occurred. Todd Freese was notified on this day of the offense of Indecency with a Child Texas Penal Code PC 21.11. This offense is an offense listed in the Texas Family Code section 261.101 as an offense that has a duty to report by professionals. Mr. Freese did not report the offense to a state agency which is in a violation of Texas Family Code section 261.109, which is a state jail felony.

170.    The affidavit language setting out the offense conduct related to Plaintiff Myers is

as follows:

> On January 15, 2020, MV's parents had enough and there was a meeting
> between Head of Middle School - Chrystal Myers, Dean of Students - Todd
> Freese and the parents at the school, due to no resolution. MV's mother
> explained that Freese had not yet removed the suspect from MV's classes. MV's
> mother explained MV was struggling with the fact she and the suspect were in
> the same class again. The school administration assured the family that they
> would work on it. On this day, MV's parents were told that Hammer did not
> know about this incident. However, MV's mother advised them she had already
> told Hammer via email. On this date is when Myers was made aware of the
> Indecency with a Child Texas Penal Code PC 21.11. This offense is an offense
> listed in the Texas Family Code section 261.101 as an offense that has a duty to
> report by professionals. Myers did not report the offense to a state agency which
> is in a violation of Texas Family Code section 261.109, which is a state jail
> felony.

171.    The affidavit language setting out the offense conduct related to Plaintiffs Hammer

and Clifton is as follows:

> On January 22, 2020, MV's mother had an interview with Hammer about
> sexual misconduct. The Assistant Head for Admin/Director of Admission -
> Adrianne Clifton was present and took notes by hand on a legal pad. At this
> point Hammer and Clifton are aware of the Indecency with a Child Texas Penal
> Code PC 21.11. This offense is an offense listed in the Texas Family Code
> section 261.101 as an offense that has a duty to report by professionals. Myers
> did not report the offense to a state agency which is in a violation of Texas
> Family Code section 261,109, which is a state jail felony.

172.    None of these paragraphs sets out a single allegation of a specific intent to conceal.

173.    At the end of the affidavit, the following words appear:

> On September 18, 2020, Hammer sent a "Confidential Waiver and Release of
> all Claims" to MV's parents. The agreement, if signed would allow the parents
> to receive a portion of the tuition paid for the school year of 2020-2021. If not
> signed they would not receive any money in return. In a portion of the
> "Confidential Waiver and Release of all Claims": "WHEREAS, the Parents,
> collectively and individually, and the School desire to compromise, resolve and

settle fully and finally the dispute regarding the tuition obligation and any and all claims between or among them up to the date of this Agreement, including any and all claim' arising out of the incident, Student's enrollment in the school or the Enrollment Agreement, in order to avoid the time, expense and inconvenience attendant upon litigation between them and without admission of liability or wrongdoing of any kind of anyone." Further on in the document the same verbiage is listed.

After speaking with MV's parents, this document was reviewed. MV's parents stated Trinity School wanted them to sign this document agreeing they would not come after the school, for the "incident". MV's parents hired an attorney to assist them with this process. Ultimately, MV's parents gave up and did not want to take the right away from her to talk about what happened to her.

174.    This event, however, cannot support the allegation of a specific intent to conceal. The alleged offenses occurred in December, 2019 and January, 2020. The release and non-disclosure agreement was sent to B.B.'s parents on September 18, 2020. This cannot substitute for the necessary condition that the intent and the act had to occur at the same time.

175.    Two features are missing from the warrant affidavit: (1) there is no showing of a knowing failure to report and (2) there is no showing of a specific intent to conceal at the time of the alleged offense. Thus, out of the three elements cited above, two are missing.

176.    This was the state of the evidence available to Defendants Laura Nodolf and Jennifer Lively when they instructed Defendants Alonzo and Sharp to get the warrants and arrest the Plaintiffs.

177.    Defendants Nodolf's and Lively's instruction to Defendant Alonzo to cease investigating and immediately arrest the Plaintiffs was a specific, intentional act of Nodolf and Lively which violated the U.S. Constitution. They are therefore liable.

178.    Defendants Sharp and Lively were present for this meeting and heard Defendant Nodolf's and Defendant Lively's instruction. Defendants Sharp, Lively, and Nodolf were advising Alonzo to violate Plaintiffs' constitutional rights. Defendants Sharp and Lively had a reasonable opportunity to prevent the unconstitutional harm. But Defendants Sharp and Lively did not act in any way to prevent the harm. Defendants Sharp and Lively are therefore liable. *See Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (collecting cases, discussing, and setting out elements of bystander liability).

179.    Additionally, working together, Defendants Alonzo and Sharp deliberately or recklessly provided false, material information for use in the affidavits in support of Plaintiffs' arrest warrants. *See Wilson*, 33 F.4th at 206.

180.    Second, Defendants Alonzo and Sharp deliberately or recklessly made knowing and intentional omissions that resulted in warrants for Plaintiffs' arrests being issued without probable cause. *See Wilson*, 33 F.4th at 206.

181.    Third, all four individual defendants should have known a reasonable officer would conduct additional investigation before proceeding, especially in light of B.B.'s admission during the CAC interview, which Alonzo watched, that she was a "little cheerleader who lies a lot," as well as other statements showing her questionable credibility.[59] *Bledsoe v. Willis*, No. 23-30238, 2023 WL 8184814, at *5 (5th Cir. Nov. 27, 2023) (collecting cases)

---

[59] Mem. Op. and Order, *Hammer v. Nodolf*, No. Case 7:23-CV-00158-JKP, ECF 48, at 56 (Sept. 24, 2024) (quoting CAC Interview 34:15 to 34:35); *see id.* ("[Alonzo] also conceded at trial that she missed B.B. self-describing herself as 'a little cheerleader who lies a lot.'").

(finding *Franks* violation for reckless omission of material information when "officers failed to make the most basic inquiries that would have yielded such [exculpatory] information"). Here, the need for additional investigation was even more apparent given that there was no urgency. By the time the charges were pursued, nearly a year had passed since the alleged offense. B.B. was no longer enrolled at Trinity School, and there was no risk of ongoing harm that would have excused a thorough and objective investigation.

182.    Further, Defendant Alonzo swore under oath that she had personal knowledge of the information set forth in the probable cause affidavits. In truth, Defendant Alonzo did not have personal knowledge of the following statements made in her affidavit:

- "Mr. Freese did not report the offense to a state agency which is in a violation of Texas Family Code section 261.109."

- "On this date is when Myers was made aware of the Indecency with a child Texas Penal Code PC 21.11. This offense is an offense listed In the Texas Family Code section 261.101 as an offense that has a duty to report by professionals. Myers did not report the offense to a state agency which is in a violation of Texas Family Code section 261.109, which is a state jail felony."

- "At this point Hammer and Clifton are aware of the Indecency with a child Texas Penal Code PC 21.11.. This offense is an offense listed in the Texas Family Code section 261.101 as an offense that has a duty to report by professionals. Myers did not report the offense to a state agency which is in a violation of Texas Family Code section 261.109, which is a state jail felony."[60]

---

[60] "[T]his is a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause." *Illinois v. Gates*, 462 U.S. 213, 239, 103 S. Ct. 2317, 2333, 76 L. Ed. 2d 527 (1983) (discussing *Nathanson v. United States*, 290 U.S. 41, 54 S. Ct. 11, 78 L. Ed. 159 (1933)).

183.    As a direct and proximate result of Defendants' conduct and actions, Plaintiffs were wrongfully arrested even though probable cause for their arrest did not exist.

184.    By lying in her affidavit that B.B. had reported that T.F. "did touch her vagina," that Chrystal Myers "failed to report" when she in fact did make a CPS report, and that B.B. never claimed prior to the CAC interview that T.F. touched her vagina, Alonzo padded her affidavit with deliberate falsehoods in order to make the unconstitutional arrests—a top-down directive that came straight from Defendants Nodolf and Lively.

185.    Additionally, although she directed Defendant Alonzo to cease investigation and make arrests, Nodolf claims not to be involved in the investigation or prosecution of these cases.[61] Defendant Alonzo left out of her arrest affidavit that Defendants Nodolf, Lively, and Sharp were involved in the decision not to investigate further.

186.    Instead, as is commonly her practice, Defendant Nodolf acts as though she has entirely delegated all authority to her co-conspirator assistant district attorneys. But Defendant Nodolf does not delegate. According to Defendant Alonzo, her supervisor Rosemary Sharp, and MPD Chief of Police Seth Herman, every decision in every high-profile case, including during the investigation phase, must go through Defendant Nodolf.

---

[61] Nodolf's noninvolvement claims have proven false. She texted the police chief after the Trinity Four were indicted. She spoke to Lively by phone, and presumably in the office, for over twenty minutes the day Plaintiffs were indicted. Nodolf also spoke to B.B.'s mother by phone at least six times for a combined total of about an hour and one-half on Nodolf's cell phone during the pendency of Plaintiffs' criminal cases.

Indeed, according to Chief Herman, that is the custom or policy of MPD and the Midland District Attorney's Office.

187.    Although she has claimed she did not participate in the grand jury presentation of these cases, upon information and belief, Defendant Nodolf instructed her co-conspirator assistant district attorney Jennifer Lively to get Plaintiffs indicted on the felony version of this offense by repeating the lies contained in Alonzo's affidavit and concealing additional exculpatory facts from the grand jury—e.g., the subsequent CPS investigation being closed and ruling out all misconduct by Plaintiffs. Co-conspirator Lively dutifully complied.

188.    Even though she claims not to know and be distant from the ongoing prosecutions, Defendant Nodolf is truly pulling the strings and making all decisions. Throughout the pendency of Plaintiffs' cases, the assistant district attorney assigned by Nodolf, Defendant Jennifer Lively, repeatedly told Plaintiffs' defense counsels decisions about searches of the school's server seized by Alonzo had to go through Defendant Nodolf, who apparently volunteered to personally drive the server to Kerrville, Texas to be searched. Lively repeatedly told Plaintiffs' trial attorneys that decisions about discovery matters had to be run by Nodolf.

189.    When the jig was up, and it became clear that the lies were coming to light, Defendant Nodolf even attached her own affidavit to the motion to dismiss Plaintiffs cases. In the affidavit, Defendant Nodolf turned on Defendant Alonzo, averring Alonzo's testimony was "false, misleading, and incorrect." Defendant Lively followed suit in her own affidavit.

190.    Upon information and belief, by repeating the lies contained in Alonzo's arrest warrant affidavits, and concealing exculpatory information included in the CPS report and forensic interview, District Attorney Laura Nodolf herself, or through her instruction to co-conspirator Lively, knowingly provided false information to a grand jury to secure an unjust and malicious prosecution against Plaintiffs.

191.    Defendant Laura Nodolf does not have the benefit of absolute immunity in this case because she was not performing a function for which absolute immunity would protect her. She was directing a police investigation. Therefore, she only has qualified immunity for directing Defendant Alonzo's investigation.

192.    As a direct result of Defendant's conduct, Plaintiffs were falsely arrested, charged, indicted, and faced trial for failure to report with intent to conceal, despite the absence of probable cause to establish that each had committed a crime. Defendants' conduct, as described above, deprived Plaintiffs of their rights to be secure in their persons against unreasonable seizure, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. Section 1983.

193.    As a direct result of Defendants' conduct, Plaintiffs were falsely arrested and charged with failure to report indecency with a child with intent to conceal, despite the absence of probable cause to establish that each had committed a crime. Defendants' conduct, as described above, deprived Plaintiffs of their right to be secure in their persons against unreasonable seizure, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. § 1983.

194.    Upon information and belief, like the affidavits in this case, the grand jury presentation suffered from a complete lack of additional investigation. Defendants conspired to, and did, mislead the grand jury in the same way the affidavit misled the magistrate who issued the arrest warrants.

195.    Because the grand jury in Plaintiffs' cases was misled by Defendant Alonzo's misstatements and omissions in the very same way as the magistrate who issued the arrest warrants, the independent intermediary doctrine does not serve to break the chain of causation for Plaintiffs' false arrest. *See Wilson*, 33 F.4d at 206.

### Count 2:
### Conspiracy to violate Constitutional Rights
### *Turner v. Upton Co.,* 915 F.2d 133 (5th Cir. 1990)
### (All Defendants)

196.    All preceding paragraphs are incorporated herein by reference.

197.    The custom and culture of Midland County law enforcement was to take direction from the District Attorney, Defendant Nodolf. The Sheriff knew Nodolf was playing police officer; the commissioners knew; the police chief knew; the City Council knew; and the individual Defendants knew. No one did anything about it. As such, both Defendant City employees and Defendant County employees failed to intervene, provide training, or even suggest to Nodolf she was not a police officer and should not give direction before a finding of probable cause.

198.    State Bar records received in this litigation show Defendant Nodolf has no training in law enforcement or policing. Plaintiffs cannot find any evidence to show Defendant Nodolf had any training in law enforcement or policing.

199.    Defendants and at least one other co-conspirator agreed to violate Midland County residents', including Plaintiffs', civil rights in violation of Section 1983, as detailed in the preceding counts.

200.    Specifically, Defendants, through their own conduct and the conduct of co-conspirator assistant district attorneys and law enforcement officers agreed to, and in many cases did, violate Midland residents' (including Plaintiffs') constitutional rights, including:

a) Fourth Amendment Rights to be free from unreasonable searches, seizures, and arrests but for warrants based on probable cause untainted by misleading and false information;

b) Fourteenth Amendment Rights to Due Process by abusing her grand jury powers and presenting false and misleading information to grand juries in order to secure indictments against citizens when probable cause did not exist, as well as violations of *Brady v. Maryland*, 373 U.S. 83 (1963), including:

i.    failing to disclose that B.B. underwent state-sponsored EMDR therapy, which was designed to train her to testify, and that she was being treated at a state-sponsored facility set up with the assistance of co-conspirator Jennifer Lively;

ii.    failing to disclose B.B. made an additional, apparently false, outcry against A.M.—for which he was never arrested, charged, or indicted—in the weeks leading up to the Trinity Four's criminal trial;

iii.    concealing the exculpatory co-defendant's statement in *State v. Clinton Young* while Young had a pending death warrant, nearly leading to his execution before the exculpatory evidence was later turned over by a different prosecutor;

iv.    suppressing Axon evidence logs in David Wilson's murder trial, which were only disclosed mid-trial (during a hearing with Axon's counsel) and would have demonstrated critical timing issues, deletion of video, and the involvement of MPD, contradicting Defendant Nodolf's representations that MPD lacked access to such materials;

v.    misleading the grand jury by concealing the subsequent CPS investigation, which ruled out all misconduct by Plaintiffs; and

vi.    providing false information and concealing exculpatory evidence regarding grand jury proceedings in multiple cases, including the Midland Christian Five and the Trinity School prosecutions, where exculpatory facts were withheld in order to secure unjust indictments.

201.   Defendants knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose.

202.   Defendants and at least one co-defendant and/or co-conspirator, during the existence of the conspiracy, knowingly committed at least one of the overt acts described above, in order to accomplish some object or purpose of the conspiracy.

### COUNT 3:
### 42 U.S.C. § 1983 – *MONELL* LIABILITY AGAINST
### DEFENDANTS CITY OF MIDLAND AND MIDLAND COUNTY

203.   All preceding paragraphs are herein incorporated by reference.

204.   It was a widespread and persistent practice in Midland County for the District Attorney to collude with the Midland Police Department to arrest first, then investigate, and then prosecute "for cover."

205.   It was a widespread and persistent practice in Midland County to allow the District Attorney (and her assistant district attorney co-conspirators) to make deliberate

misrepresentations to a grand jury in order to commence prosecution against Midland residents, despite lack of probable cause and strong exculpatory evidence to the contrary.

206.    Indeed, although she never appeared in court (until appearing on paper when filing the dismissal), all decisions ran through Defendant Nodolf. Upon information and belief, Defendant Nodolf conspired and instructed co-conspirator assistant district attorney Lively to mislead the grand jury in the exact same way Alonzo misled the magistrate to get arrest warrants for Plaintiffs.

207.    In cases involving the Trinity Administrators, Midland Christian Administrators, David Wilson, Megan McMurry, and others, this widespread and persistent practice violated Plaintiffs' and others' Fourteenth Amendment Right to Procedural and Substantive Due Process, Sixth Amendment Right to Counsel and a Speedy Trial, and Fourth Amendment Rights to be free from unreasonable searches, seizures, and arrests.

208.    The Supreme Court has established that municipalities are directly liability for constitutional violations by their employees under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 690 (1978).

209.    The Fifth Circuit has established as follows:

> Two configurations can lead to a municipality's liability under section 1983 for the acts of its officials. In the first, typified by the district court's reference to *Praprotnik*, a municipality's final policymakers are held effectively to have made policy or condoned creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees. In the second, the municipality may be held liable for the illegal or unconstitutional actions of its final policymakers themselves as they engage in the setting of goals and the determination of how those goals will be achieved. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

*Turner v. Upton Cnty., Tex.*, 915 F.2d 133, 136 (5th Cir. 1990).

210.    "When the official representing the ultimate repository of law enforcement power in the county makes a deliberate decision to abuse that power to the detriment of its citizens, county liability under section 1983 must attach . . . ." *Id.* at 138.

211.    In *Culbertson v. Lykos*, the Fifth Circuit clarified the ratification concept, holding "[i]f a final policymaker approves a subordinate's recommendation and also the subordinate's reasoning, that approval is considered a ratification chargeable to the municipality." 790 F.3d 608, 621-22 (5th Cir. 2009).

212.    Defendant Nodolf, as a district attorney, occupied an office that is a "local entity, created by the State of Texas and deriving its powers from those of the State, but limited in the exercise of those powers to the county, filled by its voters, and paid for with its funds." *Crane v. State*, 766 F.2d 193, 195 (5th Cir. 1985). Consequently, there are certain circumstances in which the district attorney is a policymaker for the State and circumstances when the district attorney is a policymaker for the county. *Id.*

213.    The Fifth Circuit and its district courts have drawn the county versus state policymaker line at *what* the district attorney was doing. If the district attorney was *enforcing* state law, then they are a state actor; if, however, they were enforcing a locally created policy *contrary* to state law, they are acting as a county actor. *Echols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990) ("Defendants created that system and controlled it for the County, not for the State; therefore, in so doing they acted as County, not State, officials. The system they created and controlled violated Texas law; thus, it can scarcely be said to represent

the official policy of the State of Texas") (quoting *Crane v. Texas*, 759 F.2d 412, 432 (5th Cir. 1985), amended on denial of reh'g, 766 F.2d 193 (5th Cir. 1985)).

214.    In addition to the widespread and persistent practice, Defendant Nodolf, in her role as a county policymaker, instituted a policy that officers were to go through her or her assistant district attorney co-conspirators prior to instituting certain arrests. Additionally, they were to act in line with whatever Defendant Nodolf or her co-conspirator assistant district attorneys instructed, regardless of the body of evidence in the case or what additional investigation may be necessary. This was a Midland County custom or policy, not a State of Texas policy. That custom or policy actually ran contrary to Texas law. *See* Tex. Const. art. I, § 9; Tex. Code Crim. Proc. Ann. arts. 1.06, 18.01(b).

215.    In instituting (and repeatedly practicing) this custom or policy, Defendant Nodolf was acting as a policymaker for Midland County.

216.    Moreover, Midland County, by and through the Sheriff's and/or Midland County Commissioners' ratification or delegation of final policymaking authority to Defendant Nodolf, is liable under both formulations of Section 1983 county liability set out in *Turner* and under the ratification theory explained in *Culbertson*.

217.    First, the Sheriff and/or Midland County Commissioners, as final policymakers, "ratified" the unconstitutional or illegal actions of Defendant Nodolf, her co-conspirator assistant district attorneys, and co-conspirator law enforcement officers when they violated the constitutional rights of Midland County residents, including Plaintiffs.

218.    Specifically, the Midland County Commissioners are responsible for adopting and approving Midland County's budget/funding (including for the Midland County DA's Office). Moreover, Texas law designates the Sheriff as the final policy maker for Midland County on matters of law enforcement. *Colle v. Brazos Cnty., Tex.*, 981 F.2d 237, 244 (5th Cir. 1993).

219.    The Sheriff and/or Midland County Commissioners had actual and constructive notice, should have known, and were deliberately indifferent to Defendant Nodolf's extensive history and repeated pattern of participating in investigations prior to probable cause, advising police to make arrests without probable cause, seeking indictments by misleading grand juries, and doggedly pursuing baseless prosecutions, yet continued to approve and increase the Midland District Attorney's Office's budget and provide funding.

220.    Indeed, after review of all of the Commissioners Court agendas and minutes available online, the Midland County Commissioners Court has *never* exercised its supervisory power or even attempted to cease Defendant Nodolf's unconstitutional actions.

221.    Instead, Defendant Midland County, through its Sheriff and/or Commissioners, further sanctioned Defendant Nodolf's law enforcement activities when, upon information and belief, the County purchased a custom bulletproof vest for Defendant Nodolf.[62]

---

    [62] *See* ¶ 118, *supra*.

222. By failing to use its positive law power of review to stop Nodolf from violating Midland Citizens' constitutional rights (including Plaintiffs here), the Sheriff and/or County Commissioners have accepted as a matter of course the decisions of Defendant Nodolf (traditionally a nonpolicy making official). The Sheriff and/or Midland County Commissioners have effectively absolutely delegated final policy making authority for investigations, arrests, and prosecutions in the County to Defendant Nodolf.

223. Additionally, Defendant Nodolf (herself and through co-conspirator law enforcement officers and assistant district attorneys) has a well-known history of malicious prosecutions (and trials), repeatedly making misleading and false statements to grand juries to obtain frivolous indictments despite her knowledge that there was no probable cause to charge for the offense and/or deliberate indifference to the absence of such probable cause. It is so well known that it is a "widespread practice that is so common and well-settled as to constitute a custom that fairly represents" Midland County's policy on investigations, arrests, indictments, and prosecutions.

224. As explained *supra*, although not a Plaintiff here, David Wilson was subject to the familiar series of constitutional violations by Defendant Nodolf: Nodolf personally searched his home without probable cause; Nodolf personally participated in his interrogation prior to an arrest or finding of probable cause by a neutral magistrate; Nodolf personally lied to the grand jury; Nodolf personally obtained a frivolous murder indictment as a delay tactic; Nodolf personally tried Wilson on the frivolous murder indictment when

Wilson called her bluff and refused to ask for a continuance on Nodolf's last-minute charge upgrade.

225.    Following his acquittal, David Wilson petitioned to remove Defendant Nodolf from office. Demonstrating the Commissioner's Court's awareness of and/or deliberate indifference to, the Midland County Judge (a voting member of the Commissioner's Court) even commented publicly saying "Midland County Deserves a Better DA," something plastered in the local Midland news.[63]

226.    Upon information and belief, the Sheriff and all County Commissioners were aware of Nodolf's pattern of violating citizens' constitutional rights at least by the summer of 2022.

227.    Nevertheless, neither the Sheriff nor County Commissioners did anything to stop Defendant Nodolf, her co-conspirator assistant district attorneys, and co-conspirator law enforcement officers' custom, pattern, and practice of unconstitutional behavior prior to Plaintiffs unlawful arrests, indictments, and prosecutions, which were the moving force behind and proximately caused Plaintiffs' harms.

228.    Defendant Midland County at all times relevant to this complaint has maintained policies, customs, or practices that caused and were the moving force behind the violation of Plaintiffs' constitutional rights.

---

[63] Stewart Doreen, *County Judge Terry Johnson: "Midland County Deserves a Better DA,"* Midland Rep.-Telegram, June 10, 2022, *available at* https://www.mrt.com/news/local/article/County-Judge-Terry-Johnson-Midland-deserves-a-17233152.php. (last visited Nov. 26, 2023).

229.    Defendant Midland County's policymakers either directly engaged in or were deliberately indifferent as to said policies, customs, or practices.

230.    Said policies, customs, and practices included a failure to adequately train and supervise Defendant Nodolf and her assistant district attorney co-conspirators in proper scope of participating in law enforcement operations before arrests and findings of probable cause, directing and advising officers on how to proceed in an investigation before a finding of probable cause, presenting truthful constitutionally complete information to grand juries, and prosecuting cases when it is clear probable cause does not exist for arrest, indictment, and/or continued prosecution.

231.    Similarly, Defendant City of Midland is governed by a City Charter, which provides the City Council and Mayor are the governing and lawmaking body for the City.

232.    Like the County Sheriff and Commissioners, the City of Midland has delegated final day-to-day policymaking authority to its (now former) Chief of Police, Seth Herman.

233.    No one at City Hall, including the City Council, Mayor, or City Manager dictates the daily operations of the Midland Police Department, such as who to consult prior to arrest or what information to include in a warrant affidavit.

234.    By failing to exercise their positive supervisory powers, the City Council, Mayor, and City Manager have accepted as a matter of course and custom the decisions of Police Chief Herman on day-to-day policy (such as seeking advice from Defendant Nodolf and allowing her to dictate officers' investigative actions on high profile cases). By abdicating its power of review, the City of Midland absolutely delegated final policy making authority

for investigations and arrests to Police Chief Herman. Indeed, Chief Herman has referred to the pre-arrest practice of consulting Nodolf, even himself describing it as the custom or policy of the Department. This custom or policy was the moving force behind the violation of Plaintiffs' constitutional rights.[64]

235.    Similarly, Defendant City of Midland and Chief Herman were aware of and thereby on notice of a repeated pattern of unconstitutional and unprofessional behavior on the part of Defendants Alonzo and Sharp that resulted in unreliable and untrustworthy investigations and unreliable and untrustworthy sworn testimony before courts.

236.    Defendant City of Midland's claim that Chief Herman could not make policy is disproven by its own documentation that shows both Herman and his lieutenant have changed policy for the department, including Herman's change to policy on responding to alarm calls following the tragedy at David Wilson's house.

237.    Defendant Alonzo's unreliable investigations and testimony have been at the center of numerous criminal cases in Midland that ultimately were dismissed as unfounded and unsupported. These faulty criminal proceedings have wreaked havoc on the lives and constitutional rights of numerous members of the Midland community. Indeed, in

---

[64] PLTF002336 (by Herman: "There is nothing in those cases that we did that did not have the DA's approval or direction on. 100%. Just like with Trinity, especially with everything that's going around Midland Christian at that point, does anybody really think we're gonna go, "You know what? Let's just, let's just ad hoc this one. Let's just go ahead and get warrants, rather than on a two year case, two year old case, mind you, what's the, what's the protocol for us on a two year case is we take it to the DA's office, go, "Hey, look, I'm ... We're just gonna ... " well, I'm assuming we're gonna grand jury this. . . . But instead, they're directed to treat it just like Midland Christian.").

Plaintiffs' criminal trial, Alonzo admitted to directing the seizure of a *different* teacher at a *different* school without probable cause. She ordered other officers to bring him in for questioning (an arrest without probable cause). Later the same day, she ordered him released when surveillance footage proved his innocence.

238.    There is no doubt that the City of Midland knew—or should have known—what was going on with its police department and specifically with Defendant Alonzo's investigations, as there was at least one standing-room-only city council meeting where Midland residents directly called for the City Council to investigate the "weaponization of the law" that led to the arrests of the Midland Christian Five and the Trinity Four.[65]

239.    The City of Midland approved of, was deliberately indifferent to, and/or turned a blind eye to Defendant Alonzo's misconduct. Defendant City of Midland failed to adequately train and supervise Defendant Alonzo in conducting reliable, trustworthy, and reasonably complete investigations and in providing reliable and trustworthy testimony before judicial officers and grand juries.

240.    Defendant City of Midland was aware and thereby on notice of a repeated pattern of unconstitutional and unprofessional behavior on the part of Defendant Alonzo in failing to conduct reliable and trustworthy investigations and in failing to provide reliable and trustworthy testimony before judicial officers.

---

[65] Stewart Doreen, *Blog: Council will evaluate best path regarding review of MPD*, Midland Rep.-Telegram, Nov. 15, 2022, *available* at https://www.mrt.com/news/local/article/Blong-Council-will-evaluate-best-path-regarding-17587555.php?fbclid=IwAR1EhrDuXGMVv9Dt2MvuBII7NBB_w54V2fhH1HjgWYIYAZH_uMjY7zLJD2g (last visited Nov. 27, 2023).

241.     Defendant City of Midland at all times relevant to this complaint has maintained policies, customs, or practices that caused and were the moving force behind the violation of Plaintiffs' constitutional rights.

242.     Defendant City of Midland's policymakers were deliberately indifferent as to said policies, customs, or practices.

243.     Said policies, customs, and practices included a failure to adequately train and supervise officers in conducting reliable and trustworthy investigations and in providing reliable and trustworthy testimony before judicial officers and grand juries.

## 8. Damages

244.     All preceding paragraphs are incorporated herein by reference.

245.     Defendants' actions, both jointly and severally, deprived Plaintiffs of their protected rights under the United States Constitution and federal law.

246.     As a proximate result of Defendants' actions, Plaintiffs have suffered the deprivation of liberty, reputational harm, public humiliation, distress, pain, and suffering for which they are entitled to compensatory damages, including damages for mental and emotional distress.

247.     Additionally, Defendants Nodolf and Alonzo acted with malice and with intentional disregard for Plaintiffs' constitutional rights for which Plaintiffs are entitled to punitive damages. Such damages would assist in deterring and preventing similar conduct in the future.

248.   As a result of Defendants' actions and/or inactions, Plaintiffs seek the following damages, which in the aggregate exceed $1,000,000.00:

    a) Actual damages;

    b) Compensatory damages;

    c) Past and future mental anguish;

    d) Past and future reputational damages;

    e) Past and future lost wages;

    f) Past and future loss of earning capacity;

    g) Attorney's fees and costs in defending the individual Plaintiffs' criminal cases and any other accusations arising from the facts forming the basis of this suit;

    h) Each Plaintiff has retained the services of the undersigned counsel, and claim entitlement to an award of reasonable and necessary attorney's fees under 42 U.S.C. § 1983 and 1988;

    i) Interest;

    j) Court costs;

    k) All other damages, both general and special, at law and in equity, to which Plaintiffs may be justly entitled.

### 9. Punitive Damages Against Defendants Nodolf, Lively, Alonzo, and Sharp

249.   All preceding paragraphs are incorporated herein by reference.

250.   Punitive damages may be awarded in Section 1983 cases when the defendant's conduct involves reckless or callous indifference to the federally protected rights of others.

251.   The widespread and persistent practice of Defendants to arrest first and then investigate and subsequently attempt to cure this error by intentionally misrepresenting

evidence to a grand jury, and then engaging in dilatory tactics to deprive defendants of a speedy trial, demonstrates a callous and reckless disregard to the constitutional rights of Midland residents.

252.    Punitive damages should be awarded to deter future egregious conduct in violation of constitutional rights.

### 10.    Jury Demand

253.    Plaintiffs hereby request a jury trial; the appropriate jury fee has been paid.

### Conclusion & Prayer for Relief

FOR THESE REASONS, Plaintiffs pray upon final trial hereof they recover judgment against Defendants jointly and severally for the damages described above.

Respectfully submitted March 26, 2025:    SELLERS LAW FIRM, PC

/s/ Frank Sellers
**Frank Sellers**
Texas Bar No. 24080305
frank@sellerstriallaw.com
1612 Summit Ave., Suite 200
Fort Worth, Texas 76102
P: 817.928.4222
F: 817.385.6715

-AND-

LAW OFFICE OF ALLISON CLAYTON

/s/ Allison Clayton
**Allison Clayton**
Texas Bar No. 24059587
P.O. Box 64752
Lubbock, Texas 79464
P (806) 773-6889
F (888) 688-6515
E Allison@AllisonClaytonLaw.com

ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2025, I electronically filed the above pleading with the Clerk of Court for the Western District of Texas, Midland-Odessa Division, using the court's electronic case filing system (CM/ECF). Service is completed by CM/ECF's Notice of Electronic Filing, which is automatically generated and sent to counsel of record for all parties to the case.

/s/ Allison Clayton
Allison Clayton