UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| SHELBY HAMMER, ADRIANNE CLIFTON, TODD FREESE, AND CHRYSTAL MYERS, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Cause No. 7:23-CV-158-JKP |
| LAURA NODOLF; MIDLAND COUNTY, TEXAS; CITY OF MIDLAND, TEXAS; JENNIE ALONZO; ROSEMARY SHARP; and JENNIFER LIVELY, | § § § § § § | |
| Defendants. | § | |

**DEFENDANTS LAURA NODOLF AND JENNIFER LIVELY'S MOTION TO DISMISS
PLAINTIFFS' THIRD AMENDED COMPLAINT AND BRIEF IN SUPPORT**

SPROUSE SHRADER SMITH PLLC
Blair Saylor Oscarsson, SBN 24056073
blair.oscarsson@sprouselaw.com
701 S. Taylor, Suite 500 (79101)
P. O. Box 15008
Amarillo, Texas 79105-5008
Tel: (806) 468-3340
Fax: (806) 373-3454

/s/ *Blair Saylor Oscarsson*
Blair Saylor Oscarsson

***Attorneys for Laura A. Nodolf and Jennifer Lively***

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... ii

I.      SUMMARY OF FACTS ...................................................................................... 1

II.     RULE 12(B)(6) STANDARD OF REVIEW ...................................................... 6

III.    ARGUMENT AND AUTHORITIES.................................................................. 8

        A.      Nodolf and Lively are entitled to absolute immunity for all claims related
                to the judicial phase of the criminal process…………………………………8

        B.      Nodolf and Lively are entitled to qualified immunity for claims related to the
                advise they allegedly gave the police…………………………………………11
                .
        C.      Plaintiffs' suit against defendant Jennifer Lively is untimely……………………22

IV.     CONCLUSION.................................................................................................... 23

PRAYER............................................................................................................................. 24

CERTIFICATE OF COMPLIANCE WITH LOCAL RULES ..................................... 25

CERTIFICATE OF SERVICE ...................................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Allen v. Hays*, 65 F.4th 736 (5th Cir. 2023) ................................................................. 23

*Anderson v. Creighton*, 483 U.S. 635 (1987) .............................................................. 12

*Armstrong v. Ashley*, 60 F.4th 262 (5th Cir. 2023) ....................................................... 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 7, 8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 7, 8

*Brown v. Lyford*, 243 F.3d 185 (5th Cir. 2001) ............................................................ 11

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ............................................................. 10

*Burns v. Reed*, 500 U.S. 478 (1991) ........................................................................... 11

*Collins v. Ainsworth*, 382 F.3d 529 (5th Cir. 2004) .................................................... 12

*Cuvillier v. Sullivan*, 503 F.3d 397 (5th Cir. 2007) ....................................................... 7

*Daniels v. Williams*, 474 U.S. 326 (1986) ................................................................... 11

*Davidson v. Cannon*, 474 U.S. 344 (1986) .................................................................. 11

*Franks v. Delaware*, 438 U.S. 154 (1978) ............................................................ 14, 21

*Goodson v. City of Corpus Christi*, 202 F.3d 730 (5th Cir. 2000) ................................ 12

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ........................................................... 11, 12

*Hope v. Pelzer*, 536 U.S. 730 (2002) .......................................................................... 12

*Imbler v. Pachtman*, 424 U.S. 409 (1976) .................................................................... 9

*Kalina v. Fletcher*, 522 U.S. 118 (1997) ................................................................... 9, 10

*Katrina Canal Breeches Litig.*, 495 F.3d 191 (5th Cir. 2007) ........................................ 7

*Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002) .......................................................... 12

*Krupski v. Costa Crociere S. p. A.*, 560 U.S. (2010) .................................................... 23

*L.M.W. v. State*, 891 S.W.2d 754 (Tex. App.—Fort Worth 1994, no writ ) ................... 22

*Malley v. Briggs, (475 U.S. 335 (1986)* ........................................................................ 9

*McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) ................................... 12

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ..................................................................... 12

*Mullenix v. Luna*, 577 U.S. 7 (2015)..................................................................... 12, 22

*Muniz v. State*, 851 S.W.2d 238 (Tex.Cr.App. 1991) ................................................... 13

*Ramsey v. Arrott*, 64 Tex. 320 (1885)........................................................................... 13

*Rhodes v. Prince*, 360 F. App'x 555 (5th Cir. 2010) ...................................................... 7

*Saucier v. Katz*, 533 U.S. 194 (2001) ........................................................................... 12

*Scanlan v. Texas A&M Univ.*, 343 F.3d 533 (5th Cir. 2003).......................................... 8

*Terwilliger v. Reyna*, 4 F.4th 270 (5th Cir. 2021).......................................................... 10

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009).............................................. 8, 9, 10, 11

*Wallace v. Kato*, 549 U.S. 384 (2007) ........................................................................... 22

*Warnock v. Pecos Cnty.*, 116 F.3d 776 (5th Cir. 1997) ................................................. 12

*Wheeler v. Nesbitt*, 65 U.S. 544 .................................................................................... 13

*Williams v. Kaufman Cnty.*, 352 F.3d 994 (5th Cir. 2003) ........................................... 12

**Statutes**

42 U.S.C. §1983.............................................................................................................. 23

**Rules**

FED. R. CIV. P. 12(b)(6) ................................................................................................... 6

Fed. R. Civ. P. 15 (c) .................................................................................................... 22

FED. R. CIV. P. 8(a)(2) ...................................................................................................... 6

TO THE HONORABLE COURT:

COME NOW Defendants Laura Nodolf ("Nodolf") and Jennifer Lively ("Lively") and file this Motion and Brief to Dismiss Plaintiffs' Third Amended Complaint [Doc. 92] pursuant to Federal Rule of Civil Procedure 12(b)(6), and show as follows:

## I.    <u>SUMMARY OF FACTS</u>

This is a federal civil rights case arising from the February 25, 2022, arrest of Plaintiffs Shelby Hammer, Adrianne Clifton, Todd Freese, and Chrystal Myers. Plaintiffs allege that their constitutional rights were violated when they were arrested and indicted without probable cause. Doc. 92.

At the time, Defendant Laura Nodolf served as the Midland County District Attorney, and Defendant Jennifer Lively was an Assistant District Attorney. Defendants Jennie Alonzo and Rosemary Sharp were officers with the Midland Police Department. Lively presented the case to the grand jury and prosecuted it, while Alonzo conducted the investigation and submitted the affidavit supporting the arrest warrants. *Id*.

Plaintiffs were administrators at Trinity Christian School in Midland, Texas, the school attended by twelve-year-old student, BB. *Id*.; Ex. A, D.[1] In the fall of 2019, BB alleged she was sexually groped at school by an older student, TF. *Id*. BB said that TF put his hand down her pants during Spanish class. BB disclosed the incident to a friend, who then reported it to Trinity administrator, Todd Freese. *Id*.

BB's parents met with the school several times in late 2019 and 2020 until the school closed for Covid. Ex. A, B, D. BB returned to Trinity in the Fall semester, but BB's parents

---

[1] In resolving a motion to dismiss, a court may consider documents that a defendant attaches to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the claim. *Armstrong*, 60 F.4th at 272, n.10.

withdrew her from the school within a few days. Ex. A, B, D. Since BB only attended Trinity for a brief time, they requested that Trinity refund the tuition they paid. Ex. A, C, D. Trinity presented BB's parents with a "Waiver and Release" ("Release") agreement in exchange for refunding the tuition. Ex. A, C, D; Doc. 92. BB's parents consulted with an attorney regarding the Release and declined to sign it, believing it prevented the family from talking about anything that would paint Trinity in a negative light, including what TF did to BB at school and Trinity's handling of it. Ex. A, B, C, D.

In 2022, BB's parents called co-Defendant Midland Police Department to report the Trinity administrators' failure to report what happened to BB to CPS. Doc. 92. Midland PD assigned the case to Alonzo. Doc. 92 Alonzo arranged for BB to be forensically interviewed and watched the interview. Ex. A, B, C, D; Doc. 92. The interview was also recorded. Ex. B.

During the forensic interview, BB reported that TF unbuttoned and unzipped her pants in Spanish class, put his hand into her pants, and touched the part of her body doctors would call "vagina." *Id*. at 14:36—17:48. While describing the incident, she pointed to her crotch. *Id*. at 17:23. While this was happening, BB mouthed "help" to another student, but he laughed at her and could not see what was happening under the desk. *Id*. at 12:36; 14:21; 19:25.

After the incident, BB "broke" in the hall and told another friend what occurred. *Id*. at 19:58. That friend reported the incident to Plaintiff Todd Freese. *Id*. at 20:15. Freese called BB into his office, and she reported that she told him "everything" that happened from September through December. *Id*. at 20:52—22:32.

BB said she told Freese about how TF grabbed her in the gym, and Freese said he would review the camera footage. *Id*. at 22:48—31:24. She described how, during the gym incident, TF grabbed her waist, butt, and chest, while she pointed to her breasts. *Id*. She explained that TF felt around her hips and pinched her butt hard. *Id*. She described that she could feel his whole front

on her back and that his hands were hugging, rubbing, and grabbing her chest. *Id*. He was moving his hands up and down on her boobs. *Id*. She could hear his heavy breathing. *Id*. She could feel what a doctor would call his penis on her back. *Id*. at 31:23. He pushed his penis against her. *Id*. at 27:27—27:35. She felt his penis get hard and pushing more against her back while he grabbed her boobs harder, and he breathed harder. *Id*. at 34:58—35:34.

BB reported that she was afraid to do anything because he was 6' 2" and really muscular, the star quarterback, and everyone loved him. *Id*. at 34:05—34:20. She said everyone would believe him and would think she was just a little cheerleader who lies. *Id*. at 34:20—34:35. She was scared that she was going to "go through all that just for no one to believe [her]…" *Id*. at 34:39—34:49.

BB described several other incidents in which TF fondled her and made her touch his penis at school. *See id.*

Following the interview, Alonzo met with BB's parents. Ex. A, C. They explained how they learned about TF's inappropriate touching of BB on December 12, 2019. Ex. C at 1:28—2:42. The parents believed TF was touching BB's rear and encouraged her to fight him off. *Id.* at 2:43—3:26. BB's father emailed Todd Freese to explain that if BB was called into the office for kneeing a boy, he did not want BB to be punished. 3:21—3:49. Mr. Freese did not respond. 3:49—4:11. On about December 17, BB's mother got a call from another parent expressing concern over what had happened to BB at school that day. The parent told BB's mother that BB had been grabbed in the frontal area in Spanish class that day. 4:32-4:39. The parent said that BB, TF, and another student were called into Mr. Freese's office that day. 5;01—5:22.

BB's parents went to the school the next morning to meet with Mr. Freese. 5:48—6:15. They discussed what happened to BB. *Id.* Mr. Freese said that he had interviewed BB, TF, and another boy and would consult the video cameras. 6:17—6:35.

Christmas break came and went. 6:54—7:04. BB's parents contacted Mr. Freese and requested a meeting with Plaintiff Chrystal Myers, head of the middle school. 7:44. The meeting occurred on January 15, 2020. Mr. Freese and Ms. Myers, as well as BB's parents, attended. 8:13—8:22. Freese and Myers said they were still investigating 9:35. BB's mother told Alonzo that by this point Freese and Myers knew that TF had touched BB's "vagina or whatever" over clothes because BB told Freese when she met with him alone in his office in December. 9:42—10:06.

BB's mother reported to Alonzo that two weeks following the January 15, 2020 meeting, she requested a meeting with Plaintiff Shelby Hammer, the headmaster of the school, to discuss the school's lack of a student sexual misconduct policy. 11:10—1:50. During the meeting, Ms. Hammer turned the discussion to what happened to BB. 12:25; 13:09. Plaintiff Adrienne Clifton attended the meeting and took notes. 13:00.

After the January 15 meeting, school was out for snow days, BB got the flu, BB missed a week of school for an activity, the 7th grade class went on a field trip, and then it was March 2020, and Covid hit. 14:28—14:57.

BB returned to Trinity in August 2020. 15:18; 16:34. Upon seeing TF, BB had two panic attacks at school, the second so bad she passed out. 17:05—17:16. BB's parents decided to pull BB out of Trinity in September 2020 after being in school for 4 weeks. 17:20—17:38. BB was diagnosed with PTSD and prescribed medication. 17:58. She started seeing a counselor twice a week.18:16—18:30.

BB's parents requested their tuition money back, and Plaintiff Hammer emailed the parents a "Confidential Waiver and Release of All Claims" ("Release"). Ex. D. The Release proposed to settle all claims among the parents and BB and the school "in any way growing out the Incident, the Student's enrollment, attendance, or participation in or at the School, which

Parents or Student have or might have by virtue of any fact(s), act(s) or event(s) occurring prior to the effective date of this Agreement." *Id*. at 1-2. The "Incident" was described as, "in the 2019-2020 school year, Student encountered unwanted behavior from another student." *Id*.

The Release requested indemnity from the parents:

> indemnify and hold harmless the school from any liability, loss, legal fees, judgments or damages the Released Parties may suffer as a result of claims, lawsuits, causes of action, demands, settlements, costs, or judgments asserted against them by Student or anyone on her behalf at any time in the future concerning, arising out of or related to the Incident or Student's enrollment, attendance, or participation in or at the School. In this regard, Parents agree to indemnify the Released Parties to the fullest and broadest extent permitted by law.

The Release included a requirement that the parents not place the school in a negative light and instruct BB to do the same:

> not in any way disparage, defame, libel, slander, place in a negative light, or in any other way harm or cause others to or attempt to harm the reputation, goodwill or business interests of the School to any persons, including but not limited to current or former parents, students, or members of the media (which includes, but is not limited to, any representatives of any newspapers, television station, radio station, magazines, or other publication), or on any social media sites or other websites, and any other print or electronic media. Parents also agree to instruct Student not to in any way disparage, defame, libel, slander, place in a negative light, or in any other way harm or cause others to or attempt to harm the reputation, goodwill or business interests of the School to any persons, including but not limited to current or former parents, students, or members of the media (which includes, but is not limited to, any representatives of any newspapers, television station, radio station, magazines, or other publication), or on any social media sites or other websites, and any other print or electronic media.

*Id*. at 2. The Release further required BB and her parents to "not disclose the contents of this Agreement to anyone except their attorneys or tax consultants" unless they are served with a subpoena or there is a court order. *Id*.

BB's parents hired a lawyer regarding the Release and ultimately did not sign. 21:59.

In early 2022, several administrators at another school in Midland were arrested, which "triggered" BB. 26:40. BB's parents decided at that time to call the police. 32:51—33:17.

Then Alonzo allegedly met with Nodolf and Lively and told them what she had learned. Doc. 92. Plaintiffs claim that they instructed Alonzo to arrest Plaintiffs without conducting any further investigation. *Id.*

Alonzo prepared affidavits for arrest warrants for the four Plaintiffs and presented them to the Justice of the Peace, who signed the arrest warrants. Ex. D. Plaintiffs were then arrested. Doc. 92.

Lively presented the case to the grand jury, and Plaintiffs were indicted. *Id.*

Plaintiffs proceeded to trial in April 2023. *Id.* During the trial, Alonzo testified that she met with Sharp, Nodolf, and Lively and it was decided that Alonzo would arrest Plaintiffs without any additional investigation. *Id.* The DA's office then dismissed the case, stating Alonzo was no longer a credible witness it was willing to continue sponsoring. *Id.*

Plaintiffs now bring this civil rights case against Nodolf and Lively alleging that they conspired with Alonzo and Rosemary Sharp to falsely arrest Plaintiffs in violation of their constitutional rights. Because Plaintiffs do not state a claim against Nodolf or Lively for violating or conspiring to violate their constitutional rights, they bring this motion to dismiss under Rule 12(b)(6).

## II.    RULE 12(B)(6) STANDARD OF REVIEW

Rule 12(b)(6) allows dismissal if a plaintiff fails ''to state a claim upon which relief may be granted." *See* FED. R. CIV. P. 12(b)(6). Under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* FED. R. CIV. P. 8(a)(2).

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breeches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). To survive the motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should…be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 558)).

A complaint must provide the plaintiffs' grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 553-54.[2] A complaint must, therefore, contain sufficient factual information to state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face when the plaintiff pleads sufficient factual allegations that allow the court to draw reasonable inferences that the defendant is liable for the misconduct alleged. *Id*.

While courts are required to take all factual allegations found in a complaint as true for purposes of a motion to dismiss, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id*. at 678-679 (noting that Rule 8 "does not unlock the doors for discovery for a plaintiff armed with nothing more than conclusions"); *see also Rhodes v. Prince*, 360 F. App'x 555, 558 (5th Cir. 2010) (noting that "legal conclusions must be supported by factual allegations" in order to be entitled to the assumption of truth by the court.

---

[2] The *Twombly* decision arose out of a claim made under the Sherman Anti-Trust Act alleging a conspiracy, in which the Supreme Court determined that a bare assertion of a conspiracy did not suffice to survive a Rule 12 motion to dismiss; the complaint instead must contain sufficient "factual matter" to suggest an agreement was made. *Id*. at 556. Moreover, *Twombly* also stated that allegations at the pleading stage must suggest an agreement, not merely set forth factual allegations sufficient with an agreement. *Id*. at 557

Considering *Iqbal* and *Twombly*, when considering a motion to dismiss a court must first identify the allegations in the complaint that are not entitled to the assumption of truth because the allegations consist of conclusory statements or a formulaic recitation of the elements of a cause of action. *See Iqbal*, 556 U.S. at 678. The second step then requires a court to examine the remaining factual assertions to determine if the allegations suggest a claim for relief. *Id*. The conclusory allegations contained in the Plaintiffs' Third Amended Complaint, like those in *Iqbal* and *Twombly*, are not entitled to assumption of truth for purposes of determining whether the allegations state a claim entitling the Plaintiffs to relief. *See Iqbal*, 556 U.S. at 678.

In addition to the allegations in the complaint, the Court can consider "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Armstrong v. Ashley*, 60 F.4th 262, 272, n.10 (5th Cir. 2023) citing *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). According, Defendants Nodolf and Lively attach their Appendix containing BB's CAC interview (under seal), Alonzo's interview with BB's parents, Alonzo's affidavit in support of the arrest warrants, and the Release Trinity prepared related to the Incident.

### III.    ARGUMENT AND AUTHORITIES

A. <u>Nodolf and Lively are entitled to absolute immunity for all claims related to the judicial phase of the criminal process.</u>

Prosecutors are absolutely immune from "actions that are intimately associated with the judicial phase of the criminal process." *Van de Kamp v. Goldstein*, 555 U.S. 335, 340 (2009). Quoting Chief Judge Learned Hand, the Supreme Court said, "It has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Id*. (cleaned up). When granting absolute immunity to prosecutors accused of eliciting false testimony, suppressing important evidence, and introducing a misleading artist's sketch, the Supreme Court said it must consider "the general common-law concern that harassment by unfounded litigation could both cause a deflection of the

prosecutor's energies from his public duties and also lead the prosecutor to shade his decisions instead of exercising the independence of judgment required by his public trust." *Van de Kamp*, 555 U.S. at 341 *citing Imbler v. Pachtman*, 424 U.S. 409, 416 (1976) (quotations omitted).

> Where § 1983 actions are at issue, the Court said, both sets of concerns are present and serious. The public trust of the prosecutor's office would suffer were the prosecutor to have in mind his own potential damages liability when making prosecutorial decisions--as he might well were he subject to § 1983 liability. This is no small concern, given the frequency with which criminal defendants bring such suits. A defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate, and the substantial danger of liability even to the honest prosecutor that such suits pose when they survive pretrial dismissal. Complex, close, fair-trial questions often would require a virtual retrial of the criminal offense in a new forum, and the resolution of some technical issues by the lay jury. A prosecutor, the Court noted, inevitably makes many decisions that could engender colorable claims of constitutional deprivation. Defending these decisions, often years after they were made, could impose unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials. The Court thus rejected the idea of applying the less-than-absolute qualified immunity that the law accords to other executive or administrative officials, noting that the honest prosecutor would face greater difficulty than would those officials in meeting the standards of qualified immunity. Accordingly, the immunity that the law grants prosecutors is absolute.

*Van de Kamp*, 555 U.S. 341-342 (cleaned up).

In addition, prosecutors are entitled to absolute immunity for activities in connection with the preparation and filing of charging documents. *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997).

> The prosecutor's act in seeking an indictment is but the first step in the process of seeking a conviction. Exposing the prosecutor to liability for the initial phase of his prosecutorial work could interfere with his exercise of independent judgment at every phase of his work, since the prosecutor might come to see later decisions in terms of their effect on his potential liability. Thus, [the Court] shield[s] the prosecutor seeking an indictment because any lesser immunity could impair the performance of a central actor in the judicial process.

*Id.* at 128 (*quoting Malley v. Briggs*, 475 U.S. 335, 341-343 (1986)).

"[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

Prosecutors are also immune from when they "supply legal advice based on the investigators' facts and determine whether "factual criteria [is] sufficient to satisfy probable cause." *Terwilliger v. Reyna*, 4 F.4th 270, 280 (5th Cir. 2021). Furthermore, "supervisory prosecutors are immune in a suit directly attacking their actions related to an individual trial…" *Van de Kamp*, 555 U.S. at 346.

In this case, Plaintiffs allege that Nodolf and Lively conspired with law enforcement to violate their Fourteenth Amendment right to due process by abusing their grand jury powers to secure indictments against citizens[3] when probable cause did not exist by concealing evidence and providing false information. Doc. 92 ¶ 200(b). However, Nodolf and Lively are absolutely immune for their conduct in seeking indictments. Even if Lively, while under Nodolf's supervision, intentionally presented false evidence to the grand jury, both Lively and Nodolf would be absolutely immune. *See Kalina*, 522 U.S. at 128-129; *Van de Kamp*, 555 U.S. at 341; *Imbler*, 424 U.S. at 416; *Buckley*, 509 U.S. at 346.

Plaintiffs further allege "upon information and belief" that Defendants Alonzo, Nodolf, and Lively conspired to present "false information and recklessly mispresented facts" to the grand

---

[3] To the extent Plaintiffs bring claims for "citizens" other than themselves, they lack standing, and those claims should be dismissed. *Anderson v. Valdez*, 845 F.3d 580, 599 (5th Cir. 2016) ("A person may assert a § 1983 claim against anyone who "under color of any statute, ordinance, regulation, custom, or usage, of any State" violates that person's rights under the Constitution (quoting 42 U.S.C. § 1983).

jury, even though Lively, not Nodolf, presented the case to the grand jury. Doc. 92 ¶ 12. And even though Plaintiffs admit that the grand jury proceedings were secret, they allege that Alonzo testified "upon information and belief" "consistently with her sworn affidavit." *Id.*

Assuming Plaintiffs "belief" is correct, and Lively, under Nodolf's supervision, instructed Alonzo to testify falsely, Lively and Alonzo are absolutely immune. Prosecutors are absolutely immune from damages liability for making false or defamatory statements in judicial proceedings as long as the statements were related to the proceeding. *Burns v. Reed*, 500 U.S. 478, 489-490 (1991). Likewise, prosecutors are absolutely immune for eliciting false and defamatory testimony from witnesses. *Id.* Accordingly, the Court should dismiss all claims related to their preparation for and participation in the grand jury proceedings.

B.  Nodolf and Lively are entitled to qualified immunity for claims related to the advice they allegedly gave the police.

Prosecutors are entitled to qualified immunity when giving advice to police during a criminal investigation. *Burns*, 500 U.S. at 495-96; *Van de Kamp*, 555 U.S. at 343. Qualified immunity "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 343 (1986). "That is the balance the courts have struck between compensating wronged individuals for deprivation of constitutional rights and frustrating officials in discharging their duties for fear of personal liability." *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001). Conduct which is merely negligent cannot meet the standard for liability under § 1983. *Daniels v. Williams*, 474 U.S. 326, 331–34 (1986); *Davidson v. Cannon*, 474 U.S. 344, 347 (1986).

Under qualified immunity, a state actor will be shielded from personal liability unless the right the actor violated was clearly established at the time of the violation. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Keenan v. Tejeda*, 290 F.3d

252, 261 (5th Cir. 2002) (citation omitted). This does not, however, require that the "very action in question has previously been held unlawful." *Warnock v. Pecos Cnty.*, 116 F.3d 776, 782 (5th Cir. 1997) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Instead, the Court must consider whether the state of the law at the time of the incident gave the officer fair warning that his actions amounted to constitutional violations. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Qualified immunity is immunity from suit, not a mere defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Therefore, the defense must be evaluated at an early stage of the proceedings. Government officials performing discretionary functions are shielded from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow*, 457 U.S. at 818. Courts must first determine whether the plaintiff has stated a violation of a constitutional right. *Hope*, 536 U.S. at 736; *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1002 (5th Cir. 2003). Even if they have, defendants will be shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Hope*, 536 U.S. at 739; *Williams*, 352 F.3d at 1002.

Once a defendant raises qualified immunity, the plaintiff bears the burden of demonstrating the inapplicability of the qualified immunity defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). To overcome Nodolf and Lively's qualified immunity, Plaintiffs must establish a violation of a "clearly established" constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). Plaintiffs must also show that Nodolf's and Lively's actions were objectively unreasonable. *Collins*, 382 F.3d at 573; *see also Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000).

In this case, Plaintiffs complain that Nodolf, Lively, Alonzo, and Sharp met and that "Alonzo laid out for Defendants Nodolf and Lively her case against the Trinity Four. She then asked how she should proceed. Defendants Nodolf and Lively instructed Defendant Alonzo to arrest Plaintiffs on the felony of failure to report child abuse with the intent to conceal, without conducting any further investigation." Doc. 92 at ¶ 6. It is undisputed that at the time of the alleged meeting, BB had been forensically interviewed while Alonzo watched, and Alonzo had interviewed BB's parents. Doc. 92 at 77. (…the DA's office told you to get the warrants…before talking to any other witnesses…[j]ust take this girl and her mother's word for it, and let's roll?").

Assuming Plaintiffs' allegations regarding the meeting and Nodolf and Lively's instructions are true, Nodolf and Lively are entitled to qualified immunity. Though it is undisputed that Plaintiffs—and all people—have a right to be free from arrest except upon a showing of probable cause, there was no clearly established law in February 2022 that would have informed Nodolf and Lively that probable cause to arrest Plaintiffs did not exist.

"Among the very best definitions given of probable cause [] is that by the supreme court of the United States in *Wheeler v. Nesbitt*, 65 U.S. 544, 24 HOW 544, 16 L. Ed. 765 [(1861)] and which is, "the existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." *Ramsey v. Arrott*, 64 Tex. 320, 323 (1885).

"Probable cause exists when the facts and circumstances within an officer's personal knowledge and of which he has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that, more likely than not, a particular suspect has committed the crime." *Muniz v. State*, 851 S.W.2d 238, 251 (Tex.Cr.App. 1991). Officers should examine cumulative information known to all the officers who cooperated in the arrest in determining whether probable cause exists for the arrest. *See id.*

> When the Fourth Amendment demands a factual showing sufficient to comprise probable cause, the obvious assumption is that there will be *truthful* showing. This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true. It is established law that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter. If an informant's tip is the source of information, the affidavit must recite some of the underlying circumstances from which the informant concluded that relevant evidence might be discovered, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, was credible or his information reliable.

*Franks v. Delaware*, 438 U.S. 154, 164-165 (1978) (emphasis in original) (citations and quotations omitted).

"In [the Fifth Circuit], a law enforcement officer must have assisted in the preparation of, or otherwise presented or signed a warrant application, in order to be subject to liability under *Franks*. If an officer does not present or sign the affidavit, liability attaches only if he helped prepare the complaint by providing information for use in it. The analysis must consider the role played by each defendant." *Terwilliger*, 4 F.4th at 283 (internal citation and quotations omitted). Plaintiffs do not allege that Lively or Nodolf helped prepare the affidavit or provided information for use in it. Instead, Plaintiffs claim that

> Defendants Alonzo and Sharp [] consulted with Defendants Nodolf and Lively and briefed them on the investigation, after which time Nodolf and Lively directed Alonzo to stop her investigation and arrest the Plaintiffs—telling her they could fill in any holes later. A search warrant was executed the same day and then a grand jury subpoena was later issued for the school's records. ***However, at the time of the decision to arrest, the only information known to Defendants Nodolf and Lively was what Defendant Alonzo could have told her***, and that was limited to the CAC interview, the interview of B.B.'s parents, and some documents provided by the parents.

Doc. 92 ¶ 166 (emphasis added).

Plaintiffs allege that Lively and Nodolf conspired with Alonzo to lie to the Justice of the

Peace to get an arrest warrant. They spend pages claiming that Alonzo, spurred on by Nodolf and

Lively, exaggerated or omitted portions of the interviews. That is simply incorrect—Alonzo's

affidavit matches BB's and her parents' interviews and the Release:

| Affidavit Allegation—Ex. D | Evidence |
|---|---|
| MV stated she was sexually assaulted a year and a half ago at Trinity School | "I got sexually assaulted 2 ½ years ago at Trinity during school." Ex. A at 11:24. |
| MV stated incident occurred every other day for four months | "Basically every other day for four months" Ex. A at 11:52. |
| MV stated on Dec. 17, 2019, the suspect was touching her leg in class and moving closer to her vagina. MV stated suspect stuck hand in her pants and touched her vagina over the clothes. | "He started grabbing my leg and he would just, like, keep going closer and closer up…he started to, like, go in my pants." Ex. A at 12:36.<br><br>"He was just like grabbing it and like pulling up and like grabbing really hard." Ex. A at 14:41.<br><br>"Moved his hand into my pants and he, like, started grabbing like on my thigh. And then like, got further down." Ex. A at 15:38.<br><br>"He just like he would not stop." Ex. A at 16:23.<br><br>Doctor would call it "vagina." Ex. A at 17:47. |
| MV stated she shook her head no indicating she wanted suspect to stop but suspect continued despite MV moving away | "I was just like, looking at him, I'll be like 'uh uh' and he'll just keep going." Ex. A at 15:08.<br><br>"I was just like I was bent over working and I was trying to like bend over more so he like, couldn't. But he like unzipped it first." Ex. A at 15:19. |
| MV stated that she mouthed to another student for help but that the other student laughed | "I looked over at someone on the side, and I just looked at them and mouthed to help me, and he just started laughing because he didn't know what was happening." Ex. A at 12:36.<br><br>"I said help me and he just started laughing because he couldn't see anything cause my chair, my chair, was like, turned really turned to each other." Ex. A at 19:25. |

| | |
|---|---|
| MV stated that after class, she broke down emotionally and told a friend who then told the Dean of Trinity School, Todd Freese | "I like broke in the hall, and I like told one of my friends, like what had happened, and like I told him, you can't tell him, and you can't tell anyone. He told my teacher or, no, the dean about what happened and then we had PE together." Ex. A at 19:58. |
| MV stated that the next day she was called to Freese's office and had to explain every detail of what occurred | "I got called into the Dean's office, and he was a male and I sat in there alone with the door shut, talking to him about everything that had happened." Ex. A at 20:52.<br><br>"I just told him, like everything that happened from September to December, and it was like the week before we got out for Christmas break." Ex. A at 21:17<br><br>"At this point, my parents still didn't even know." Ex. A at 22:23. |
| MV identified another incident in the gym when the suspect grabbed her from behind, grabbed her butt, and moved his penis up and down on her back intentionally. MV said suspect was also grabbing her breasts and her private parts over the clothes. | "I had to stay to finish my reps, and he was still up there to finish and whenever I was done, he was like, OK let's go. And he, like, just grabbed me by the waist, so I went behind and then he started grabbing my butt, and then he was just like pushing me, sort of, and he grabbed my chest and I would I just like looked at him like the only way I felt like I could tell him 'no' was like looking at him like with like an angry look." Ex. A at 22:58.<br><br>"He started to like, feel around my hips and like my waist and then I like found them going lower." Ex. A at 24:24.<br><br>"He, like, moved around to behind me and, like, hugged me from behind and then just like started grabbing my boobs from behind. And then he like moved back." Ex. A at 24:49. |
| MV stated the first time something happened was when the pair was leaving Spanish class in which the suspect grabbed MV's butt when she was leaving class. | "We were getting ready to leave Spanish. We all had our books, and we were at the door, and it was sometime in September. And he like grabbed my butt before he walked out the door." Ex. A at 39:14. |
| MV stated that suspect asked via text if he could grab her butt daily and MV agreed but MV stated the conduct escalated from that point forward. | "Then he texted me and he was like, can we make that like a daily thing, and I was like uh sure and because I didn't . . . know what it was." Ex. A at 39:29.<br><br>"He would do that like every single day or every other day and then it started to get like where he would put his hand on my thigh like every class and then like just slowly move it up until the last time." Ex. A at 39:48 |

| | |
|---|---|
| MV stated the first time the suspect tried to put MV's hand on his penis was when she was sitting in Spanish class. Suspect pushed down on MV's hand, and she could feel penis moving. MV stated that suspect's penis was hard. MV stated that she had to rip her hand away from the suspect. | "So, we were sitting in the back of the classroom. It was like 2 desks and then like 4 desks and five and six. And so, we were all in the back. It was just us two… He just like grabbed my hand and he like put it on his lap and then like started moving more towards his penis and he would like push down on my hand and I kind of just like ripped it away." Ex. A at 41:02..<br><br>"It was like hard and weird" Ex. A at 41:55.<br><br>"Happened in Spanish" Ex. A at 42:27.<br><br>"He was like pushing really hard on it, and I just kind of like ripped my hand away." Ex. A at 44:09. |
| MV's mother became aware of inappropriate touching between MV and suspect after reviewing texts on MV's cell phone. | "After I had my meeting with the Dean, my parents were really mad because they had just found out because my mom was going through my phone, she saw something. So, she went up to the school to go tell them, not knowing that I had already talked to the Dean. And so, she was just like, and he told her that he talked to me, and she said you cannot do that alone every again." Ex. A at 1:00:04.<br><br>"I had been reading my daughter's texts on her phone while she was getting ready for a band concert on Thursday, December 12th and was going through her phone as I normally do randomly do and saw that she had confided in a young man about being touched inappropriately and how she didn't know what to do." Ex. B at 1:28. |
| MV's parents notified Freese via email of the inappropriate touching by suspect. | "We went home that night and emailed, Chad emailed Todd Freese, who was the dean of students at the time." Ex. B at 3:21.<br><br>"We laid in bed and wrote an email saying we don't want to divulge his name, the boy's name, but here's what's going to happen. We've given our daughter full permission to hit him. Knee him, do whatever, and she will not get in trouble. And at that point, you you will find out who it is. But this is, this is not, you know, we don't appreciate this behavior. She's going to defend herself. We didn't hear back from that e-mail. That was on a Thursday night at 9:30. We didn't hear back that Friday. We didn't hear all weekend, Monday, nothing, Tuesday." Ex. B at 3:29. |
| Freese claims that he did not receive the email that was sent Dec.12, 2019. | "That first meeting with him, he did say that the reason he never responded to us was because the e-mail never showed up in his inbox. He and I had already emailed |

| | |
|---|---|
| | back and forth before because our son, years before he was he, Mr. Freeze in his first year." Ex. B at 8:24.<br><br>"before all this had happened on Tuesday, you know, we had emailed him. Well, he never got it. He says he never got it. Went to spam and then we had another incident on Tuesday." Ex. B at 9:13. |
| MV's parents found out about the school investigation after speaking with a friend then speaking with MV. | "I got a phone call from a girlfriend of mine and she said, hey, I heard what happened with Baryn and Tristan. And I said, I know we told her that she could, you know, need him, do whatever, and we're not going to tolerate being grabbed on the rear. And she said no today. He grabbed her in the frontal area today in Spanish class. My son was telling me when he got into the car from carpool." Ex. B at 4:32.<br><br>"She said, no, your daughter was called into the office today and so was Tristan because another boy turned Tristan in, so Mr. Freese called them in." Ex. B at 5:01. |
| MV's parents when to Trinity on Dec. 17, 2019, for a meeting with Freese at which Freese told the parents he had interviewed the suspect and MV, that he would look for the camera footage, and that it was a "he said she said situation." | "We discussed everything that had happened. He discussed that he did call Baryn in, and he did call Tristan in and interviewed him. And I felt like at that point, he said that he had admitted to doing it. This was the day after, so he had already kind of spoken to. He said a boy turned him in. He wouldn't tell me who and and we went through all of this, and I was trying to pinpoint dates based on Barron's telling me when it happened. He said OK, well, we've got a video camera in the gym, so we'll try and see if we can look at video. Well, that week was the week before Christmas break. We didn't hear anything." Ex. B at 6:35. |
| MV's mom emailed Shelby Hammer on Jan. 14, 2020, about policies in place for future incidents, and a meeting was set up for Jan 20, 2020. | "I never talked to Shelby Hammer, the head of the school. My parents talked to her about everything that happened." Ex. A at 1:01:12.<br><br>"She knew. She did, but, you know, they didn't tell her for quite some time. They didn't tell her immediately." Ex. B at 27:49. |
| MV's parents met with Chrystal Myers and Todd Freese complaining that Freese had not yet removed the suspect from M's classes and that MV was struggling because of it. At this meeting, MV's parents were told that Hammer did not know about this incident despite MV's mother | "We end up meeting with Chrystal and Todd and we said, you know, what have you all done at this point? Well, we're still investigating. Ok, that's great, but I need, I need my kid and this boy out of the same class." Ex. B at 9:29.<br><br>"They didn't tell her for quite some time. They didn't tell her immediately." Ex. B at 27:49. |

| | |
|---|---|
| having emailed Hamer on Jan. 20, 2020. | |
| On Jan. 22, 2020, MV's mother had an interview with Hammer about the sexual misconduct. Adrianne Clifton was present. | "I meet with Shelby about policy implementation, and she turns it on to, you know, of course the situation." Ex. B at 12:38. |
| Once all students were back at Trinity after COVID, MV did not respond well to seeing the suspect, so the family decided to remove MV from Trinity without any answers from the investigation. | "We go back to school in August. We think everything's gonna be fine. He's in the high school at this point because he's you're older and much larger." Ex. B at 15:18.<br><br>"When they interviewed, they interviewed like 10 boys before they did his punishment, and they called them all out of band and she had her first panic attack." Ex. B at 15:53.<br><br>"She said she had a panic attack so bad that she passed out." Ex. B at 17:16. |
| On Sept. 18, 2020, Hammer sent a "Confidential Waiver and Release of all Claims" to MV's parents. The waiver would allow the parents to receive a portion of the 2021-2022 tuition back but would require them to settle and release all potential claims against the school and would prevent MV from talking about what happened to her. | "We would like our money back, they said fine and then when they emailed us they said OK, we need a formality to e-mail saying that she's leaving. OK, great, we did. She emailed us back with a contract and with a gag order." Ex. B at 19:07.<br><br>"Did it specifically say in the contract not to talk about the incident?" "Yes., Baryn forever would not be allowed to talk about it. We wouldn't be allowed to talk about it, or they could come after us."" Browns, 20:31; "That's what Shelby Hammer sent y'all?" "Yes." Ex. B at 20:42.<br><br>"And it lists in there she's not allowed to discuss this incident? "Yeah." "Yeah, once this is signed, it is done and never to be brought up again." Ex. B at 30:59.<br><br>"The Parents agree that they will not in any way disparage, defame, libel, slander, place in a negative light, or in any other way harm or cause others to or attempt to harm the reputation, goodwill or business interests of the School to any persons. […] Parents also agree to instruct Student not to in any way disparage, defame, libel, slander, place in a negative light, or in any other way harm or cause others to or attempt to harm the reputation, goodwill or business interests of the School to any persons." Ex. C at ¶ 5. |
| If signed, the agreement would allow the parents to receive a | "Thank you for this e-mail. It serves as your formal notice to withdraw Baryn at the end of the school day |

| | |
|---|---|
| portion of the 2021-2022 tuition back but would require them to settle and release all potential claims against the school. | today. As I mentioned to Mrs. Brown when we spoke earlier this week, Trinity is releasing you from the enrollment agreement. Which is what she told me. Yes, we'll let you get out of the contract." Ex. B at 53:27.<br><br>"I attached the waiver and release. She didn't tell me that, so I was I was very blindsided." Ex. B at 53:43.<br><br>"Long contract. Gag order. Can't ever return back to school." Browns, 20:20; "The Parents understand and agree that the School is not committing to enroll or re-enroll Student at any time in the future." Ex. C at ¶ 4.<br><br>"The Parents and Student agree to waive, release, and settle any and all claims and causes of action of any nature whatsoever between the Parents and/or Student and the School and release and forever discharge the School, its Board of Trustees, employees, representatives, attorneys, successors, or assigns ("Released Parties") of and from all and any manner of actions, causes of actions, suits, rights to attorney fees, damages, costs, expenses, compensation, debts, claims and demands whatsoever in law or equity by reason of any matter, cause or thing whatsoever, known or unknown." Ex. B at ¶ 2. |
| MV's parents stated Trinity wanted them to sign the document agreeing they would not come after the school, for the "incident." | "This was kind of a bait and switch. She told me all I needed to do was email her and she'd get a check back to us or she would, you know, get our money back. Well, I didn't realize that there was gonna be strings attached." Ex. B at 21:17.<br><br>"And they started threatening us a little of like, 'We hear rumors about you saying this, saying things, but it could be just the rumor mill.' Well, yeah it is, it's a private school and it's Midland, TX." Ex. B at 22:21.<br><br>"We knew that they were going to retaliate, and that's what we have felt it been. It was a threatening kind of situation." Ex. B at 31:21.<br><br>"She made it very clear that there was no negotiating that was about to happen." Ex. B at 31:34.<br><br>"Parents, collectively and individually, and the School desire to compromise, resolve and settle fully and finally the dispute regarding the tuition obligation and any and all claims between or among them up to the date of this Agreement, including any and all claims |

|  | arising out of the incident, student's enrollment in the School or the Enrollment Agreement, in order to avoid the time, expense and inconvenience attendant upon litigation between them and without admission of liability or wrongdoing of any kind by anyone." Ex. C at p. 1. |
|---|---|
| MV's parents decided not to sign the waiver and did not want to take the right away from MV to talk about what happened to her. | "We're not going to shut our daughter up just because you're going to give us some money." Ex. B at 42:16. |

*Franks* made clear: the arrest warrant affidavit must be truthful but not that every fact recited be necessarily correct. *Franks*, 438 U.S. at 165. A Fourth Amendment violation occurs only when "an officer intentionally, or with reckless disregard for the truth, includes a false statement in a warrant application." *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006) (citing *Franks*, 438 U.S. 154).

> It is clear that *Franks* itself was confined to providing a mechanism for challenging a search warrant that was not supported by probable cause but that, due to the inclusion of deliberately falsified allegations in the warrant affidavit, appeared to be supported by probable cause. The principles of *Franks* have never been applied to facially invalid warrants, and we decline to so extend *Franks* today.

*Kohler*, 470 F.3d at 1114.

Plaintiffs claim that Alonzo's affidavit did not allege probable cause that they intended to conceal the abuse of BB and claim specifically that the Release was not evidence of their intent to conceal. Doc. 92 ¶ 78. They further point to the criminal trial court's exclusion of such evidence. *Id*. at ¶ 86.

Even assuming *Kohler* did not make clear that *Franks* forbids falsifying allegations and not facially invalid warrants, Plaintiffs point to no cases that would have instructed Nodolf and Lively that the Release at issue is not evidence to amounting to probable cause. Instead, the only Texas court addressing the issue before Plaintiffs' trial determined that civil settlement agreements

are admissible as evidence of concealment in criminal trials: "Rule 408 also permits introduction of attempted settlement when such is offered to show an effort to obstruct a criminal prosecution or proceeding." *L.M.W. v. State*, 891 S.W.2d 754, 764 (Tex. App.—Fort Worth 1994, no writ) (overruled on other grounds by *Logan v. State*, 71 S.W.3d 865, 868 (Tex. App.—Fort Worth 2002, pet. ref'd)).

Because there was no case on point to inform Lively and Nodolf that probable cause did not exist—based on BB's CAC interview, BB's parents' interview with Alonzo, and the Release— they are entitled to qualified immunity. *See Mullenix*, 577 U.S. at 13. ("Because the Fourth Amendment area "is one in which the result depends very much on the facts of each case," the officer is entitled to qualified immunity unless a case "*squarely governs*" the case at hand.") (emphasis in original).

### C. Plaintiffs' suit against Defendant Jennifer Lively is time-barred.

The "statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." *Wallace v. Kato*, 549 U.S. 384, 397 (2007). Since Plaintiffs were detained more than two years before they filed suit against Jennifer Lively, their suit is out of time. *See id.*

Plaintiffs were arrested on February 25, 2022. Doc. 92 at ¶¶ 1-2. They were released later that day. Accordingly, Plaintiffs had to file suit on or before February 25, 2024. *See Wallace*, 549 U.S. at 397. Because they did not file their motion for leave to file their Third Amended Complaint, which for the first time names Jennifer Lively as a Defendant, until March 26, 2025, their suit as to Lively is untimely and should be dismissed as time barred.

To the extent that Plaintiffs may argue that their Third Amended Complaint relates back to their Original Complaint, Fed. R. Civ. P. 15 (c) does not apply because Plaintiffs were not mistaken

as to Lively's proper identity when their filed their Original Complaint (or First Amended or Second Amended Complaints). To the contrary, Plaintiffs claimed she was a "co-conspirator" with the named Defendants and called her out by name repeatedly. [Doc. 1] Orig. Compl. at ¶¶ 13, 57, 132, 166-69, 187.

Plaintiffs did not make a "mistake" when determining not to sue Lively until March 26, 2025. "[M]aking a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties is the antithesis of making a mistake concerning the proper party's identity." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 549 (2010). This is not an instance where Plaintiffs knew of two parties and chose to sue the wrong one; instead, Plaintiffs *added* Lively as a party to the case, along with the original Defendants.

Lively is entitled to protection by the statute of limitations and have this case against her dismissed. *See id.* at 550 (The "defendant [is] protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits. A prospective defendant who legitimately believed that the limitations period had passed without any attempt to sue him has a strong interest in repose.) (citation omitted); *see also Allen v. Hays*, 65 F.4th 736, 751 (5th Cir. 2023) (relation back did not apply because the plaintiffs "merely declined to sue the parties despite being aware of their existence").

Therefore, the Court should dismiss the claims against Lively as being filed after the statute of limitations has run.

## IV.    CONCLUSION

Plaintiffs' Third Amended Complaint fails to plead a plausible claim for relief against Nodolf and Lively under 42 U.S.C. §1983. Nodolf and Lively are entitled to absolute immunity for all claims related to the judicial phase of Plaintiffs' criminal case and qualified immunity for

advice they allegedly gave to police. Plaintiffs have failed to overcome that immunity and plead sufficient facts to show that Nodolf and/or Lively violated their constitutional rights. Additionally, Plaintiffs' suit against Lively is time-barred. Accordingly, the Court should dismiss all claims against Nodolf and Lively.

### PRAYER

WHEREFORE PREMISES CONSIDERED, Defendants Laura Nodolf and Jennifer Lively respectfully pray that the Court grant this Motion to Dismiss.

Respectfully submitted,

SPROUSE SHRADER SMITH PLLC
Blair Saylor Oscarsson, SBN 24056073
blair.oscarsson@sprouselaw.com
701 S. Taylor, Suite 500 (79101)
P. O. Box 15008
Amarillo, Texas 79105-5008
Tel: (806) 468-3340
Fax: (806) 373-3454

/s/ *Blair Saylor Oscarsson*
Blair Saylor Oscarsson

**Attorneys for Laura A. Nodolf and Jennifer Lively**

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that on June 26, 2025, I communicated with Plaintiffs' attorneys, Mr. Sellers and Ms. Clayton, regarding perceived deficiencies in the Third Amended Complaint and that I intended to file a motion to dismiss their Complaint under Rule 12(b)(6) if they did not amend the Complaint, or if upon amending, the Amended Complaint was still deficient. Plaintiffs' counsel, Mr. Sellers, communicated that he disagreed that the Third Amended Complaint was deficient.

/s/ *Blair Saylor Oscarsson*
Blair Saylor Oscarsson

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2025, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court. The electronic case filing system will send a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

**Attorneys for Plaintiffs**
Frank Sellers
Westfall Sellers
1612 Summit Avenue, Suite 200
Forst Worth, Texas 76102
Tel: (817) 928-4222
frank@westfallsellers.com

-and-

Allison Clayton
Law Office of Allison Clayton
P.O. Box 64752
Lubbock, Texas 79464
Tel: (806) 773-6889
alllison@allisonclaytonlaw.com

**Attorneys for City of Midland, Texas and Sergeant Jennie Alonzo, and Rosemary Sharp**
William S. Helfand
Norman Ray Giles
Lewis Brisbois Bisgaard & Smith, LLP
24 Greenway Plaza, Suite 1400
Houston, Texas 77046
Tel: (713) 659-6767
bill.helfand@lewisbrisbois.com
norman.giles@lewisbrisbois.com

**Attorneys for Defendant Midland County, Texas**
Max E. Wright
R. Layne Rouse
Shafer, Davis, O'Leary & Stoker
700 N. Grant, Suite 201
P. O. Drawer 1552
Odessa, Texas 79760-1552
lrouse@shaferfirm.com
mwright@shaferfirm.com

/s/ *Blair Saylor Oscarsson*
Blair Saylor Oscarsson